## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| TIM DOYLE, Individually and on Behalf of All Others Similarly Situated,<br><br>                  Plaintiffs,<br>     v.<br><br>REATA PHARMACEUTICALS, INC., J. WARREN HUFF, MANMEET S. SONI, COLIN J. MEYER, R. KENT MCGAUGHY, JR., JACK B. NIELSEN, WILLIAM E. ROSE, WILLIAM D. MCCLELLAN, JR., JAMES E. BASS, JEFFERIES LLC, SVB SECURITIES LLC F/K/A SVB LEERINK LLC, STIFEL, NICHOLAUS & COMPANY, INCORPORATED, ROBERT W. BAIRD & CO., INCORPORATED, LADENBURG THALMANN & CO., INC., CANTOR FITZGERALD & CO., CITIGROUP GLOBAL MARKETS INC., BARCLAYS CAPITAL INC., GOLDMAN SACHS & CO. LLC,<br><br>                  Defendants. | Case No. 4:21-cv-00987-ALM LEAD<br><br>CLASS ACTION |

**LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. iv

TABLE OF DEFINED TERMS ............................................................................................. x

PRELIMINARY STATEMENT ............................................................................................. 1

RESPONSE TO DEFENDANTS' STATEMENT OF THE ISSUES ........................................... 3

STATEMENT OF FACTS ..................................................................................................... 3

    I.    Overview: Reata, Bard, and CARDINAL .................................................................... 3

    II.   FDA Approval, eGFR, and Washout Period .............................................................. 4

        A.    The FDA Approval Process .............................................................................. 4

        B.    Retained eGFR and the Washout Period ........................................................... 5

    III.  Defendants Made Misrepresentations and Material Omissions of Fact About Bard, CARDINAL, and the FDA's Guidance with Respect Thereto ......................................... 6

    IV.  Reata Misled Investors About CARDINAL, Bard, and Reata's FDA Interactions ......... 8

    V.   The Briefing Book Reveals the Truth ........................................................................ 12

        A.    TSUBAKI .................................................................................................... 13

        B.    The FDA's Concerns with the Washout Period and its September 2018— February 2019 Communications and Attempts to Meet with Reata to Discuss CARDINAL Phase 3 .............................................................................. 13

        C.    The FDA's Recommendation to Modify CARDINAL ........................................ 14

        D.    The January 2020 and September 2020 FDA Meetings ...................................... 14

        E.    Reata's Conduct after the January 2020 Meeting Indicates its Awareness of the Import of the FDA's Concerns ....................................................................... 15

NATURE AND STAGE OF THE PROCEEDINGS .................................................................. 15

ARGUMENT ...................................................................................................................... 16

    I.    The CAC Alleges Actionable Misrepresentation and Omissions of Material Fact ........ 16

        A.    The Securities Act Claims Are Not Governed by Rule 9(b) ............................... 16

        B.    All Claims Have Been Pled with Particularity ................................................. 17

1. Defendants' Reliance on Nonpublic Documents Is Improper and Should Be Rejected ................................................................................ 17

2. The Date Defendants First Learned of the FDA's Concerns Is Irrelevant to Whether the FDA Guidance Representations Have Been Pled with Particularity .................................................................... 20

3. The CAC Sufficiently Alleges the Time Period in which the FDA Communicated its Concerns About the Washout Period ............................... 22

   a. The FDA Told Reata, in January and September 2020, that CARDINAL's Four-Week Off-Treatment Measurements Were Insufficient to Support Approval ............................................... 22

   b. The CAC's Allegations with Respect to the 2016-2019 Timeframe Are Sufficiently Particularized ................................................... 23

   c. The TSUBAKI Results Independently Rendered the Washout/Retained eGFR Representations False and/or Misleading ........ 26

4. Defendants' Statements in 2021 Were False and/or Misleading .................... 27

C. Defendants Had a Duty to Disclose the Omitted Information .............................. 28

D. The CAC Does Not Plead Fraud by Hindsight ....................................................... 30

E. The Washout/Retained eGFR Representations and the Bard NDA Representations Are Actionable ......................................................................... 32

F. Defendants' Statements Were Not Forward-Looking and Even If They Were, They Are Actionable ......................................................................................... 36

II. The CAC Sufficiently Alleges Scienter for Purposes of the Exchange Act Claims ....... 38

A. The CAC's Falsity Allegations Support a Strong Inference of Scienter .............. 39

B. The Officer Defendants' Scienter ........................................................................ 40

1. The Officer Defendants' Knowledge and Expertise as to Bard, CARDINAL, and TSUBAKI, and Their Frequent Communications to Investors on those Topics Demonstrate Scienter ........................................... 41

2. The Officer Defendants' Knowledge of Reata's FDA Interactions, and their Frequent Statements on that Topic, Demonstrates Scienter .................. 43

3. The Officer Defendants' Refusals to Comment on FDA Interactions Following Major Negative Events Demonstrates Scienter ........................... 43

ii

4.  Defendants' Linguistic Changes Following the January 2020 Meeting Demonstrate Scienter ........................................................................ 45

5.  Defendants' Omission of the TSUBAKI Results from their Justification Analysis Demonstrates Scienter ........................................................ 46

6.  The Officer Defendants Had Motive and Opportunity .................................. 46

7.  The "Core Operations" Doctrine Strengthens the Inference of Scienter ........ 49

III.  The CAC Adequately Alleges Control Person Liability .................................................. 50

CONCLUSION ............................................................................................................................ 50

## TABLE OF AUTHORITIES

**Cases**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ...................................................................... 47, 48

*Alaska Elec. Pension Fund v. Asar*,
  768 Fed. App'x 175 (5th Cir. 2019) ............................................................ 13, 49

*Alkermes Pub. Ltd. Co. Sec. Litig.*,
  523 F. Supp. 3d 283 (E.D.N.Y. 2021 ........................................................... 30, 40

*Barrie v. Intervoice-Brite, Inc.*,
  397 F.3d 249 (5th Cir. 2005) ............................................................................ 18

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)........................................................................................... 16

*Busic v. Orphazyme A/S*,
  21-cv-3640, 2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ........................... 41, 43, 44

*Callinan v. Lexicon Pharms., Inc.*,
  479 F. Supp. 3d 379 (S.D. Tex. 2020) ........................................................ 31-32, 36

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ............................................................. 38

*City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*,
  21-cv-762, 2022 WL 4491093 (S.D. Cal. Sept. 27, 2022) ............................... 47

*City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*,
  15-cv-374, 2016 WL 6075540 (W.D. Tex. Sept. 16, 2016) ............................. 18

*Corban v. Sarepta Therapeutics, Inc.*,
  14-cv-10201, 2015 WL 1505693 (D. Mass. Mar. 31, 2015) ....................... 24, 29, 33

*Dahhan v. Ovascience, Inc.*,
  321 F. Supp. 3d 247 (D. Mass. 2018) ............................................................. 45

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278 (5th Cir. 2006) ............................................................................ 19

*Frater v. Hemispherx Biopharma, Inc.*,
  996 F. Supp. 2d 335 (E.D. Pa. 2014) ............................................................ 37, 40

*Freudenberg v. E\*Trade Fin. Corp.*,
712 F. Supp. 2d 171 (S.D.N.Y. 2010)...................................................................... 32

*Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ............................................................... 42, 43

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)...................................................................... 29

*Glover v. DeLuca*,
03-cv-0288, 2006 WL 2850448 (W.D. Pa. Sept. 29, 2006) ...................................... 32

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018)...................................................................... 33

*Hatamian v. Advanced Micro Devices, Inc.*,
87 F. Supp. 3d 1149 (N.D. Cal. 2015) ..................................................................... 41

*Immanuel Lake v. Zogenix, Inc.*,
19-cv-01975, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020)...................................... 32

*In re Amarin Corp. PLC Sec. Litig.*,
13-cv-6663, 2016 WL 1644623 (NJ Dist. Ct. Apr. 26, 2016) ................................... 36

*In re Amylin Pharms., Inc. Sec. Litig.*,
01-cv-1455, 2003 WL 21500525 (S.D. Cal. May 1, 2003) ........................... 29, 34, 40

*In re Apache Corp.*,
21-cv-00575, 2022 WL 4277350 (S.D. Tex. Sept. 15, 2022).................................... 34

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010)..................................................................... 49

*In re AstraZeneca Sec. Litig.*,
559 F. Supp. 2d 453 (S.D.N.Y. 2008)...................................................................... 40

*In re BioMarin Pharm. Inc. Sec. Litig.*,
20-cv-06719, 2022 WL 164299 (N.D. Cal. Jan. 6, 2022)......................................... 40

*In re BP P.L.C. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) ...................................................... 17, 42, 43

*In re Cell Pathways, Inc. Sec. Litig.*,
99-cv-725, 2000 WL 805221 (E.D. Pa. June 20, 2000)........................................... 37

*In re CV Therapeutics, Inc., Sec. Litig.*,
 03-cv-03709, 2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ................................... 28, 29, 37, 38

*In re Delcath Sys., Inc. Sec. Litig.*,
 36 F. Supp. 3d 320 (S.D.N.Y. 2014) .................................................................................. 41

*In re Egalet Corp. Sec. Litig.*,
 340 F. Supp. 3d 479 (E.D. Pa. 2018) ................................................................................ 36

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
 258 F. Supp. 2d 576 (S.D. Tex. 2003) ............................................................................... 48

*In re Fibrogen, Inc.*,
 21-cv-2623, 2022 WL 2793032 (N.D. Cal. July 15, 2022) ....................................... 50

*In re Fleming Co. Inc. Sec. & Derivative Litig.*,
 03-md-1530, 2004 WL 5278716 (E.D. Tex. June 16, 2004) ............................................. 16, 41

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
 791 F.3d 90 (D.C. Cir. 2015) ........................................................................................... 38

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
 17-cv-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020) .......................................... 37

*In re JP Morgan Chase Sec. Litig.*,
 363 F. Supp. 2d 595 (S.D.N.Y. 2005) .............................................................................. 23

*In re MannKind Sec. Actions*,
 835 F. Supp. 2d 797 (C.D. Cal. 2011) ...................................................................... *passim*

*In re Medimmune Inc. Sec. Litig.*,
 873 F. Supp. 953 (D. Md. 1995) ....................................................................................... 29

*In re OCA, Inc. Sec. & Derivative Litig.*,
 05-cv-2165, 2006 WL 3747560 (E.D. La. Dec. 14, 2006) ....................................... 50

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
 307 F. Supp. 3d 583 (S.D. Tex. 2018) .............................................................................. 35

*In re Repros Therapeutics, Inc. Sec. Litig.*,
 09-cv-2530, 2010 WL 11583428 (S.D. Tex. Nov. 17, 2010) .................................... 32

*In re Sanofi Sec. Litig.*,
 87 F. Supp. 3d 510 (S.D.N.Y. 2015) ........................................................................... 30, 40

*In re SolarWinds Corp. Sec. Litig.*,
   21-cv-138-RP, 2022 WL 958385 (W.D. Tex. Mar. 30, 2022) .................................................. 42

*In re Venator Materials PLC Sec Litig*.,
   547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................................ 24, 41, 43, 50

*In re Viropharma Inc. Sec. Litig*.,
   21 F. Supp. 3d 458 (E.D. Pa. 2014) ...................................................................................... 37

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
   45 F.4th 1236 (10th Cir. 2022) ............................................................................................. 49

*Johnson v. Riverside Healthcare Sys.,*
   534 F.3d 1116 (9th Cir. 2008) .............................................................................................. 16

*Kleinman v. Elan Corp*.,
   706 F.3d 145 (2d Cir. 2013)................................................................................................... 33

*Lemmer v. Nu-Kote Holding, Inc.*,
   98-cv-161, 2001 WL 1112577 (N.D. Tex. Sept. 6, 2001) ........................................................ 47

*Lewkut v. Stryker Corp.*,
   724 F. Supp. 2d 648 (S.D. Tex. 2010) .................................................................................... 13

*Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*,
   67 F. Supp. 3d 782 (E.D. Tex. 2014)...................................................................................... 49

*Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) ................................................................................................ 19

*Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*,
   238 F.3d 363 (5th Cir. 2001) ................................................................................................ 17

*Lormand v. US Unwired, Inc*.,
   565 F.3d 228 (5th Cir. 2009) .................................................................................... 32, 37, 38

*Mulderrig v. Amyris, Inc*.,
   492 F. Supp. 3d 999 (N.D. Cal. 2020) .................................................................................... 47

*Nathenson v. Zonagen In*c.,
   267 F.3d 400 (5th Cir. 2001) ......................................................................................... 33, 46

*Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
   575 U.S. 175 (2015)................................................................................................................ 34

*Pardi v. Tricida, Inc.*,
   21-cv-76, 2022 WL 3018144 (N.D. Cal. July 27, 2022) ........................................................ 43

*Pierrelouis v. GoGo Inc*.,
   18-cv-4473, 2021 WL 1608342 (N.D. Ill. Apr. 26, 2021)...................................................... 24

*Sanders v. AVEO Pharm., Inc*.,
   13-cv-11157, 2015 WL 1276824 (D. Mass. Mar. 20, 2015) .................................................. 30

*Schueneman v. Arena Pharms., Inc*.,
   840 F.3d 698 (9th Cir. 2016) ............................................................. 28, 31, 36, 40

*Skiadas v. Acer Therapeutics Inc*.,
   19-cv-6137, 2020 WL 4208442 (S.D.N.Y. July 21, 2020).......................................... 37, 45, 46

*Sullivan v. Leor Energy, LLC*,
   600 F.3d 542 (5th Cir. 2010) ............................................................................ 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308, 322 (2007)................................................................................ 38, 48

*Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)............................................................................ 33, 36

*Vallabhaneni v. Endocyte, Inc.*,
   14-cv-01048, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ......................................................... 30

*Wu Winfred Huang v. EZCORP, Inc*.,
   259 F. Supp. 3d 563 (W.D. Tex. 2017)............................................................... 24, 32

*Yan v. ReWalk Robotics Ltd.*,
   973 F.3d 22 (1st Cir. 2020)................................................................................ 29

*Yanek v. Staar Surgical Co*.,
   388 F. Supp. 2d 1110 (C.D. Cal. 2005) ....................................................... 30, 39, 40

*Yellowdog Partners LP v. Curo Group Holdings Corp*.,
   18-cv-2662, 2019 WL 6492651 (D. Kan. Dec. 3, 2019) ........................................... 47, 48, 49

**Rules**

Fed. R. Civ. P. 15................................................................................................. 50

Fed. R. Evid. 201(b)............................................................................................ 19

**Regulations**

21 C.F.R. § 312.21 (2022) ................................................................................................. 4

21 C.F.R. § 312.41(b) (2022) ....................................................................................... 4, 22

21 C.F.R. § 312.47 (2022) ................................................................................................. 5

21 C.F.R. § 314.101(a)(1) (2022) ................................................................................. 5, 24

21 C.F.R. §§ 312.40(b) & 312.42(b)(1)-(2) (2022) ......................................................... 4

C.F.R. §§ 312.20-23 (2022) .............................................................................................. 4

**TABLE OF DEFINED TERMS**

| Term | Definition |
| --- | --- |
| 10-14 Day Washout Representations | Representations that Bard's PD effects took no more than 10-14 days to wash out |
| 2019 Offering | Reata's November 14, 2019 secondary stock offering of 2.76 million shares at $183.00 per share (gross proceeds: $505.1 million), underwritten by the 2019 Underwriter Defendants |
| 2019 Offering Documents | Reata's Shelf Registration Statement, November 13, 2019 Prospectus Supplement, and documents incorporated by reference therein |
| 2019 Underwriter Defendants | Citigroup Global Markets Inc., Robert W. Baird & Co., Inc.; Cantor Fitzgerald & Co.; Jefferies LLC; SVB Securities f/k/a/ SVB Leerink LLC; Ladenburg Thalmann & Co., Inc., and Stifel Nicolaus & Company, Inc. |
| 2020 Offering | Reata's December 1, 2020 secondary stock offering of 2.0 million shares at $140.85 per share (gross proceeds: $281.7 million), underwritten by the 2020 Underwriter Defendants |
| 2020 Offering Documents | Reata's Shelf Registration Statement, December 1, 2020 Prospectus Supplement, and documents incorporated by reference therein |
| 2020 Underwriter Defendants | Barclays Capital Inc. and Goldman Sachs & Co. LLC |
| AdCom Meeting | December 8, 2021 AdCom Meeting to consider the Bard NDA |
| AdCom | The FDA's Cardiovascular and Renal Drugs Advisory Committee |
| Bard | Bardoxolone methyl |
| Bard NDA | Reata's NDA for approval of Bard as treatment for Alport Syndrome, based on CARDINAL data, submitted to the FDA on or about February 25, 2021, accepted for filing on or about April 25, 2021, and rejected by the FDA on or about February 25, 2022 |
| Bard NDA Representations | Representations concerning the filing and status of the Bard NDA |
| BEACON | Reata's Phase 3 trial of Bard as treatment for stage 4 CKD and type 2 diabetes, conducted in 2011-2012 |
| BEAM | Reata's Phase 2 trial of Bard as treatment for stage 3/4 CKD and type 2 diabetes, conducted in 2009-2010 |
| Bergman Declaration | September 7, 2022 Declaration of Craig J. Bergman in Support of Defendants' Joint Motion to Dismiss the Amended Complaint (ECF No. 59) |
| Briefing Book | Report on the Bard NDA, prepared by FDA review staff for the AdCom Meeting and published on December 6, 2021 |
| CAC | Lead Plaintiff's June 21, 2022 Consolidated Amended Complaint (ECF No. 37) |

| | |
|---|---|
| CARDINAL | Reata's integrated Phase 2/3 clinical trial evaluating Bard's efficacy and safety as a treatment for Alport CKD, first announced on November 14, 2016 and conducted between March 2017 and Fall 2020, purporting to measure retained eGFR after a four-week washout period following one and two-years of Bard treatment |
| CARDINAL Phase 2 | Phase 2 of CARDINAL, initiated on March 2, 2017, measuring "retained" eGFR following 48 weeks of treatment and a four-week washout, with results reported in July 2018 |
| CARDINAL Phase 3, year 1 | CARDINAL Phase 3 "retained" eGFR measurements after one year of treatment (48 weeks and four-week washout), collected between August 2018 and Fall 2019 |
| CARDINAL Phase 3, year 2 | CARDINAL Phase 3 "retained" eGFR measurements after two years of treatment (100 weeks and a four-week washout), collected between August 2019 and Fall 2020 |
| CARDINAL Retained eGFR Representations | Representations that CARDINAL's results showed Bard produced a significant eGFR benefit retained after washout |
| CCO | Chief Commercial Officer |
| CEO | Chief Executive Officer |
| CKD | Chronic kidney disease |
| Class Period | November 14, 2016 through December 8, 2021, inclusive |
| CLO | Chief Legal Officer |
| CMO | Chief Medical Officer |
| Director Defendants | James E. Bass, William D. McClellan, Jr., R. Kent McGaughy, Jack B. Nielsen, and William E. Rose |
| DX | Exhibits to Bergman Declaration |
| eGFR | Estimated glomerular filtration rate |
| EOP2 Meeting | An end of phase 2 meeting offered by the FDA "to evaluate the Phase 3 plan and protocols" and ensure their "adequacy" before "major commitments of effort and resources to specific Phase 3 tests are made." 21 C.F.R. §312.47(b)(1). Singled out by the FDA to be of "considerable assistance" to sponsors. *Id*. |
| Exchange Act | Securities Exchange Act of 1933 |
| FDA | U.S. Food and Drug Administration |
| FDA Guidance Representations | Representations that Reata had designed and operated CARDINAL "based on" guidance the FDA provided to Reata specifying: (1) what CARDINAL should study (retained eGFR), (2) how CARDINAL should measure it (after a four-week washout period), and (3) what findings the FDA would accept to support approval (an eGFR improvement retained after a four-week washout) |

| | |
|---|---|
| February 2019 Letter | February 5, 2019 letter from the FDA to Reata–referenced in the Briefing Book and submitted by Defendants in connection with their motion to dismiss (as DX 7)–summarizing prior September 4-5, 2018 communications between FDA and Reata and reiterating offer to meet with Reata |
| GFR | Glomerular filtration rate |
| Huff | J. Warren Huff, Reata's founder and sole CEO and Chairman from 2002 onwards |
| Hume Declaration | November 23, 2022 Declaration of Daniel Hume in Support of Lead Plaintiff's Opposition to Defendants' Joint Motion to Dismiss the Consolidated Amended Complaint |
| IND | Investigational New Drug |
| IND application | Application to FDA to allow clinical testing of drug not yet approved by the FDA |
| Individual Defendants | Officer Defendants and Director Defendants |
| Kyowa | Kyowa Kirin Co., Ltd., a global pharmaceutical company headquartered in Japan, to whom Reata sub-licensed Bard development rights for Asia in 2009, and who thereafter collaborated with Reata in Bard's development pursuant to a December 24, 2009 Exclusive License and Supply Agreement with Reata |
| Meyer | Colin J. Meyer, Reata's CMO from 2013 until July 7, 2020, and Chief R&D Officer from July 7, 2020 until February 7, 2022 |
| NDA | New Drug Application, submitted by sponsors for FDA approval to market a drug |
| Officer Defendants | Huff, Meyer, and Soni |
| Pharmacodynamic ("PD") effects | Biochemical, physiologic, and molecular effects of drugs on the body |
| Prior Study Retained eGFR Representations | Representations that two prior Reata studies – BEAM and BEACON – had demonstrated that Bard produced a significant eGFR benefit retained after washout |
| PX | Exhibits to Hume Declaration |
| R&D | Research and development |
| Retained eGFR | Measurement of eGFR following: (i) cessation of further drug treatment, and (ii) an adequate washout period that allows PD effects to extinguish. If an eGFR improvement is retained after washout, it indicates that treatment has a disease-modifying effect. |
| Securities Act | Securities Act of 1933 |
| Shelf Registration Statement | Reata's July 23, 2018 Form S-3 registration statement, used for the 2019 Offering and 2020 Offering |

| | |
|---|---|
| SMP Letter | December 15, 2016 letter from the FDA to Reata—referenced in the Briefing Book, termed the "December 2016 Advice Letter" in the CAC, and attached as Exhibit 2 to the Bergman Declaration – allowing Reata's IND to become effective and clinical study of Bard as a treatment for Alport Syndrome to proceed |
| Soni | Manmeet Soni, Reata's Chief Financial Officer since August 28, 2019, and Chief Operating Officer since June 2020 |
| TSUBAKI | Kyowa's Phase 2 study of Bard as a treatment for type 2 diabetes CKD, conducted between 2014-2016, with results reported November 2017, which (1) directly measured GFR, and (2) collected serial eGFR off-treatment measurements at four, eight, and twelve weeks after treatment cessation |
| Type B Meeting | Often termed "milestone" meetings, a specific subset of meetings offered by the FDA for the purpose of ensuring sponsor/FDA alignment prior to major sponsor submissions or endeavors, such as IND applications ("pre-IND meetings"), NDAs ("pre-NDA meetings") and Phase 3 trials ("End of Phase 2" or "EOP2 meetings") |
| Underwriter Defendants | 2019 Underwriter Defendants and 2020 Underwriter Defendants |
| Washout Period | The period of time necessary for a drug's PD effects to extinguish following discontinuation of drug treatment |
| Washout/Retained eGFR Representations | Collective term for the (1) 10-14 Day Washout Representations, (2) CARDINAL Retained eGFR Representations, and (3) Prior Study Retained eGFR Representations |
| Wespath/Lead Plaintiff | Court-appointed Lead Plaintiff UMC Benefit Board, Inc., US Equity Fund-P Series, a series of the Wespath Funds Trust, US Equity Index Fund-P Series, a series of the Wespath Funds Trust, Wespath Institutional Investments LLC, US Equity Fund-I Series, a series of the Wespath Funds Trust, and US Equity Index Fund-I Series, a series of the Wespath Funds Trust |

Lead Plaintiff respectfully submits this memorandum of law in opposition to Defendants' Joint Motion to Dismiss the Consolidated Amended Complaint (ECF No. 59).[1]

## PRELIMINARY STATEMENT

This is a class action filed on behalf of purchasers of Reata Pharmaceuticals, Inc. ("Reata") securities between November 14, 2016 and December 8, 2021. The CAC asserts claims under the Securities Exchange Act of 1934 and the Securities Act of 1933 relating to a clinical trial, called CARDINAL, for Reata's lead drug candidate, Bardoxolone ("Bard"), which it was developing to treat Alport Syndrome, a chronic kidney disease ("CKD"). CARDINAL purported to measure Bard's ability to enhance kidney filtration, which is measured by a metric termed estimated GFR ("eGFR"). Specifically, CARDINAL purported to measure whether Bard merely had short-term pharmacodynamic ("PD") effects on kidney filtration or lasting disease-modifying effects. That Bard had the latter effect was key to its approval. To make this determination, CARDINAL was supposed to measure "retained eGFR," which measures eGFR after (i) ceasing drug treatment and (ii) an additional time period sufficient for PD effects to wash out (*i.e.*, the "washout period").

Throughout the Class Period, Reata repeatedly represented that it had designed CARDINAL based on FDA "guidance" specifying how Reata should perform the study and what findings the FDA required for approval. Reata also repeatedly represented that Bard's PD effects washed out within 10-14 days and, as a result, that CARDINAL's measurement of eGFR after a four-week washout period adequately measured Bard's retained eGFR benefits. Investors were therefore shocked when, on December 6, 2021, the FDA released a Briefing Book describing just

---

[1] Unless otherwise noted, (i) all emphasis is added and all internal quotation marks and citations are omitted; (ii) citations to "¶ __" are to the CAC (ECF No. 37); (iii) citations to "D. Br." are to Defendants' Motion (ECF No. 59); (iv) citations to "DX" are to the Bergman Declaration exhibits, filed concurrently with Defendants' Motion; (v) citations to "PX" are to the Hume Declaration exhibits, filed concurrently herewith; (v) capitalized terms not defined herein have the meaning ascribed in the foregoing Table of Defined Terms; and (vi) references to "SOF" are to this memorandum's Statement of Facts, and references to "Section" are to this memorandum's Argument section.

1

the opposite, namely that the FDA had: (i) repeatedly voiced concerns to Reata about the sufficiency of CARDINAL's washout period; (ii) repeatedly asked for meetings with Reata to obtain FDA concurrence on CARDINAL's design, which Reata rebuffed; (iii) told Reata to modify CARDINAL to use a longer washout period; and (iv) told Reata that CARDINAL's data was insufficient for FDA approval. All the while, Defendants had taken advantage of Reata's stock inflation, engaging in (i) four stock offerings that raised over $1 billion during the Class Period and (ii) insider selling by the Officer Defendants and other senior executives.

Following the Briefing Book's revelations, Reata stock declined 38% on the same day. Three days later, the FDA's advisory committee ("AdCom") voted unanimously against Bard's approval, causing Reata's shares to decline an additional 46.5%.

In arguing that the CAC is insufficiently particularized with respect to *when* the FDA communicated its concerns to Reata, Defendants improperly rely upon Reata's cherry-picked, non-public correspondence with the FDA. However, that correspondence only *bolsters* the CAC's allegations because it shows that, contrary to Defendants' representations, the FDA never told Reata that a four-week washout period was adequate to measure retained eGFR. It also confirms that the FDA told Reata, in September 2018 and February 2019, that it no longer concurred with CARDINAL's design, rendering Reata's statements thereafter materially misleading.

Defendants also argue that the CAC pleads "fraud by hindsight," even though the CAC relies on the FDA's firsthand account of what it told Reata during the Class Period as the basis for its allegations. They also claim that Reata's representations relaying the guidance the FDA *had already provided* to Reata were somehow protected "forward-looking" statements rather than statements of historical fact. Additionally, Defendants argue they had no duty to disclose the FDA's concerns about CARDINAL's washout period. Not only is this incorrect, but it ignores that

2

Reata had an independent duty to disclose a different fact—namely, that, as of September 2018, the FDA no longer concurred on CARDINAL's design. Defendants' other argument, that Reata's management was somehow unaware of the FDA's feedback, ignores that management routinely spoke publicly about their FDA interactions in painstaking detail. That management was aware of the positive information conveyed during those interactions and somehow remained unaware of the negative information conveyed during those *very same interactions* is simply implausible.

For these reasons and those discussed herein, Defendants' Motion should be denied.

## RESPONSE TO DEFENDANTS' STATEMENT OF THE ISSUES

1. Should Plaintiffs' claims under the Exchange Act and Securities Act be dismissed for failure to sufficiently allege an actionable misstatement or omission? **Response:** No, the CAC alleges actionable misrepresentations and omissions of material fact. *See* Section I.

2. Should Plaintiffs' claims under the Exchange Act be dismissed on the independent ground that the CAC's allegations fail to raise a compelling inference of scienter? **Response:** No, the CAC sufficiently alleges scienter for purposes of the Exchange Act claims. *See* Section II.

## STATEMENT OF FACTS

### I.    Overview: Reata, Bard, and CARDINAL

Defendant Reata is a biopharmaceutical company headquartered in Plano, Texas. ¶ 3. Defendant J. Warren Huff founded Reata in 2002 and has since served as its CEO and Chairman. ¶¶ 25, 394-95. Defendant Colin J. Meyer was Reata's Chief Medical Officer ("CMO") from 2013 until July 2020 and its Chief R&D Officer from July 2020 to January 2022. ¶¶ 26, 394-95. Reata had fewer than 300 employees until 2021 and fewer than 100 until 2018. ¶ 390.

Reata acquired exclusive licenses for Bard and omaveloxolone ("Omav") in 2004 and focused thereafter on developing these two "lead product candidates." ¶ 59. Bard was Reata's most important product. ¶¶ 60, 387-88. Reata devoted more R&D spending to Bard than any other product candidate, it discussed Bard more than any other candidate, and analysts ascribed more value to Bard than any of Reata's other product candidates. *Id*. Reata frequently stated that its

3

continued existence was "substantially dependent" upon Bard's success. ¶¶ 389, 429.

In 2009, Reata sub-licensed its right to use and develop Bard in Asia to Kyowa pursuant to an agreement requiring Kyowa to provide Reata with "all data collected or analyzed" in any Kyowa clinical studies of Bard and "all study reports analyzing such data." PX 1 at 21.

By 2016, Reata was developing Bard as a treatment for Alport Syndrome, a form of CKD. ¶¶ 58, 63-66, 89. This required FDA approval of a New Drug Application ("NDA") based on a clinical study named CARDINAL. ¶¶ 3, 47-54. CARDINAL, announced on November 14, 2016 and completed in late 2020, purported to measure Bard's effect on "retained eGFR." ¶¶ 5-6, 133.

## II.        FDA Approval, eGFR, and Washout Period

### A.        The FDA Approval Process

FDA approval proceeds via three steps: (1) submission of an Investigational New Drug ("IND") application; (2) testing drug efficacy and safety through human clinical trials; and (3) submission of an NDA, predicated on the trial results. ¶¶ 3, 47-54.

*IND*: The IND application contains safety data and a proposed "protocol" for clinical study. ¶¶ 3, 49; 21 C.F.R. §§ 312.20-23 (2022). INDs become automatically effective after 30 days, unless safety concerns or clear deficiencies in study protocol lead to an FDA "clinical hold" barring testing. PX 2 at 30-32; 21 C.F.R. §§ 312.40(b) & 312.42(b)(1)-(2) (2022). At the sponsor's request, the FDA can provide written "advice" on specific matters relating to an IND (known as a "study may proceed" letter). 21 C.F.R. § 312.41(b) (2022).

*Clinical Trials*: Once the IND is effective, clinical testing proceeds in three phases: (1) "Phase 1" trials establish basic drug parameters, such as dosage, metabolization, and excretion; (2) "Phase 2" trials, performed on a small set of patients, provide preliminary evaluation of efficacy and safety; and (3) "Phase 3" trials, performed on larger populations, generate sufficient data on efficacy and safety to provide a basis for FDA review. ¶ 51; 21 C.F.R. § 312.21 (2022). The three

phases are usually sequential but may also—as here—overlap or be combined. *Id.*

*NDA*: Once trials are complete, the drug sponsor submits an NDA. ¶¶ 52-53. The FDA's acceptance of an NDA for "filing" merely indicates the FDA's "threshold determination that the NDA is sufficiently complete to permit a substantive review." 21 C.F.R. § 314.101(a)(1) (2022). To aid review, the FDA can convene an AdCom of independent subject matter experts. ¶ 53. The AdCom holds a public meeting to consider submissions from the FDA and the sponsor, which are publicly released prior to the meeting. ¶¶ 364-65. The AdCom's recommendations are non-binding; the FDA makes the final decisions on an NDA. ¶¶ 374, 376.

*Sponsor/FDA Meetings*: The FDA provides sponsors opportunities to obtain FDA feedback through formal meetings. ¶ 54; 21 C.F.R. § 312.47 (2022); PX 3 at 1. Of particular relevance here are "Type B" meetings, such as pre-IND meetings and pre-NDA meetings, offered *prior* to major endeavors, used to ensure sponsor/FDA alignment before major sponsor undertakings. ¶ 54; PX 3 at 3. The FDA has singled out one Type B meeting—the End of Phase 2 ("EOP2") meeting, held "before major commitments of effort and resources to specific Phase 3 tests are made" in order "to evaluate the Phase 3 plan and protocols" and ensure their "adequacy"— to be of "considerable assistance" to sponsors. 21 C.F.R. §312.47(b)(1)(i) (2022); ¶ 101.

### B.      Retained eGFR and the Washout Period

*CKD and eGFR*: CKD involves the deterioration of the kidneys' ability to filter waste products from the bloodstream. ¶¶ 55-57. The kidneys' filtering ability, known as "glomerular filtration rate" ("GFR"), is measured by a metric termed estimated GFR ("eGFR"). *Id.*

*Retained eGFR*: A drug that boosts eGFR can indicate efficacy in treating CKD. ¶¶ 71-73. However, reliance on eGFR alone leaves uncertainty as to whether the treatment merely produces short-term PD effects that vanish after treatment ends, or whether the treatment actually slows the decline in kidney function and thus alters the course of the disease (a "disease-modifying effect").

¶¶ 4, 71, 73. Measuring "retained eGFR" resolves this uncertainty by removing PD effects, thus clarifying the remaining effects as disease-modifying. ¶¶ 74-83.

*Washout Period*: Retained eGFR removes PD effects by measuring eGFR after (i) ceasing drug treatment and (ii) waiting for an additional "washout period" sufficient for the drug to cease producing PD effects. ¶¶ 4, 74-83. An eGFR improvement retained after the washout period indicates disease-modifying effects. *Id.* But eGFR measured *before* full washout has occurred will include, and be inflated by, the drug's continuing PD effects. ¶¶ 4, 87-88.

**III.      Defendants Made Misrepresentations and Material Omissions of Fact About Bard, CARDINAL, and the FDA's Guidance with Respect Thereto**

During the Class Period, Defendants repeatedly made the following false or misleading assertions. ¶¶ 132-353.

*FDA Guidance Representations*: Reata repeatedly represented that it had designed and operated CARDINAL "based on" guidance the FDA provided to Reata specifying: (1) what CARDINAL should study (retained eGFR); (2) how CARDINAL should measure it (after a four-week washout period); and (3) what findings the FDA would accept to support approval (an eGFR improvement retained after a four-week washout). *See, e.g.*, CAC Sections V.A.1.a, 2-6, 8, 10-18, 21, and 23. For example:

> The U.S. Food and Drug Administration (FDA) has provided us with guidance that, in patients with CKD caused by Alport syndrome, an analysis of retained eGFR, which is the eGFR change after a four week withdrawal of drug, demonstrating an improvement versus placebo after one year of bardoxolone methyl treatment may support accelerated approval [and] . . . after two years of treatment may support full approval.

¶¶ 5, 135, 201-02.

Reata also claimed the FDA had affirmatively approved CARDINAL's washout period as appropriate to measure Bard's retained eGFR. *See* ¶ 240 ("[T]he FDA . . . indicated that a four-week withdrawal period . . . is appropriate for Bard in the Phase 3 CARDINAL . . . stud[y]").

6

When questioned late in the Class Period as to whether the FDA still stood behind this guidance, Defendants twice represented that nothing had changed. ¶¶ 298-99, 337-38, 348. Specifically, on November 9, 2020, when asked if the FDA still maintained that an eGFR improvement retained "after 4 weeks of withdrawal" could "serve as the basis for approval," Defendant Huff answered: "Yes, that's our impression . . . [T]here has been no indication that they are changing their approach to the endpoints." ¶¶ 298-99. Then, on May 6, 2021, when asked, "how confident are you that you're on the same page with the . . . [FDA] reviewing [Bard] and that you follow[ed] their guidance to a T," Defendant Meyer insisted that Reata had:

> been *transparent with our discussions with the agency* dating back to our pre-IND meeting with Alport syndrome, which we had in 2016. They gave us the design for the Alport syndrome trial, which we've executed . . . And so from our perspective, *the design is what they told us to do*. We've executed it. *We don't believe there is any discrepancies between what they told us to do and what we've executed*.

¶ 337.

The FDA's December 2021 Briefing Book revealed otherwise. *See* Section I.B.2-3. It disclosed that between November 2017 and September 2020, the FDA had retreated from and ultimately abandoned the positions that Defendants had continued to publicly ascribe to it. *Id.*

*10-14 Day Washout Representations*: Defendants repeatedly asserted that Bard wash-out took only 10-14 days. ¶¶ 141-45.[2] However, by November 2017, Kyowa's TSUBAKI study indicated that Bard washout required eight weeks (twice the length of CARDINAL's washout period). *See* SOF V.A.

*CARDINAL Retained eGFR Representations*: Defendants repeatedly asserted that CARDINAL's results showed that Bard produced a significant eGFR benefit retained after washout. ¶¶ 146-48, 247-58, 262, 287-301, 304. Though the numbers reported were correct, they

---

[2] *See* CAC Sections V.A.1.c, 2, 4, 8, 11-13, 19, and 21.

did not measure or represent *retained* eGFR. ¶¶ 128-30, 147. As TSUBAKI showed, valid measurement of retained eGFR required an eight-week washout period. ¶¶ 128-30. By taking eGFR measurements after only four weeks, CARDINAL measured eGFR when Bard's PD effects were still active, rather than "retained" eGFR. *Id*.

*Prior Study Retained eGFR Representations*:[3] Defendants repeatedly asserted that two prior Reata studies—BEAM and BEACON—had already demonstrated that Bard produced a retained eGFR improvement following a four-week washout period.[4] However, while BEAM and BEACON did measure eGFR after a four-week period, Bard required eight weeks to wash out. ¶ 150. Thus, the eGFR measured in BEAM and BEACON was not "retained eGFR" at all. *Id*.

*Bard NDA Representations*: From November 9, 2020 onwards, Defendants made a series of representations concerning the filing and status of the Bard NDA.[5] These representations were misleading because they omitted facts then known by Defendants that (1) were material to evaluation of the Bard NDA and (2) indicated greater risks to its approval than understood in light of Defendants' other misstatements. ¶¶ 153-56, 371(g).

**IV.      Reata Misled Investors About CARDINAL, Bard, and Reata's FDA Interactions**

On October 5, 2016, the FDA held a pre-IND meeting with Reata, during which Reata proposed a Phase 2 study evaluating Bard's efficacy based on eGFR. ¶¶ 96, 160-61, 163-64, 172. The FDA instead suggested that Reata conduct a trial encompassing both Phase 2 and Phase 3 and told Reata that it should utilize *retained* eGFR (not *on-treatment* eGFR) as the key measure of efficacy. ¶¶ 96, 160-61, 163-64. That combined Phase 2/3 study became CARDINAL.

---

[3] The 10-14 Day Washout Representations, CARDINAL Retained eGFR Representations, and Prior Study Retained eGFR Representations are collectively referred to herein as the "Washout/Retained eGFR Representations."

[4] *See, e.g.*, CAC Sections V.A.1.e, 2-4, 8-9, 12-14, 16-21, and 23.

[5] *See* CAC Sections V.A.1.f, 19-23, and 25.

The Class Period began on November 14, 2016, when Reata, in publicly reporting the CARDINAL study (¶¶ 158-64), also made its first FDA Guidance Representations, 10-14 Day Washout Representations, and Prior Study Retained eGFR Representations. *Id.*

On December 15, 2016, the FDA allowed Reata's IND application to become effective and provided Reata with a "study may proceed" letter (the "SMP Letter"). *See* D. Br. at 7-9; DX 2. That letter did not "endorse[]" or "approve[]" a four-week washout period. *See* D. Br. at 8, 30. Rather, it simply notified Reata that the FDA's "safety review" was complete and allowed CARDINAL to proceed with the four-week washout period that Reata proposed. DX 2 at 1-2.

Reata initiated CARDINAL Phase 2 on March 2, 2017. ¶ 172. The first Phase 3 patient was enrolled on August 7, 2017 (¶¶ 191-94), and Phase 3 enrollment was completed "in the second half of 2018." ¶¶ 238, 383. Consequently, collection of Phase 3, year 1 retained eGFR measurements began in August 2018 (and continued until Fall 2019), and collection of Phase 3, year 2 retained eGFR measurements began in August 2019 (and continued until Fall 2020).

On November 4, 2017, Kyowa released the TSUBAKI results. ¶¶ 197-98; SOF V.A; Sections I.B.3.c. Two days later, Reata held an ad-hoc conference call emphasizing how the TSUBAKI results purportedly validated CARDINAL. *Id.* However, Reata concealed that other TSUBAKI data, known to Reata, showed that Bard required eight weeks to wash out. *Id.*

On July 23, 2018, Reata reported CARDINAL Phase 2 results. According to Reata, one year of Bard treatment had produced a substantial eGFR benefit retained after a four-week washout period. ¶¶ 211-18. However, Reata did not disclose that TSUBAKI indicated that a four-week washout period was inadequate to measure Bard's retained eGFR benefits. ¶¶ 117-18, 197-99. Unaware of this undisclosed fact, analysts interpreted Phase 2's results to portend similar success in Phase 3. ¶ 218. Reata's share price increased 65%, or $30.15 per share, that day. ¶ 219.

9

Immediately thereafter, Reata completed a secondary stock offering on July 25, 2018 and sold 3.45 million shares at $72.00 per share for gross proceeds of $248.4 million. ¶¶ 220-21.

On November 11-12, 2019, Reata announced CARDINAL Phase 3's year 1 results. ¶¶ 247-57. According to Reata, one year of Bard treatment had again produced an eGFR improvement retained after a four-week washout period. *Id*. However, Reata again omitted the TSUBAKI results, which indicated that Bard washout took eight weeks, and that, as a result, the FDA had repeatedly expressed concerns about CARDINAL's four-week washout period. *Id.* Reata also omitted that between September 2018 and February 2019, the FDA had repeatedly communicated and sought to meet with Reata to discuss CARDINAL Phase 3, telling Reata that (i) the FDA needed to "ensure alignment" between Reata and the FDA, and (ii) Reata needed to "obtain[] FDA concurrence" that CARDINAL Phase 3 was "adequate and acceptable" to support FDA approval. ¶¶ 101-05, 370; *see also* DX 7 at 1; SOF V.B. Reata also omitted that, during these communications, the FDA had advised Reata to either conduct a separate study to verify Bard's true washout period or to modify CARDINAL Phase 3 to collect additional eGFR measurements after longer periods of washout. ¶¶ 370, 383; Section I.B.3.b.

Unaware of these facts, analysts observed that Phase 3's year 1 results appeared to give the FDA exactly what (Reata said) the FDA needed and concluded that Bard had a high chance of approval. ¶ 258. On November 14, 2019, Reata completed another secondary stock offering and sold 2.76 million shares at $183.00 per share for gross proceeds of $505.1 million (the "2019 Offering"). ¶¶ 259-64, 466-94. The 2019 Underwriter Defendants underwrote that offering, drafted and disseminated the 2019 Offering Documents, and solicited investors to purchase Reata's shares sold pursuant thereto. ¶¶ 36-42, 470-74.

On August 10, 2020, Reata disclosed that it had met with the FDA to explore accelerated

approval based on CARDINAL Phase 3's year 1 data and had been advised to wait for Year 2 data before proceeding with an NDA. ¶¶ 277-81. Reata's share price fell sharply, from $156.20 to $104.41, a one-day decline of $51.79, or 33.2%. ¶¶ 284, 357-60. Although Reata's announcement indicated that something might be amiss with the FDA, it did not reveal anything close to the full picture, including that *seven months earlier*, in a January 2020 meeting, the FDA had again expressed concern with CARDINAL's washout period and hence, the validity of its "retained" eGFR results. *See* SOF V.D; Section I.B.3.a. Unbeknownst to investors, it was this concern that led the FDA to disagree with Reata's pursuit of accelerated approval. ¶¶ 106-07.

On November 9, 2020, Reata announced CARDINAL Phase 3's year 2 results. ¶¶ 287-301. According to Reata, those results showed that two years of Bard treatment produced an eGFR improvement retained after a four-week washout. ¶¶ 288-99. Reata also announced its intention to submit an NDA for Bard approval. *Id*. Analysts again observed that these results appeared to give the FDA exactly what (Reata said) it needed. ¶ 300. Reata's share price jumped 32.4% (up $42.77 per share) that same day. ¶ 301. Reata executives, including Huff and Meyer, along with Reata's CCO and CLO, thereafter (uncharacteristically) sold a large number of Reata shares, generating proceeds of over $50 million. ¶¶ 419-27.

Thereafter, on December 1, 2020, Reata completed another secondary offering, selling 2 million shares at $140.85 per share (the "2020 Offering"). ¶¶ 302-06, 495-525. The 2020 Underwriter Defendants underwrote that offering, drafted and disseminated the 2020 Offering Documents, and solicited investors to purchase the shares issued pursuant thereto. ¶¶ 43-44, 502.[6]

Reata submitted the Bard NDA in February 2021, which the FDA accepted for filing on

---

[6] The Director Defendants signed and/or authorized the signing of the Shelf Registration Statements for the 2019 and 2020 Offerings. ¶¶ 30-35. Given their omission of the above facts, the 2019 and 2020 Offering Documents were negligently prepared by Reata, the Individual Defendants, and the Underwriter Defendants (¶¶ 467-75, 496-503), and contained untrue statements of material fact and omitted material facts indicating their falsity. ¶¶ 476-92, 504-25.

April 26, 2021. ¶¶ 319, 325. The FDA convened an AdCom and scheduled a hearing for December 8, 2021 (the "AdCom Meeting"). ¶ 12. On August 9, 2021, Reata disclosed four "review issues" flagged by the FDA, prompting a second decline in Reata's share price, from $122.13 to $100.00. ¶¶ 340-48, 361-63.[7] Reata again omitted the FDA's concerns about CARDINAL's inadequate washout period and the inability of its results to support FDA approval. ¶¶ 342, 345-46.

## V.        The Briefing Book Reveals the Truth

The FDA prepared the Briefing Book for the AdCom, setting forth the FDA's evaluations of CARDINAL, and publicly released it on December 6, 2021, three days prior to the AdCom Meeting. ¶ 365. The Briefing Book presented a radically different account of CARDINAL's progress than the one Reata had provided (*see* Sections I.B.2-3), revealing that:

1        Although TSUBAKI had demonstrated, in November 2017, that Bard took eight weeks to wash out, Reata had continued to use a four-week washout period for CARDINAL's Phase 3 "retained" eGFR measurements collected between 2018 and 2020 (¶¶ 114-25);

2        Accordingly, CARDINAL's apparent success (based on measuring eGFR halfway through Bard's washout period) had been a mirage, and, in reality, CARDINAL had not measured or provided *any* evidence of Bard's retained eGFR benefit (¶¶ 128-30, 147, 367-69); and

3        *The FDA had spent the prior four years warning Reata of the existence and importance of this exact issue and had advised Reata to modify CARDINAL's design to correct it.*[8]

The market immediately reacted. On December 6, 2021, Reata's share price fell 37.8%, from $78.69 to $48.92 (a $29.77 drop). ¶ 372. Two days later, on December 8, 2021, the AdCom voted unanimously that CARDINAL had not demonstrated Bard's efficacy and that it had not been adequately designed to do so. ¶¶ 373-75. In response, Reata's share price fell $25.31 (46.5%) on December 9, 2021. ¶ 375. The FDA rejected the Bard NDA on February 25, 2022. ¶ 376.

---

[7] The four review issues were: (1) interpretation of CARDINAL's *on-treatment* eGFR results (*i.e.*, not *retained* eGFR); (2) arcane statistical issues (specifically, use of treatment duration as a covariate in statistical analyses of CARDINAL data); (3) COVID-19's impact on CARDINAL; and (4) FDA concerns that many of CARDINAL's retained eGFR measurements had been taken following washout periods *shorter* than four weeks. ¶¶ 341-45.

[8] ¶¶ 94-113, 370; DX 25 at 10-11, 39-40; DX 26 at 5; DX 27 at 139-40.

A.    **TSUBAKI**

Kyowa and Reata publicly reported certain results from a Phase 2 study of Bard, TSUBAKI, in November 2017. ¶ 118. TSUBAKI's headline result (its "primary endpoint") confirmed Bard's effects as measured by *actual* GFR. ¶¶ 118, 198; *see also* PX 4 at 4-5; PX 5 at 14, 19.[9] However, the Briefing Book revealed that TSUBAKI also included retained eGFR measurements after washout periods of four, eight, and twelve weeks, which showed that Bard took eight weeks to wash out. ¶ 117; DX 25 at 44; *see also* PX 6 at 13 (visibly demonstrating this result). While the slides used in Reata's November 6, 2017 TSUBAKI presentation referenced the existence of these off-treatment measurements (*see* PX 5 at 14), the measurements themselves, and what they indicated, were not publicly reported until the Briefing Book's release. ¶ 118.

B.    **The FDA's Concerns with the Washout Period and its September 2018—February 2019 Communications and Attempts to Meet with Reata to Discuss CARDINAL Phase 3**

The Briefing Book describes how "following submission of the IND in 2016, the Agency repeatedly voiced concerns about the time-course for resolution of . . . [Bard's PD] effect on creatinine/eGFR following discontinuation of treatment" DX 25 at 39. It also describes how, between September 2018 and February 2019, the FDA repeatedly sought to meet with Reata to discuss CARDINAL Phase 3, indicating that the FDA no longer concurred with Phase 3's design:

> In September 2018, FDA encouraged the Applicant to request an end-of-phase 2 meeting to discuss the development program and ensure alignment. The Applicant declined, noting that they were running a phase 2/3 trial and were "not seeking input from the Division on the program at this time." In follow-up correspondence sent in February 2019, the Division emphasized the importance of obtaining FDA concurrence that a study intended to support a marketing application was adequate and acceptable for this purpose . . . and reiterated its offer to meet with the Applicant to discuss the development program and a path forward.

---

[9] The Court may take judicial notice of PX 1-6, which are publicly available FDA documents and SEC filings. *See Alaska Elec. Pension Fund v. Asar*, 768 Fed. App'x 175, 180 n.25 (5th Cir. 2019) (SEC filings); *Lewkut v. Stryker Corp.*, 724 F. Supp. 2d 648, 653 n.1 (S.D. Tex. 2010) (publicly available FDA documents).

DX 25 at 39; ¶¶ 101-05, 370.

The FDA's February 5, 2019 letter to Reata, annexed to Defendants' Motion (but not previously available to the public) (the "February 2019 Letter"), reveals that the FDA contacted Reata on September 4, 2018 to recommend that Reata request an EOP2 meeting to discuss Phase 3. ¶¶ 101-02, 227; DX 7 at 1. After Reata declined to follow that recommendation, the FDA contacted Reata the next day, reiterating that "an EOP2 meeting would be beneficial to ensure we are aligned as you proceed with your development program." DX 7 at 1. On February 5, 2019, the FDA again wrote Reata, reiterating that Reata should meet with the FDA "to discuss . . . [its] development program and a path forward," and "encourag[ing]" Reata "to obtain FDA concurrence that . . . [its] study intended to support a future marketing application . . . [was] adequate and acceptable for this purpose." DX 7 at 1; ¶ 104.  Reata ignored this request.

### C.      The FDA's Recommendation to Modify CARDINAL

The Briefing Book further revealed that after "repeatedly voic[ing] [its] concerns" about CARDINAL's washout period, the FDA "ultimately recommended that [Reata] conduct a separate study to characterize the time course for resolution of . . . [Bard's PD] effect *or modify CARDINAL Phase 3 to obtain the information (i.e., revise the protocol to include additional off-treatment eGFR measurements)*." ¶ 370. In other words, the FDA told Reata to either do a new study to determine Bard's true washout period or modify CARDINAL by adding measurements of eGFR after longer periods of washout.

### D.      The January 2020 and September 2020 FDA Meetings

Finally, the Briefing Book revealed that, in January and September 2020 meetings, Reata:

> met with Agency to discuss submission of an NDA for . . . [Bard] under the accelerated approval pathway based primarily on the Year 1 data on eGFR from CARDINAL Phase 3. The Division *did not agree with the proposed approach*, *voicing concerns about the interpretability of the eGFR findings given the available information on the time course for resolution of . . . [Bard's PD] effect . . .*

14

¶ 370; DX 25 at 39. In other words, the FDA told Reata that CARDINAL's washout period lacked adequate basis and that the validity of CARDINAL's "retained eGFR" data was in doubt.

E.    **Reata's Conduct after the January 2020 Meeting Indicates its Awareness of the Import of the FDA's Concerns**

As the Briefing Book reported, Reata entered its January 2020 FDA meeting seeking Bard's accelerated approval but exited understanding that approval, no matter the timeline, was in serious jeopardy. *See* Section I.B.3.a. Two changes in Reata's conduct after this meeting show that Reata understood the importance of the FDA's January 2020 comments.

*First*, Defendants Huff and Meyer, previously voluble concerning Reata's interactions with the FDA, suddenly refused to provide any commentary, hiding behind a so-called "policy" that, prior to January 2020, they had *not once* invoked in connection with Reata's FDA interactions regarding CARDINAL. ¶¶ 266, 401-08. Their newfound reticence ensued for seven months, including during Reata's February 19 and May 11, 2020 conference calls. *Id.*

*Second*, on August 10, 2020, at the same time their voice returned (¶¶ 277-81), the term "*retained eGFR*" *vanished from Reata's SEC filings*, replaced with "eGFR during the off-treatment period," which did not present the same claim that eGFR improvement was *retained* after washout. ¶¶ 285-86, 409-13. Moreover, when Huff and Meyer resumed speaking about Reata's FDA interactions, they mischaracterized the January 2020 dispute as one about procedure and timing, rather than substance. ¶¶ 277-81. Even so, Reata's share price fell, as the market feared (correctly) that undisclosed *substantive* stumbling blocks might also be in play. ¶¶ 284, 357-60.

## NATURE AND STAGE OF THE PROCEEDINGS

This putative securities class action was commenced on December 20, 2021, against Defendants Reata, Huff, and Soni. *See* ECF No. 1. On April 22, 2022, the Court consolidated related actions and appointed Wespath as Lead Plaintiff. *See* ECF Nos. 33, 34. On June 21, 2022,

Wespath filed the CAC, asserting Exchange Act claims against Reata and the Officer Defendants, as well as Securities Act claims relating to the 2019 and 2020 Offerings against Reata, the Officer Defendants, the Director Defendants, and the Underwriter Defendants. *See* ECF No. 37. On September 7, 2022, Defendants filed their Motion. *See* ECF No. 59.

## ARGUMENT

### I.     The CAC Alleges Actionable Misrepresentation and Omissions of Material Fact

#### A.     The Securities Act Claims Are Not Governed by Rule 9(b)

"[T]he heightened pleading standards of . . . [Rule] 9(b) do not apply" to Securities Act claims. *In re Fleming Co. Inc. Sec. & Derivative Litig.*, 03-md-1530, 2004 WL 5278716, at *44 (E.D. Tex. June 16, 2004). Only a "short and plain statement" of the claim under Rule 8(a) is required. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570-73 (2007). "This is not an onerous burden. 'Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests.'" *Johnson v. Riverside Healthcare Sys.,* 534 F.3d 1116, 1122 (9th Cir. 2008).

Here, Defendants incorrectly argue that the Securities Act claims are subject to Rule 9(b) because they are "substantively identical" to the Exchange Act claims and thus "sound in fraud." D. Br. at 22-23. But the CAC does not even allege Exchange Act claims against the Director or Underwriter Defendants (*see* CAC Section V.II.), and Reata and the Officer Defendants' Securities Act liability is premised upon strict liability and negligence, not fraud.[10] Leaving no room for misunderstanding, the CAC (i) pled the Securities Act allegations in an entirely separate section (*see* CAC Section V.III.), (ii) "expressly disavow[ed] and disclaim[ed] any allegations of fraud,

---

[10] *See, e.g.*, ¶¶ 531, 567, 569 (Reata, as "registrant and issuer of the common stock," is "strictly liable" for registration statements containing "materially inaccurate statements"); ¶¶ 475, 503, 533, 560-62, 571, 597-600 (the Officer Defendants violated the Securities Act by "sign[ing] the Shelf Registration Statement[s]" and/or "control[ing] the contents and dissemination" of offering documents containing untrue statements).

scheme or intentional conduct," in connection with those claims (¶¶ 464, 529, 545, 556, 567, 583, 594), and (iii) explicitly stated that any allegations supporting the Exchange Act claims were incorporated into the Securities Act allegations "only to the extent that . . . [they] d[id] not allege fraud, scienter, or the intent . . . to defraud." ¶¶ 464, 527, 543, 554, 565, 581, 592.

Where a complaint "expressly . . . disavows and disclaims any allegation of fraud," and instead "avers that . . . [defendants] made untrue statements of material facts and omitted to state material facts" in violation of the Securities Act, such allegations "do not 'sound in fraud' and cannot be dismissed for failure to satisfy Rule 9(b)." *Lone Star Ladies Inv. Club v. Schlotzsky's, Inc.*, 238 F.3d 363, 369 (5th Cir. 2001). In any event, the CAC's Securities Act allegations, like its Exchange Act allegations, are sufficiently particularized to satisfy Rule 9(b).

**B.      All Claims Have Been Pled with Particularity**

To comply with Rule 9(b) and the PSLRA, a plaintiff must: "(1) specify each statement alleged to have been misleading; (2) identify the speaker; (3) state when and where the statement was made; (4) plead with particularity the contents of the false representation; (5) plead with particularity what the person making the misrepresentation obtained thereby; and (6) explain the reason or reasons why the statement is misleading, *i.e.*, why the statement is fraudulent." *In re BP P.L.C. Sec. Litig.*, 843 F. Supp. 2d 712, 746 (S.D. Tex. 2012). "What constitutes particularity will necessarily differ with the facts of each case." *Id.*

Taking issue with the last requirement, Defendants claim the CAC fails to explain, with the requisite particularity, why each statement was false or misleading, because it does not identify the exact date Reata first learned of the FDA's concerns regarding the washout period.

**1.      Defendants' Reliance on Nonpublic Documents Is Improper and Should Be Rejected**

The CAC's falsity allegations are largely based on the Briefing Book, which, prior to the

17

filing of Defendants' Motion, contained the only publicly available, firsthand accounts of the FDA's communications with Reata. Defendants *do not* dispute that the Briefing Book observes that the FDA "repeatedly voiced concerns" to Reata about CARDINAL's washout period. ¶¶ 14, 97. Rather, to avoid this inconvenient fact, and to call into question the timeframe in which those communications occurred, Defendants point to two nonpublic communications in which the FDA did not appear to express concern about the washout period. In doing so, Defendants raise factual disputes that must be resolved in Lead Plaintiff's favor.[11] Defendants' reliance on DX 2 (the SMP Letter) and DX 7 (the February 2019 Letter) is improper. While those documents were referenced in the Briefing Book, they were not, and could not have been, incorporated by reference into the CAC because they were not publicly available, or otherwise available to Lead Plaintiff, until Defendants annexed them to their Motion. *See* Hume Declaration ¶ 3. For the following reasons, the Court should strike DX 2 and DX 7 and disregard references thereto in Defendants' Motion.[12]

*First*, Defendants distort the standards applicable to determine whether DX 2 and DX 7 were incorporated by reference and/or whether they are the appropriate subject of judicial notice. Defendants state, "[w]*ith certain exceptions discussed separately below*, the exhibits to the Bergman Declaration consist of documents expressly relied upon in the CAC and/or relevant SEC filings or earnings call transcripts." D. Br. at 6 n.2. DX 2 and DX 7 are the "exceptions." For these exhibits, Defendants improperly ask the Court to take a significant step beyond the black-letter law and consider the CAC's second-level references to these nonpublic documents as an incorporation by reference. Defendants' authorities are inapt; those cases did not involve situations

---

[11] *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 257-58 (5th Cir. 2005); *City of Pontiac Gen. Emps.' Ret. Sys. v. Dell Inc.*, 15-cv-374, 2016 WL 6075540, at *4 (W.D. Tex. Sept. 16, 2016).

[12] Lead Plaintiff does not oppose Defendants' request to judicially notice the remaining exhibits, including publicly available SEC filings and analyst call transcripts, which were referenced in the CAC.

where, on a Rule 12(b)(6) motion, a court considered documents, proffered by a defendant, that were neither publicly available nor in the plaintiff's possession. *See* D. Br. 24 at n. 5.[13]

*Second*, courts routinely determine that judicially noticing a document for the existence of a document *does not* mean that the truth of the statements therein should be assumed. *See* Fed. R. Evid. 201(b); *see also Chuttoo v. Horton*, 20-cv-211, 2022 WL 4100807, at *7 (E.D. Tex. Sept. 7, 2022). Thus, even if DX 2 and DX 7 could be judicially noticed, Defendants' reliance thereon would be improper. For example, Defendants argue that the February 2019 Letter "requests only that Reata submit a 'written response to the comments' in the earlier SMP Letter, *none of which had anything to do with the adequacy of the washout period*." D. Br. at 24 (citing DX 7) (emphasis in the original). Defendants urge the Court to make a factual inference from this nonpublic document to explain away that the FDA "repeatedly voiced concerns" about CARDINAL's washout period. ¶¶ 14, 97. But Defendants are not entitled to a trial on the merits at the pleading stage. *See Lone Star Fund V (U.S.), LP v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010).

*Finally*, Defendants improperly cherry-picked their nonpublic communications with the FDA, selecting two communications they believe help their cause, while choosing not to annex many other communications referenced in the Briefing Book, let alone all communications between Reata and the FDA relating to Bard and CARDINAL. For example, Defendants did not annex communications with the FDA from (i) September 2018, (ii) January 2020, and (iii) September 2020, which also were referenced in the Briefing Book. Defendants cannot use the PSLRA discovery stay (*see* 15 U.S.C. § 78u-4(b)(3)(B)) as both a sword and shield at the pleading

---

[13] For example, in *Sullivan v. Leor Energy, LLC*, 600 F.3d 542 (5th Cir. 2010), the Fifth Circuit cautioned, in an employment contractual dispute, that "the district court generally 'must not go outside the pleadings'" (*id.* at 546), but that consideration of the last version of the draft employment agreement which gave rise to the litigation was appropriate. Likewise, in *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278 (5th Cir. 2006), the Fifth Circuit expressly disallowed reliance on an expert declaration at the pleading stage, but generally found that district courts could "rely on matters of public record." *Id.* at 286.

stage. Lead Plaintiff submits that discovery of all communications regarding how "the Agency repeatedly voiced concerns" to Reata is appropriate and will inform whether Defendants materially misled investors about its interactions with the FDA relating to Bard and CARDINAL. ¶¶ 97, 370.

### 2. The Date Defendants First Learned of the FDA's Concerns Is Irrelevant to Whether the FDA Guidance Representations Have Been Pled with Particularity

As discussed below, the date Reata first learned of the FDA's concerns about CARDINAL's washout period is irrelevant to whether the FDA Guidance Representations have been pled with particularity. In any event, as discussed in Section I.B.3, the CAC alleges the timeframe in which the FDA's concerns were communicated with the necessary particularity.

Defendants represented, throughout the Class Period, that Reata: (i) had obtained "guidance" from the FDA in 2016 that "an analysis of retained eGFR" could support Bard's approval; (ii) had designed CARDINAL "based on" that guidance; (iii) was operating CARDINAL in accordance with that guidance; and (iv) that the guidance had remained unchanged throughout CARDINAL's duration. ¶¶ 5, 133-36, 202, 298, 337.

However, the Briefing Book and the February 2019 Letter demonstrate that on September 4, 2018, the FDA began urging Reata to attend an EOP2 meeting to ensure "alignment" on Phase 3 and to "obtain FDA concurrence" that Phase 3 was "adequate and acceptable" to support FDA approval of Bard. DX 7 at 1; DX 25 at 39 n.2. These communications indicate that, regardless of what it told Reata in 2016, by September 2018, the FDA *no longer concurred* with Phase 3's design, rendering Defendants' FDA Guidance Representations thereafter false and/or misleading.

As Defendants themselves point out, CARDINAL was designed as an integrated Phase 2/3 trial. *See* D. Br. at 11-12. Consequently, the FDA had already "evaluat[ed] the Phase 3 plan and protocols" during the IND review process in 2016. *Id.*; *see also* DX 2 at 1. Thus, unless *something had changed* in the interim, an EOP2 meeting to "obtain concurrence" on Phase 3's design should

20

have been unnecessary. *See id. That the FDA repeatedly urged Reata to attend an EOP2 meeting anyway, necessarily implies that something, in fact, had changed.*

Defendants proffer an alternative reading of the September 2018 and February 2019 communications that simply does not make sense. *See* D. Br. at 11-12. According to Defendants, these communications were mistaken form letters, only issued because the FDA had forgotten that CARDINAL was a Phase 2/3 trial, and, thus, that an EOP2 meeting was unnecessary. *See id.* This is implausible given that it was the FDA that suggested CARDINAL's integrated Phase 2/3 design in the first place. ¶ 89. Moreover, Reata reminded the FDA that it was "running a Phase 2/3 trial" when it declined the FDA's *first* invitation to meet on September 4, 2018. *See* ¶ 103; DX 7 at 1. Yet, the very next day, the FDA reiterated that an EOP2 meeting was necessary to "ensure we are aligned as you proceed with your development program." DX 7 at 1; DX 25 at 39. The FDA reiterated that position *again* in February 2019. ¶ 104; DX 7 at 1.

This demonstrates that the FDA's requests were what they appeared to be: legitimate communications indicating the FDA *no longer concurred* with Phase 3's design. The Briefing Book confirms as much. *See* DX 25 at 10-11, 39; ¶¶ 104-05, 379-83. Defendants' failure to disclose this fact rendered their FDA Guidance Representations thereafter materially misleading. *See, e.g., In re Boeing Co. Aircraft Sec. Litig.*, 19-cv-02394, 2022 WL 3595058, at *22 (N.D. Ill. Aug. 23, 2022) (statements that company was upfront with federal agency during certification process were materially misleading for failure to disclose that *subsequent to* certification process, defendants withheld information from agency). This is true *regardless* of whether Defendants also knew, as of that date, of the FDA's specific concerns with the washout period.[14]

---

[14] Defendants also represented that the FDA specifically "indicated that a four-week withdrawal period . . . [wa]s appropriate for Bard in the Phase 3 CARDINAL [study]" (¶¶ 240, 492), giving the false impression that the FDA had affirmatively "agreed" that a four-week period was adequate to measure retained eGFR. However, both the Briefing

### 3. The CAC Sufficiently Alleges the Time Period in which the FDA Communicated its Concerns About the Washout Period

Although the Briefing Book does not specify the date the FDA *first* communicated its concerns to Reata, *see* D. Br. at 30, it does state that those concerns were specifically discussed during its January and September 2020 meetings with Reata. *See* Section I.B.3.a. As such, there can be no question that Defendants' alleged misrepresentations after January 2020 were false and/or misleading. In any event, the CAC's allegations as to the timing of the FDA's earlier communications are also sufficiently particularized (*see* Section I.B.3.b), and even were they not, Defendants' awareness of the TSUBAKI results, no later than November 2017, independently rendered their representations false and/or misleading. *See* Section I.B.3.c.

### a. The FDA Told Reata, in January and September 2020, that CARDINAL's Four-Week Off-Treatment Measurements Were Insufficient to Support Approval

The Briefing Book states that Reata met with the FDA "in January and September 2020" to discuss a Bard NDA submission "under the accelerated approval pathway based primarily on . . . [CARDINAL Phase 3's] year 1 data." DX 25 at 39. During those meetings, the FDA disagreed with Reata's proposal to pursue accelerated approval because it was concerned about "the interpretability of . . . [CARDINAL's] eGFR findings *given the available information on the time course for resolution of . . . [Bard's PD] effect*." *Id*. In other words, the Briefing Book

---

Book and the SMP Letter demonstrate that the FDA did no such thing. Thus, those representations were false regardless of when the FDA communicated its specific concerns about the washout period. DX 2 at 1; DX 25 at 39. Defendants nevertheless claim that because the SMP Letter acknowledged, and did not explicitly object to, the four-week period *proposed by Reata*, this shows that the FDA affirmatively approved its adequacy. *See* D. Br. at 24, 37, 39. The problem with this argument is that the FDA does not "approve" *anything* during the IND review process. *See* PX 2 at 30. It simply ensures the investigation's "safety" and, where requested, provides "advice" on the investigation's design. 21 C.F.R. § 312.41(b) (2022). The SMP Letter here was no different. It informed Reata that the FDA's safety review was complete and advised Reata that "accelerated approval *may* be possible *if* your trial shows a substantial treatment effect . . . at week 52 following a 4-week drug treatment withdrawal period." DX 2 at 1. The latter is not synonymous with a representation that the four-week period was objectively appropriate or that eGFR measurements taken at the end of that period would, in fact, measure "retained" benefits.

unequivocally states that the FDA told Reata, in January and September 2020, that CARDINAL's data was inadequate to support approval because the "available information" on Bard's washout period, *i.e.*, TSUBAKI's results, indicated a longer washout period than used in CARDINAL.

Unable to argue that the CAC's allegations are insufficiently particularized with respect to the dates of these communications, Defendants resort to re-writing the Briefing Book's text, claiming that the FDA was merely concerned about the amount of "available information *to date*," which said nothing about whether Bard would receive full approval after *more* data was collected in year 2. *See* D. Br. at 39. At best, this represents a willful misreading of the Briefing Book's language. At worst, it amounts to an accusation that the FDA's account is false. The FDA's concern was not that Reata was seeking accelerated approval based on one year of data versus two. In fact, the FDA had already told Reata that year 1 data alone could support accelerated approval *if it showed a substantial treatment effect*. *See, e.g.*, ¶ 135; DX 2 at 1. Its concern, in January 2020, was that the available information "on the time course for resolution of [Bard's PD] effect" indicated that CARDINAL's eGFR data was collected too early and, thus, *was incapable of showing any treatment effect at all, let alone a substantial one*.

### b.    The CAC's Allegations with Respect to the 2016-2019 Timeframe Are Sufficiently Particularized

A complaint "need not allege 'the exact date and time' when defendants became aware of information contrary to their statements." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 624 (S.D.N.Y. 2005). It must simply "supply some factual basis for the allegation that the defendants knew or should have known that the statements were false at some point during the time period alleged." *Id.*

Although the CAC does not identify the precise date the FDA *first* communicated its concerns to Reata, as discussed below, the only logical inference is that those concerns arose in or

23

around November 2017, when TSUBAKI's results were unblinded,[15] that they were communicated to Reata shortly thereafter, and that they culminated in a recommendation, in or around September 2018 (and in any event, *no later than* July 2019), that CARDINAL Phase 3 be modified. This is sufficient to satisfy Rule 9(b). *See In re Venator Materials PLC Sec Litig*., 547 F. Supp. 3d 624, 664 (S.D. Tex. 2021) (where there is a "factual basis establishing that [the] underlying specificity exists," failure to "plead[] the precise dates and contents of [the] specific reports" rendering defendant's statements false is "not . . . fatal").[16]

*First*, the Briefing Book plainly states that the FDA "repeatedly voiced concerns" to Reata regarding "the time-course for resolution of . . . [Bard's PD] effect on creatinine/eGFR following discontinuation of treatment" (DX 25 at 39), and that it did so "during the course of [Phase 3's] development." *Id.* at 10-11; *see* DX 27 at 139-40 (same); DX 26 at 9 (same). Thus, there can be no question that the FDA "repeatedly" communicated its concerns to Reata while Phase 3 was ongoing, *i.e.*, between August 2017 and September/October 2020. ¶¶ 193-94, 383.[17]

*Second*, the Briefing Book explains that, after repeatedly expressing its concerns, the FDA "ultimately recommended that . . . [Reata] conduct a separate study to characterize the time course

---

[15] The Briefing Book indicates that the FDA's 2021 determination that Bard washout took eight weeks, was predicated solely on data from TSUBAKI and CARDINAL Phase 3, which constituted the *only* data, available to the FDA, relevant to determining Bard's washout period. *See* DX 25 at 11. Obviously, CARDINAL Phase 3's results were not available to the FDA while Phase 3 was "in development." *Id.* Thus, by process of elimination, the concerns the FDA communicated during that period must have arisen from TSUBAKI.

[16] *See also Pierrelouis v. GoGo Inc*., 18-cv-4473, 2021 WL 1608342, at *9 (N.D. Ill. Apr. 26, 2021) (similar); *Wu Winfred Huang v. EZCORP, Inc*., 259 F. Supp. 3d 563, 574-75 (W.D. Tex. 2017) (similar).

[17] Defendants point to the FDA's April 2021 acceptance of the Bard NDA as evidence that the FDA's concerns did not arise until sometime thereafter. *See* D. Br. at 39 n.12 & 41. However, the FDA's acceptance of an NDA submission merely reflects its "threshold determination that the NDA is sufficiently complete to permit a substantive review" to begin. 21 C.F.R. § 314.101(a)(1) (2022). It does not reflect any decision that such a review will culminate in approval or that there are no concerns with the submission or the underlying data. *See Corban v. Sarepta Therapeutics, Inc*., 14-cv-10201, 2015 WL 1505693, at *7 (D. Mass. Mar. 31, 2015). In any event, Defendants' argument is contradicted by the Briefing Book's plain statements that (i) the FDA told Reata of its concerns during Phase 3's "development," and (ii) in January 2020, the FDA told Reata that CARDINAL Phase 3's year 1 data could not support accelerated approval because of the FDA's concerns with the washout period. *See* SOF V.D; Section II.B.3.a.

for resolution of . . . [Bard's PD] effect *or modify CARDINAL Phase 3 to obtain the information (i.e., revise the protocol to include additional off-treatment eGFR measurements).*" DX 25 at 39. Although the Briefing Book does not provide the exact date the FDA communicated this recommendation to Reata, it must have done so *before* Phase 3 could no longer be revised in the manner the FDA proposed. Any other conclusion defies common sense.[18]

According to Phase 3's protocol, participants' first off-treatment measurements were collected 52 weeks post-enrollment, after which, they resumed Bard treatment until week 100. ¶¶ 90-91. Then, after another four weeks off-treatment, participants' final measurements were collected at week 104, after which, their participation in the study concluded. *Id.* Thus, the *absolute latest* Phase 3 could have been revised "to include additional off-treatment eGFR measurements" (*i.e.*, measurements at weeks 105, 106, 107, etc.), was 104 weeks after Phase 3's commencement— *i.e.*, when participants' final measurements began being collected. Consequently, the FDA's proposal must have been communicated to Reata *prior to August 2019*.

Moreover, given that Phase 3 involved *two* off-treatment measurements, the most logical conclusion is that the FDA communicated its recommendation far earlier in Phase 3's development, before most participants resumed Bard treatment following their 52-week measurements and, thus, before the collection of additional off-treatment measurements (*i.e.*, measurements at weeks 53, 54, 55, etc.) was no longer possible. Given the importance the FDA ascribed to CARDINAL's off-treatment data (DX 2 at 1-2), it is unlikely that it would have waited to make its proposal until most or all participants resumed Bard treatment in year 2, as this would have reduced the additional off-treatment data that could ultimately be collected by half.

---

[18] Defendants argue that the Briefing Book's use of the word "ultimate" to describe the FDA's recommendation implies that it occurred "at or near the end of the FDA's review process"—*i.e.*, in December 2021, over a year after Phase 3 concluded. D. Br. at 40. Defendants do not even attempt to explain why the FDA would recommend that Reata modify Phase 3 when Phase 3 was already over and its modification was no longer possible.

Ignoring the obvious, Defendants argue that because the Briefing Book states that the FDA voiced concerns about, *inter alia*, measurements "collected" in Phase 3, this implies that the FDA's ultimate recommendation could not have occurred prior to "the conclusion of the 104-week study protocol." D. Br. at 40. However, this wrongly assumes that all 104-week measurements were collected simultaneously. As Defendants well know, Phase 3 participants were enrolled piecemeal over the course of over a year. ¶¶ 191, 238. Consequently, their 104-week measurements were collected starting in August 2019, over a year before the 104-week protocol concluded. Defendants' argument also wrongly assumes that off-treatment measurements were only collected at 104 weeks when, in fact, they were also collected at 52 weeks. ¶¶ 90, 91(c). Thus, the Briefing Book's use of the word "collected" indicates only that the FDA's recommendation came in or after August 2018, when the first 52-week measurements were collected.

Taken together, the most plausible inference is that the FDA, after repeatedly voicing concerns following the November 2017 unblinding of TSUBAKI's results, recommended that Reata modify Phase 3 in or around September 2018, shortly after the first 52-week measurements had been "collected" in August 2018, but while collection of additional off-treatment measurements for the remainder of participants was still possible. Of course, September 2018 is also when the FDA contacted Reata about its lack of concurrence with Phase 3, making Defendants' decision not to attach those communications to their Motion especially curious. In any event, the latest the FDA could have made its recommendation is July 2019, just before the collection of participants' final off-treatment measurements was scheduled to commence.

          **c.**      **The TSUBAKI Results Independently Rendered the Washout/Retained eGFR Representations False and/or Misleading**

Irrespective of when the FDA communicated its concerns, Defendants' November 2017 awareness of the TSUBAKI results provides an independent basis for alleging falsity with respect

26

to the Washout/Retained eGFR Representations issued thereafter.

Specifically, TSUBAKI's off-treatment measurements indicated that Bard took *eight weeks* to wash out. ¶ 117. Pursuant to its agreement with Reata (*see* PX 1 at § 4.2), Kyowa was required to provide all TSUBAKI data to Reata. On November 6, 2017, Defendants Huff and Meyer publicly discussed TSUBAKI, using slides explicitly referencing the fact of TSUBAKI's off-treatment measurements, but failing to disclose what those measurements showed—namely, that it took Bard twice as long to wash out as the washout period utilized in CARDINAL. Defendants' awareness of this information no later than November 2017 independently rendered their Washout/Retained eGFR Representations thereafter false and/or misleading, regardless of when the FDA communicated its own concerns about the washout period to Reata.

### 4.   Defendants' Statements in 2021 Were False and/or Misleading

Defendants also contend that the CAC fails to allege falsity with respect to Defendants' alleged misrepresentations in the 2021 calendar year because Defendants disclosed, in August 2021, that the FDA had identified several issues with respect to CARDINAL, including a concern over whether CARDINAL's off-treatment effects "demonstrate[d] an irreversible effect on kidney function or a reversible [PD] effect." D. Br. at 41; *see also* DX 22 at 17, 21-24.

But Defendants' August 2021 disclosures are irrelevant to whether their March, April, and May 2021 representations were misleading. As for Defendants' August and November 2021 statements, the FDA concerns described in Defendants' August 2021 disclosures arose from the fact that many of CARDINAL's off-treatment measurements had been taken *less than four weeks* after treatment cessation. ¶¶ 342-45. Defendants did not disclose *any* FDA concern that the four-week washout period was itself inadequate. *Id.* As such, Defendants' August 2021 disclosures were misleading, and they certainly did not disclose the previously concealed information. *Id.*

27

### C.       Defendants Had a Duty to Disclose the Omitted Information

Defendants also claim they had no duty to disclose the FDA's concerns about CARDINAL's washout period because those concerns represented mere "interim feedback" D. Br. at 25-28. This argument must be rejected for several reasons.

*First*, failure to disclose the FDA's washout period concerns *was not* the only omission rendering Defendants' statements false or misleading.[19] Defendants' FDA Guidance Representations were independently misleading because they omitted that, as of September 2018, the FDA no longer concurred with Phase 3's design and, despite being repeatedly asked to meet with the FDA to "obtain concurrence," Reata had declined. *See* SOF V.B. Defendants could not repeatedly highlight that CARDINAL was "based on" FDA guidance (¶¶ 163-64, 172, 202, 239, 337), without disclosing the FDA's subsequent communications indicating that its guidance could no longer be relied upon. *See In re CV Therapeutics, Inc., Sec. Litig.*, 03-cv-03709, 2004 WL 1753251, at *8-9 (N.D. Cal. Aug. 5, 2004). As for the Washout/Retained eGFR Representations, they were also rendered false or misleading by a separate omission—namely, that TSUBAKI showed that Bard took eight weeks to wash out, not 10-14 days. *See* Section I.B.3.c.

*Second*, Plaintiffs do not allege that Defendants were obligated to disclose the FDA's concerns in a vacuum, merely because investors might find them interesting. *See* D. Br. at 25-28. Plaintiffs allege that in choosing to represent that (i) CARDINAL had been designed in accordance with FDA guidance, and (ii) CARDINAL's results demonstrated Bard's retained eGFR benefits, Defendants became obligated to speak accurately on those topics. *See Schueneman v. Arena*

---

[19] It also wrongly assumes that Defendants' representations were only misleading by omission. However, Defendants knew, from the outset, that the FDA never told Reata that a four-week washout period was appropriate to measure Bard's retained eGFR benefits. *See* note 14, *supra*. Thus, Defendants' statements to that effect were false when made, regardless of whether Defendants had a duty to disclose the FDA's later concerns. *See In re MannKind Sec. Actions*, 835 F. Supp. 2d 797, 809 (C.D. Cal. 2011) (statements that company's trial had the FDA's "approval," when it did not, were "misstatement[s] of the basic facts regarding the company's ongoing involvement with the FDA").

28

*Pharms., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016).[20] Specifically, they became obligated to disclose not just the FDA's washout period concerns, but that (i) the FDA had asked Reata to modify Phase 3 to address those concerns; (ii) Reata had refused; and (iii) as a result, the FDA had rejected Reata's proposal to submit Bard for accelerated approval. *See In re CV Therapeutics*, 2004 WL 1753251, at *8-9 (falsity supported where defendants made statements about drug's "safety and efficacy, despite their knowledge of the FDA's specific reservations" on those issues).[21]

*Third*, Defendants wrongly assume that the FDA's concerns were merely "part of an iterative discussion 'about methodology and process'" and not about whether CARDINAL could support Bard's approval. *See* D. Br. at 28. But as Defendants elsewhere acknowledge, the FDA told Reata, from the outset, that off-treatment measurements demonstrating a substantial treatment effect were the *key* to Bard's approval. *See* DX 2 at 1-2; D. Br. at 11. Thus, the FDA's concern, that CARDINAL's off-treatment measurements were not measuring Bard's treatment effect, was not a "sporadic" procedural question, *In re Medimmune Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995), or part of a "run-of-the-mill regulatory back-and-forth[]," *Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 40 (1st Cir. 2020).[22] It was a concern that placed Bard's approval in serious jeopardy.

Defendants contend they were unaware of the gravity of the FDA's concerns because the FDA never "made (much less communicated to Reata) a determination at any point before . . .

---

[20] Defendants' own authority recognizes as much. *See, e.g., Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 584–85 (S.D.N.Y. 2016) (while there is "no affirmative duty to disclose the substance of interim feedback received from the FDA during the pendency of a drug application . . . such feedback *must be disclosed . . .* where its omission would render another statement materially misleading."); *cf. Corban*, 2015 WL 1505693, at *8 (defendants are not required to "delve into the FDA's specific concerns" regarding the defendant's forthcoming NDA "*absent their making of statements that would contradict those concerns*").

[21] *See also In re Amylin Pharms., Inc. Sec. Litig.*, 01-cv-1455, 2003 WL 21500525, at *8 (S.D. Cal. May 1, 2003) ("[I]f the FDA expresses significant concerns regarding the sufficiency of the trials, the company cannot make affirmative representations regarding the completeness or sufficiency of the trials without full disclosure."); *In re MannKind*, 835 F. Supp. 2d at 809 (similar).

[22] In *Yan*, the FDA warned "of a need to take action" that the defendant "intended to" and ultimately did take. *Id.*

29

December 2021 . . . that the four-week washout period undermined CARDINAL's results or would likely preclude approval." D. Br. at 28. This is absurd. The Briefing Book states that the FDA told Reata, in January 2020, that CARDINAL's year 1 data could not support accelerated approval *for this very reason.* SOF V.D; Section I.B.3.a. And while the FDA expressly invited Reata to modify Phase 3 to "alleviate" the FDA's concern (D. Br. at 28), Reata *declined to do so. See* SOF V.B-C; Section I.B.3.b. Thus, Reata had no basis to believe that CARDINAL's year 2 measurements— taken after the same inadequate washout period—would be sufficient for full approval.

Yet, Reata continued to tout CARDINAL's alignment with FDA guidance and the adequacy of the four-week washout period, implying that approval was still a "'when not if' proposition." *Sanders v. AVEO Pharm., Inc.*, 13-cv-11157, 2015 WL 1276824, at \*6 (D. Mass. Mar. 20, 2015). Defendants' failure to disclose such "serious criticism" by the FDA "is a material omission." *Id.* at \*8; *Yanek v. Staar Surgical Co.*, 388 F. Supp. 2d 1110, 1130 (C.D. Cal. 2005) (where "statements necessarily implied that there would be no serious impediments to timely FDA approval . . . omission of facts suggesting a possible delay in approval was misleading").[23]

### D.      The CAC Does Not Plead Fraud by Hindsight

Defendants' fraud by hindsight arguments are misplaced. The CAC does not rely upon the FDA's 2021 determination that Bard washout took eight weeks to establish that Defendants must have known, during the Class Period, that their representations were false or misleading. *See* D.

---

[23] Defendants' cases are inapposite. In *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510 (S.D.N.Y. 2015), the court determined that the defendant's failure to disclose the FDA's "procedural or methodological commentary" was not actionable because that commentary had not provided the defendant with any indication that its drug "could not or would not obtain timely FDA approval." *Id.* at 541. In *Alkermes Pub. Ltd. Co. Sec. Litig.*, 523 F. Supp. 3d 283 (E.D.N.Y. 2021), the court similarly found no duty to disclose where the plaintiffs failed to allege that the FDA conveyed any information that could "reasonably have been interpreted to suggest that FDA approval of . . . [the drug in question] was not possible or even unlikely." *Id.* at 294. And in *Vallabhaneni v. Endocyte, Inc.*, 14-cv-01048, 2016 WL 51260 (S.D. Ind. Jan. 4, 2016), the court granted the defendants' motion because the plaintiffs failed to allege "what exactly the FDA questioned in regard to the . . . study or how severe that questioning actually was." *Id.* at \*10. As such, there was no indication that "the FDA's questions were so 'extremely negative' to suggest that the FDA would not approve . . . [the drug in question] because of the Phase 2 study design." *Id.* at \* 13.

Br. at 29-32. Rather, the CAC alleges that Defendants knew their FDA Guidance Representations were false or misleading *based on the FDA's September 2018 and February 2019 communications* indicating that it no longer concurred on CARDINAL's design. *See* Sections I.B.2-3. Similarly, the CAC alleges that Defendants knew their Washout/Retained eGFR Representations were false or misleading based on the FDA's *repeated Class Period communications* with Reata indicating that the "available information" about Bard's washout period, *i.e.*, the TSUBAKI data, rendered CARDINAL's off-treatment measurements uninterpretable. *See id.*[24] The CAC's reliance on statements in the Briefing Book and AdCom Meeting transcript[25] to demonstrate the fact of these Class Period communications does not transform the CAC's allegations into fraud by hindsight.

"Fraud is almost always detected after the fact, typically based on evidence developed subsequent to the allegedly fraudulent statements." *In re MannKind*, 835 F. Supp. 2d at 809. Just because statements "are shown to be false by a later revelation" does not mean that such allegations "constitute 'fraud-by-hindsight.'" *Id.* at 809-10. Indeed, this is not a case where the complaint merely relies upon the FDA's subsequent identification of trial deficiencies as evidence "that the company's prior reports of good results must have been false or misleading" when made. *Callinan*

---

[24] For this reason, Defendants' argument that the CAC fails to demonstrate that Defendants and/or the FDA knew with certainty, prior to December 2021, that Bard washout took eight weeks, misses the point. *See* D. Br. at 30-32. The CAC alleges that Defendants represented, throughout the Class Period, that Bard's washout period was a known quantity, that it was a mere 10-14 days, and that, as a result, CARDINAL's four-week washout period was more than adequate to measure Bard's retained eGFR benefits. *See* ¶¶ 141-145. However, as of November 2017, Defendants knew that Bard's washout period was no longer a known quantity, and the FDA repeatedly voiced this concern to Defendants, who ignored it. *See* Section I.B.3.b-c. It is Defendants' failure to disclose these facts, not their failure to disclose that Bard definitively took eight weeks, rather than 10-14 days, to wash out, that rendered their representations false and/or misleading. *See Schueneman*, 840 F.3d at 709 ("It is the failure to disclose . . . [the FDA's] 'issues' and 'concerns' with the Rat Study . . . not who was ultimately right about the underlying science—that matters.").

[25] That an AdCom member remarked that it would have been possible to modify CARDINAL's design while the study was still ongoing "had [Reata] known then what they [know] now" (*see* D. Br. at 19, 32), does not demonstrate that Reata was unaware of concerns with the washout period during the course of the CARDINAL trial. AdCom members are independent scientists unaffiliated with the FDA. *See* ¶ 53. As such, this AdCom member was not a party to Reata's Class Period communications with the FDA, which, according to the FDA itself, involved an explicit recommendation that Reata do just what the AdCom member suggested—*i.e.,* modify Phase 3 to take additional off-treatment measurements. *See* DX 25 at 39.

31

*v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 427-28 (S.D. Tex. 2020).[26] Instead, the CAC relies on the FDA's statements about *what it told Defendants during the Class Period* as evidence of their Class Period knowledge. *See* ¶¶ 97-113, 370, 379-84.

Courts routinely accept post-class period accounts of what defendants knew, or were told, during the class period as evidence of falsity because "*any information* that sheds light on whether class period statements were false or materially misleading is relevant." *Glover v. DeLuca*, 03-cv-0288, 2006 WL 2850448, at *5 (W.D. Pa. Sept. 29, 2006); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 254 (5th Cir. 2009) (plaintiff's reliance on "post-class period deposition testimony and emails . . . does not amount to 'fraud by hindsight'" because the post-class period evidence "tend[s] to prove . . . [defendants'] state-of-mind at the time of their misleading statements.").[27]

### E. The Washout/Retained eGFR Representations and the Bard NDA Representations Are Actionable

Defendants also contend that the Washout/Retained eGFR Representations and Bard NDA Representations are non-actionable opinion statements. *See* D. Br. at 32-35; Appendix A.[28] This

---

[26] For this reason, Defendants' authority is inapt. *See* D. Br. at 29. For example, in *In re Repros Therapeutics, Inc. Sec. Litig.*, 09-cv-2530, 2010 WL 11583428 (S.D. Tex. Nov. 17, 2010), the plaintiffs argued that the defendants must have been aware of the drug's safety problems from the outset simply because the clinical trials were ultimately cancelled. *See id.* at *9. Similarly, the plaintiffs in *Immanuel Lake v. Zogenix, Inc.*, 19-cv-01975, 2020 WL 3820424 (N.D. Cal. Jan. 27, 2020) argued that the defendants must have known, when they filed their NDA, that it would be rejected based on a particular deficiency simply because the FDA ultimately rejected it for that reason. *See id.* at *8-9. As the court correctly recognized, accepting the plaintiffs' theory would mean that "a pharmaceutical company could be sued for securities fraud each and every time it received a NDA rejection" because plaintiffs "could merely parrot any deficiency identified by the FDA rejection letter and then claim the company concealed from the market that it failed to include this 'necessary' piece of information." *Id.* at *9. That, of course, is not the case here.

[27] *Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 184 (S.D.N.Y. 2010) ("[P]ost-class period articles can . . . establish awareness of falsity of class period statements; the opposite result would reward defendant for successful concealment."); *see also Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 570, 574-76 (W.D. Tex. 2017) (crediting former employee's post-class period account of defendants' class period knowledge).

[28] Appendix A also references CAC paragraphs containing only FDA Guidance Representations, *see* (¶¶ 201, 279, 280, 298), which are not opinions. For example, paragraph 298 quotes Huff's statement that "there has been no indication that . . . [the FDA's review team] are changing their approach to the endpoints." This was a false factual statement, not an opinion. Paragraphs 201, 279, and 280 simply repeated the FDA's guidance and recommendations and thus, were statements of historical fact. Appendix A also strangely references CAC paragraphs quoting analysts, not Defendants (¶¶ 218, 300), and paragraphs merely summarizing the CAC's allegations, (¶¶ 93, 94, 113, 119-25, 128-29, 139, 141-42, 145-46, 148-49, 151, 155, 197, 199, 207, 211, 449, 460, 464, 513, 527, 543, 554, 565, 581, 592).

argument must be rejected for at least two reasons.

*First*, most of these statements were not opinions. Opinions are "subjective statements that reflect judgments as to values that [are] not objectively determinable," or statements "classically indicative of opinion such as 'I believe' and 'I think.'" *Gregory v. ProNAi Therapeutics Inc.,* 297 F. Supp. 3d 372, 406 (S.D.N.Y. 2018). With the exception of statements indicating what Defendants "thought" or "believed" about CARDINAL, BEACON, and BEAM, Defendants' statements about the trial data and its implications were statements of fact, including that:

(i)    "Bard is eliminated from the system within 10 days after cessation of drug treatment," (¶ 240; *see also* ¶¶ 162, 164, 181, 205, 209, 214, 222, 230, 296, 316, 343-44, 483);

(ii)   The "off-treatment window used in CARDINAL is sufficient for resolution of acute PD changes in eGFR[]," (¶ 316); (*see also* ¶¶ 181, 213-14, 292, 296, 328, 335);

(iii)  CARDINAL's eGFR data measured "after a four week[] withdrawal, also known as retained eGFR" showed a "statistically significant . . . improvement in . . . eGFR" (¶ 213); (*see also* ¶¶ 222, 229-30, 238-40, 247, 249-51, 253, 262, 268, 282, 289-92, 304, 310, 319, 326, 328, 350, 402, 476, 486, 488, 504, 508, 519, 521);

(iv)   "In BEAM and BEACON, [Bard] treatment for one year showed statistically significant, mean increases in retained eGFR," (¶ 230); (*see also* ¶¶ 162-64, 173, 181, 198, 205, 209, 230-31, 240, 291, 304, 310-11, 326, 328, 490, 508);

(v)    Reata has "shown retained benefit now in three different trials, including the CARDINAL Phase 2 trial . . . [and] [t]hat rules out harm to kidney and demonstrates disease modifying activity," (¶ 231); (*see also* ¶¶ 335, 213-14, 239-41, 252-53, 292, 310-11, 325-26, 328, 335, 181, 205); and

(vi)   "Based on these positive results," Reata will seek, or has sought, Bard's full approval, (¶¶ 282, 289-91, 304, 310, 402); (*see also* ¶¶ 309, 324-25, 327, 476, 510).[29]

*Second*, even opinions are actionable where they "omit[] material facts about the issuer's .

---

[29] These are clearly distinguishable from the opinions in the cases Defendants cite. *See* D. Br. at 33 (citing *Nathenson v. Zonagen In*c., 267 F.3d 400, 419-20 (5th Cir. 2001)) ("broad, general statements" that the drug was "fast-acting" and an "improved" formulation were opinions); *Kleinman v. Elan Corp*., 706 F.3d 145, 154 (2d Cir. 2013) (statements about "encouraging" study findings were opinions); *Tongue v. Sanofi*, 816 F.3d 199, 211, 213-14 (2d Cir. 2016) (statements that results "underscore[d] the tremendous promise that Lemtrada holds," that the data was "nothing short of stunning," and that defendants were "very pleased" with the results, were opinions); *Corban*, 2015 WL 1505693, at *5 (statements that defendants believed results were "consistent," "stable," and "robust" were opinions)).

. . knowledge" that "conflict with what a reasonable investor would take from the statement." *Omnicare Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015);[30] *see also In re Apache Corp.*, 21-cv-00575, 2022 WL 4277350, at *5 (S.D. Tex. Sept. 15, 2022) ("'we believe' or 'we think'" can preface nearly any conclusion and yet, the resulting statement can "remain perfectly capable of misleading investors").

Here, Defendants knew, during the Class Period, that: (i) TSUBAKI indicated that it took eight weeks for Bard to wash out, and as a result, the FDA had concerns about the four-week period's adequacy; (ii) the FDA had asked Reata to modify CARDINAL to address those concerns, which Reata did not do; and (iii) as a result, the FDA had rejected Reata's proposal to submit Bard for accelerated approval. *See* Sections I.B.2-3. Thus, Defendants' statements, that they thought or believed that CARDINAL's off-treatment measurements (i) demonstrated Bard's long-term efficacy (*see, e.g.,* ¶¶ 146-148), and/or (ii) would be "sufficient to form the basis of an NDA submission to the FDA seeking approval of Bard" (¶ 239), omitted known, material information that conflicted with what a reasonable investor would have understood—namely, information demonstrating a real possibility that CARDINAL did *not* demonstrate Bard's long-term benefits and would *not* be sufficient for approval. *See In re Amylin Pharms.*, 2003 WL 21500525, at *8.

Defendants nevertheless contend that the FDA did not reach *any* conclusion about the washout period's adequacy until December 2021 and even then, cast its conclusion as a "belief."

---

[30] Opinions are also actionable where they contain embedded untrue facts. *See id.* at 185-86. Here, multiple "opinions" in Appendix A fall within this category. *See, e.g.*, ¶¶ 230, 164, 205, 207, 222. For example, on November 7, 2018, Defendants stated that Bard is "eliminated from the body within approximately 10 days after withdrawal, so we believe this retained eGFR benefit is a measure of the effect of long-term treatment on the structure of the kidney and its disease-modifying potential." ¶ 230. In other words, Defendants' "belief" that the retained eGFR benefit measured Bard's long-term efficacy was based on the *fact* that Bard washed out in 10 days. However, from November 2017 onward, Defendants knew that Bard took far longer to wash out. *See* Sections I.B.2-3. Yet, they continued to point to Bard's 10-day washout period as the basis for their belief that CARDINAL demonstrated Bard's efficacy.

34

D. Br. at 34-35.[31] This is false. While the FDA may not have concluded, until December 2021, that Bard definitively took eight weeks to wash out, it did conclude, years earlier, that (i) the only available information indicated that Bard washout took longer than four weeks, and (ii) consequently, it was impossible to determine whether CARDINAL's off-treatment measurements measured Bard's retained eGFR benefits rather than its PD effects. *See* SOF V.A; Section I.B.3.

Defendants also argue that there is no evidence that their opinions about CARDINAL's results were objectively unreasonable, even if the FDA did not find them compelling. *See* D. Br. at 35. This is incorrect and irrelevant. No later than August 2017, Reata knew that a trial conducted by its own development partner indicated that Bard washout took longer than four weeks. Reata's basis for "believing" otherwise, was a handful of measurements accidentally collected from a mere 15 patients taking different doses of Bard, over different lengths of time, during studies not designed to collect off-treatment eGFR measurements. ¶¶ 119-21; Section II.B.5. As such, that data was *objectively inadequate* to support Defendants' belief. *Id.*

In any event, where, as here, a defendant's opinion statement omitted material information about the defendant's knowledge, the opinion is actionable even if it is "sincerely held." *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 617 (S.D. Tex. 2018). "[T]hat [Reata] had an explanation for its view of the [washout period] does not mean investors would not

---

[31] In making the latter argument, Defendants selectively quote the Briefing Book and AdCom Meeting transcript. *See* D. Br. at 34-35. Those documents contain numerous statements demonstrating that the FDA's conclusion was one of fact, not opinion. *See, e.g.*, DX 27 at 147 ("[T]he increase in eGFR observed with [Bard] treatment is limited to a reversible [PD] effect only, and there is not a slowing on the rate of decline in kidney function."); *id.* ("[T]he duration of the 4-week washout in CARDINAL Phase 3 is insufficient to resolve the reversible [PD] effect of [Bard]. When the model is used to extend the time of washout, the reversible [PD] effect on eGFR observed with [Bard] has mostly resolved around week 110 or around 8 weeks after treatment stops."); *id.* at 148 ("The PK/PD model predicts the washout of reversible increase in eGFR to be longer than the 4-week washout implemented in CARDINAL, therefore, [Bard] does not slow the rate of decline in kidney function."); *see also* DX 26 at Slide 17 ("[Bard] Shows Only a Reversible [PD] Effect on eGFR."); DX 25 at 20-21 ("The results of [our] analysis do not show . . .… [a] slowing in decline in kidney function, over the study duration."). In any event, whether the FDA's determination was couched as one of "belief" is irrelevant. That belief led the FDA to refuse to approve Bard, and Defendants were aware of the information underlying the FDA's belief as early as November 2017 and failed to disclose it to the public.

35

want to know that [Reata] and the FDA were at odds" on that critical issue. *Schueneman*, 840 F.3d at 709. It is the "failure to disclose [the FDA's] 'issues' and 'concerns' with the [CARDINAL] Study . . . not who was ultimately right about the underlying science—that matters." *Id.*[32]

**F. Defendants' Statements Were Not Forward-Looking and Even If They Were, They Are Actionable**

Defendants argue that the FDA Guidance Representations and Bard NDA Representations were protected forward-looking statements. D. Br. at 35-37. This is incorrect for several reasons.

*First*, the FDA Guidance Representations are not forward-looking. Forward-looking statements are statements regarding "the plans and objectives of management for future operations" and statements about "the assumptions underlying or relating to any" such statements. *In re Egalet Corp. Sec. Litig*., 340 F. Supp. 3d 479, 502 (E.D. Pa. 2018). The FDA Guidance Representations, however, merely repeated "guidance" the FDA "provided" to Defendants during their "past interactions with the Agency." *In re MannKind*, 835 F. Supp. 2d at 816, 818. Thus, they are statements of historical fact about what the FDA *already told* management, not statements of

---

[32] Defendants' authority is inapt. *See* D. Br at 33, 34 n.7, 35. In *Amarin*, the court held that the defendant's opinions did not omit material information because, in making those statements, the defendant acknowledged the very information allegedly omitted—namely, that there were concerns that a particular trial's failure could prevent approval of the company's drug. *See In re Amarin Corp. PLC Sec. Litig.*, 13-cv-6663, 2016 WL 1644623, at \*16 (NJ Dist. Ct. Apr. 26, 2016). Thus, the only way for the plaintiffs to demonstrate that the defendants' contrary opinions were actionable, was to demonstrate that they were not reasonably held—which they failed to do. *See id.* at \*16. In *Tongue*, the court determined that that there was a "lack of any rational connection" between the defendants' opinions touting positive trial results and the drug's effectiveness, on the one hand, and the FDA's "methodological feedback," on the other. *Tongue*, 816 F.3d at 213-14. In other words, the FDA's feedback did not indicate that the drug was ineffective or would not be approved. *See id.* Thus, the plaintiffs could not establish that by failing to disclose the FDA's feedback, defendants had omitted material facts relevant to their opinions. *See id.* Because the plaintiffs also could not demonstrate that the defendants' opinions were not honestly held, the court found them non-actionable. *See id.* at 214. *Callinan* did not involve opinion statements *at all*. *See* 479 F. Supp. 3d at 417-19. Rather, the court determined that factual statements were not misleading because they accurately reported the study's findings and there were no allegations that defendants simultaneously "withheld internal information about the study design, the trial results or interpretations, or disagreements with the FDA or anyone else about the study design, the trial results, or the interpretation of those results." *Id.* at 418. The court also found no duty to disclose the omitted information—namely, that the trial results were "not necessarily meaningful" or "significant"—because those conclusions were "countered by contradictory comments made by . . . the FDA Advisory Committee," and, in any event, whether results are "meaningful" or "significant" are "subjective concepts not facts," and thus, that information was immaterial. *Id.* at 417-19.

36

future plans. *See id.* (statements indicating FDA pre-approved study's design not forward-looking); *Skiadas v. Acer Therapeutics Inc*., 19-cv-6137, 2020 WL 4208442, at *6 (S.D.N.Y. July 21, 2020) (statements "about what the FDA *had* agreed to at a meeting with [defendants]" not forward looking) (emphasis in original); *Frater v. Hemispherx Biopharma, Inc*., 996 F. Supp. 2d 335, 348 (E.D. Pa. 2014) (statements conveying "key takeaways" from FDA meeting "after the meeting had occurred" not forward-looking).

*Second,* the safe harbor only protects forward-looking statements made *without* actual knowledge that the statements are misleading. *See Lormand*, 565 F.3d at 244. Thus, where the challenged statements omitted "present facts—known at the time the statement was made," the safe harbor is inapplicable. *In re Viropharma Inc. Sec. Litig*., 21 F. Supp. 3d 458, 471 (E.D. Pa. 2014).[33] Here, Defendants knew the FDA Guidance Representations were misleading when made. *See* Sections I.B.2-3. The same is true for the Bard NDA Representations. When Defendants started making those representations in November 2020, the FDA had already told Reata that it was concerned about CARDINAL's off-treatment measurements and that those measurements were inadequate to support approval. *See* Sections I.B.3-4.

*Finally,* the so-called forward-looking statements here were "not accompanied by 'meaningful cautionary language.'" *Lormand*, 565 F.3d at 244. Warnings indicating that the FDA "may require [a company] to conduct additional clinical trials," or that a drug "may not receive regulatory approval," are "generic warning[s] . . . inherently true of any and every [NDA]." *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig*., 17-cv-341, 2020 WL 1479128, at *18 (E.D. Pa. Mar.

---

[33] *See In re Cell Pathways, Inc. Sec. Litig*., 99-cv-725, 2000 WL 805221, at *10–11 (E.D. Pa. June 20, 2000) ("Allegations based upon omissions of existing facts or circumstances do not constitute forward looking statements protected by the safe harbor."); *In re CV Therapeutics*, 2004 WL 1753251, at *10 (where "defendants possessed and failed to disclose detailed information about the FDA's serious reservations concerning Raxena's safety and efficacy, they failed to disclose historical facts").

25, 2020). As such, they are insufficiently specific to provide safe harbor protection.[34]

Furthermore, "cautionary disclosures that are themselves misleading . . . are not protected under the safe harbor." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 492 (S.D. Tex. 2016). Here, the disclosures all "characterized 'certain dangers that had already begun to materialize' as only possible future risks, not as present problems or clearly present risks." *Id.*[35] They did not warn that the FDA: (i) had *already* indicated its lack of concurrence with Phase 3's design; (ii) had *already* recommended that Phase 3 be modified to collect additional data; and (iii) had *already* told Defendants that Phase 3's eGFR measurements were insufficient to measure Bard's long-term efficacy. There is no "safe harbor protection based on a statement that risk *could* come to fruition where that risk has *already* begun to materialize." *In re Harman*, 791 F.3d at 108 ; *see Carlton*, 184 F. Supp. 3d at 492; *In re CV Therapeutics*, 2004 WL 1753251, at *11.

## II.        The CAC Sufficiently Alleges Scienter for Purposes of the Exchange Act Claims

"The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Lormand*, 565 F.3d at 251. In conducting its "holistic[]" scienter inquiry, the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 326 (2007). An inference of scienter is "strong" if the facts, taken as true, give rise to an inference that is "at least as compelling" as the inference of innocent behavior. *Id.* at 314. The inference, however, "need not be irrefutable, *i.e.*, of the 'smoking-gun'

---

[34] This conclusion is bolstered by the fact that, despite what happened with the FDA from November 2017 onward, Defendants' risk disclosures remained unchanged. *See* D. Br. at 9-11 & n.3 (acknowledging that Defendants' risk disclosures were "substantially identical" throughout the Class Period). "'The consistency of the [D]efendants' language over time' despite changing circumstances 'belies any contention that the cautionary language'" was meaningful. *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 107 (D.C. Cir. 2015).

[35] *See* D. Br. at 10 (citing disclosures that Reata "*could* . . . fail . . . to receive regulatory approval . . . for many reasons, including inadequate design or implementation" of trials, or because the FDA "*m[ight]* require more . . . clinical data to support approval," or "*might* not agree that [Reata's] completed clinical trials provide[d] adequate data on safety or efficacy").

38

genre, or even the 'most plausible of competing inferences.'" *Id.* at 324. Here, the CAC's allegations—viewed collectively—give rise to a strong inference of scienter.

### A.      The CAC's Falsity Allegations Support a Strong Inference of Scienter

Defendants knew, as of September 2018, that the FDA no longer concurred on CARDINAL's design. *See* Section I.B.2. Defendants also knew that, following the November 2017 release of TSUBAKI's results, the FDA had (i) "repeatedly" voiced concern about CARDINAL's washout period; (ii) recommended that Reata modify Phase 3 to take additional off-treatment measurements; and (iii) told Reata CARDINAL's data could not support accelerated approval. *See* Section I.B.3. Yet Defendants continued to tout CARDINAL's alignment with FDA guidance, its washout period's adequacy, and its positive results, implying that FDA approval was "in the bag." *In re MannKind*, 835 F. Supp. 2d at 811. This demonstrates falsity *and* scienter. *See Yanek,* 388 F. Supp. 2d at 1130 (defendants' "actual knowledge that these problems could delay or jeopardize [product's] approval" raised "strong inference" of scienter).

Defendants argue that the FDA's concerns represented a mere difference of opinion about CARDINAL's results and, thus, their failure to disclose those concerns does not demonstrate scienter. *See* D. Br. at 43. This argument fails for two reasons.

*First*, what Defendants subjectively believed about the FDA's concerns is irrelevant to whether scienter has been alleged for the FDA Guidance Representations. That Defendants knew, as of September 2018, that the FDA no longer concurred with Phase 3's design, and nevertheless continued to tout CARDINAL's supposed alignment with FDA guidance, demonstrates scienter.

*Second*, Defendants admit that "the FDA considered Bard's 'off-treatment retained benefit' to be a *critical issue* for potential approval of the drug," and Reata "repeatedly" told investors as much. D. Br. at 11; *see also* DX 2 at 1-2; ¶¶ 92, 128-30, 181, 212-14. That this critical issue had become "*the* sticking point with the FDA," is more than a mere difference of opinion, and "the

39

simple fact that [Reata] had an explanation for its view of the [off-treatment measurements] does not mean investors would not want to know that [Reata] and the FDA were at odds." *Schueneman*, 840 F.3d at 708-09.[36] Defendants "could have remained silent about the dispute or [they] could have addressed [their] discussions with the FDA head-on," but they "could not represent that there was no controversy," *id.* at 709, or that the FDA had deemed the off-treatment period "appropriate" (¶ 240), when the FDA repeatedly told Defendants the opposite. *See* Sections I.B.2-3. "[W]hen the FDA tells a company about problems with a product, and the company nonetheless continues to make confident predictions about a product," courts routinely infer scienter. *Frater*, 996 F. Supp. 2d at 350.[37]

Nor does it matter that the concerns expressed by the FDA between November 2017 and September 2020 did not represent a final FDA determination. *See* D. Br. at 43. "[T]he nature of those [concerns] . . . raises a strong inference that [Reata] had actual knowledge that [they] could delay or jeopardize [FDA] approval." *Yanek*, 388 F. Supp. 2d at 1130.

## B.     The Officer Defendants' Scienter

The CAC adequately alleges that the individuals who made and/or issued the misleading

---

[36] Defendants' authority is inapt. *See* D. Br. at 43. In *Sanofi,* there was no indication that the FDA's undisclosed concerns could prevent approval. *See* 87 F. Supp. 3d at 534. Thus, defendants' statements regarding the likelihood of approval were not "inaccurate" nor "'highly unreasonable' in failing to appreciate that possibility." *Id.* The same is true for (i) *Alkermes*, where the FDA gave no indication "that the design of [the company's] clinical trials" could "prevent approval," 523 F. Supp. 3d at 294, and (ii) *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008), where the plaintiff failed to "demonstrate that there were certain dangers, known all along to defendants, which would prevent [] approval." *Id.* at 471.

[37] *See, e.g., In re BioMarin Pharm. Inc. Sec. Litig*., 20-cv-06719, 2022 WL 164299, at *13 (N.D. Cal. Jan. 6, 2022) (scienter adequately alleged where defendants "repeatedly told the market that they had high confidence in approval . . . and had a good relationship with the FDA when in fact there were allegedly concrete warning signs otherwise and silence from the FDA"); *In re Amylin Pharms.*, 2003 WL 21500525, at *5 (scienter adequately alleged where company "knew that the FDA had serious concerns about its study designs which could prevent the approval of Symlin" and failed to disclose those concerns to investors, while simultaneously "making assurances regarding the completeness of the data and the likelihood of FDA approval"); *In re MannKind*, 835 F. Supp. 2d at 811-12 (scienter alleged where company represented that the FDA had pre-approved its study, "necessarily impl[ying] that there would be no serious impediments to timely FDA approval," when it knew that the FDA believed the study was "inadequate").

40

statements—Huff and Meyer—did so with knowledge and/or extreme recklessness. *See In re Venator*, 547 F. Supp. 3d at 650-51, 661-62. Their scienter can properly be imputed to Reata.[38]

### 1. The Officer Defendants' Knowledge and Expertise as to Bard, CARDINAL, and TSUBAKI, and Their Frequent Communications to Investors on those Topics Demonstrate Scienter

The "number, size, timing, nature, frequency, and context" of the misrepresentations are all factors that shift "the balance of the inferences . . . significantly in favor of scienter." *In re Fleming*, 2004 WL 5278716, at *11. For example, where individual defendants frequently "answer[] questions about . . . clinical trial data," suggesting that they are "knowledgeable about and paying close attention to the data and its reception," courts routinely infer scienter. *Busic v. Orphazyme A/S*, 21-cv-3640, 2022 WL 3299843, at *23 (N.D. Ill. Aug. 11, 2022); *see also In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014) (scienter pled where CEO's "public statements evinced a familiarity with the data in the trials"). This is especially true where, as here, the drug in question is "critical" to the company's "financial success." *See Hatamian v. Advanced Micro Devices*, *Inc.*, 87 F. Supp. 3d 1149, 1163 (N.D. Cal. 2015).

In 2004, Reata obtained the exclusive worldwide rights to develop Bard. By the start of the Class Period, Reata's CEO, Huff, and its CMO, Meyer, had been researching and developing Bard for 12 years, making them more familiar with it than virtually anyone else in the world. ¶¶ 392-95. Meyer and Huff acted as Reata's spokespersons and experts on Bard during *all* Class Period conference calls alleged in the CAC, answering complex questions about Bard during Q&A sessions. ¶¶ 396-400, 164, 181, 214, 252, 292, 327, 333, 335. That Huff and Meyer "monitored

---

[38] The misrepresentations alleged during each of the Class Period conference calls were made by Huff and/or Meyer. ¶¶ 164, 181, 197, 209, 213, 214, 231, 241, 252, 253, 280, 292, 296, 298, 311, 327, 328, 333, 335, 337, 340, 349; PX 5. Huff also signed each of Reata's Form 10-Qs, 10-Ks, and IPO registration statements and thus, is responsible for the alleged misrepresentations and omissions therein. ¶¶ 158, 170, 188 n.10, 192, 200, 222 n.12, 228, 237, 248, 261, 267, 273, 276, 288, 308, 323, 340, 349, 467, 471, 500.

and/or oversaw" Bard's development "and were able to speak about [Bard] at conference calls and meetings with investors," provides strong evidence of scienter. *Ga. Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021).[39]

Huff and Meyer were also intimately familiar with Bard studies, including CARDINAL and TSUBAKI. ¶¶ 396-400; 117-18, 197-99. Reata had access to all "data collected [and] analyzed" in TSUBAKI and "all study reports analyzing such data," pursuant to its Exclusive License and Supply Agreement with Kyowa. PX 1 at 21. In November 2017, Meyer and Huff held a special conference call on TSUBAKI, during which Meyer explained the study's design and outcomes, answered technical questions from analysts, and noted that he had personally confirmed various aspects of the study with Kyowa's "head of development." PX 4 at 10. The slides accompanying Meyer's presentation referred to TSUBAKI's off-treatment measurements specifically, noting that they were taken for twelve weeks post-treatment cessation. PX 5 at 14.

Given that (i) Reata was conducting CARDINAL when TSUBAKI was released; (ii) Bard's approval hinged on CARDINAL's ability to show Bard's retained eGFR benefits, and (iii) Reata's existence heavily depended on Bard's approval,[40] it is implausible that Meyer would have failed to inform himself about TSUBAKI's off-treatment measurements. The most plausible inference is that Meyer knew, or recklessly disregarded, what TSUBAKI showed—*i.e.,* that Bard

---

[39] *See also In re BP*, 843 F. Supp. 2d at 782-83 (CEO's repeated statements about safety weighed "strongly in favor of the inference that [the CEO] paid special attention to . . . safety efforts or, at the least, was reckless in not doing so while continuing to publicly tout improvements"); *In re SolarWinds Corp. Sec. Litig.*, 21-cv-138-RP, 2022 WL 958385, at *6 (W.D. Tex. Mar. 30, 2022) (officer "held himself out as a responsible and knowledgeable authority" on cybersecurity measures and "addressed cybersecurity issues when they arose," he "acted with, at least, severe recklessness when he touted the security measures" at the company).

[40] During the Class Period, Reata had no approved products for sale, and it had only two product candidates, Bard and Omav. Bard was Reata's leading candidate because it (i) was being developed for more indications than Omav and thus, had the potential to treat a patient population approximately 10-20 times larger than Omav; (ii) was further along in development and closer to commercial introduction than Omav; and (iii) was Reata's single-largest R&D expenditure, accounting for more than double Reata's expenditure on Omav. ¶¶ 60, 387-88. Consequently, Defendants acknowledged, throughout the Class Period, that Reata was "substantially dependent" on Bard's success. ¶ 389.

42

washout took eight weeks. "[T]hat a defendant ignored significant red flags," such as this, demonstrates scienter. *Ga. Firefighters' Pension Fund*, 514 F. Supp. 3d at 956.

### 2. The Officer Defendants' Knowledge of Reata's FDA Interactions, and their Frequent Statements on that Topic, Demonstrates Scienter

During their Class Period conference calls, Meyer and Huff also spoke at length about Reata's FDA interactions. *See* ¶¶ 164, 181, 213, 214, 241, 252, 280, 292, 298, 327, 333, 337; PX 4 at 11. In doing so, they often conveyed first-hand knowledge about specific FDA meetings, from the 2016 pre-IND meeting through the January 2020 meeting. ¶¶ 164, 280; PX 4 at 9, 11-12.[41]

Huff and Meyer's intimate familiarity with these meetings implies that they knew not just the positive information conveyed therein, but the negative information as well. Their decision to disclose the former, but not the latter, represents "an extreme departure from the standards of ordinary care," and is sufficient to plead a strong inference of scienter. *Pardi v. Tricida, Inc.*, 21-cv-76, 2022 WL 3018144, at *17-18 (N.D. Cal. July 27, 2022) (defendants' decision to disclose minor issues raised at FDA meetings but not major issues demonstrated scienter); *see also Busic*, 2022 WL 3299843, at *23 (similar).[42]

### 3. The Officer Defendants' Refusals to Comment on FDA Interactions Following Major Negative Events Demonstrates Scienter

In stark contrast to their general willingness to discuss Reata's FDA interactions and the FDA's purported guidance on CARDINAL, Huff and Meyer were curiously tight-lipped on this

---

[41] *See In re Venator*, 547 F. Supp. 3d at 665 (inference of scienter supported where "it defies reason and common sense to believe that [individual defendants] would have been unaware of" issues "given the frequency of th[eir] reference[s] [to issue] in calls with investors.").

[42] Further, given the importance of Bard's approval to Reata's continued existence, it is implausible to believe that Huff and Meyer would have discussed these meetings publicly "without knowing the full content" thereof. *Busic*, 2022 WL 3299843, at *23. "The competing inference—that [Huff and Meyer] professed to be focused on [Bard] but remained unaware of actual . . . concerns" seriously jeopardizing the likelihood of its approval—"is far less compelling." *In re BP*, 843 F. Supp. 2d at 783; *see In re MannKind*, 835 F. Supp. 2d at 815 (where "interactions with the FDA regarding [drug] approval were absolutely integral to the company's success," it would "be 'absurd' to suggest that management was without knowledge of the matter").

topic at one notable time: directly after their January 2020 meeting with the FDA.

Specifically, during their February 19, 2020 conference call, Huff and Meyer repeatedly stated that they would "not be commenting in the call or Q&A on our ongoing interactions with the regulatory agencies." ¶¶ 402-03. When asked how much year 2 data Reata expected to have when it filed for Bard's approval, Meyer also refused "to comment on the two-year data." ¶ 403. Huff and Meyer responded similarly in their May 11, 2020 call. ¶¶ 404-05. For example, when asked why Reata was "waiting to file approval [for Bard] in Alport syndrome," Meyer refused to answer, noting that "we're not going to comment" about Bard's "regulatory status." ¶ 405. Huff similarly refused to "answer questions regarding regulatory activities" on the call. ¶ 404.

When Huff and Meyer resumed discussing their FDA interactions *seven months later*, they conveyed detailed knowledge of the January 2020 meeting, including that the FDA had been skeptical about Reata's proposal to submit Bard for accelerated approval. ¶ 280. However, far from being candid about the reasons for the FDA's skepticism (*see* D. Br. at 46), Huff and Meyer failed to disclose the FDA's position that CARDINAL's washout period was inadequate.[43] Rather, they claimed the FDA had merely expressed its procedural preference that Reata file for full approval after two years of data, "based . . . on their assumption that there would not be much delay in NDA submission by waiting for the year two data." ¶ 280. This further demonstrates scienter. *See Busic*, 2022 WL 329843, at *23.

Defendants ascribe these refusals to comment to Reata's supposed "policy" of disclosing FDA "interactions" only when there was a "major event to announce." D. Br. at 45-46. However, Defendants cite only *two other instances* during the entire *five-year* Class Period where they

---

[43] For this reason, Defendants' argument that concealing developments with no-comment responses in February and May 2020, only to reveal those same developments in August 2020, would have served no purpose, is misplaced. *See* D. Br. at 46. In August 2020, Defendants failed to reveal the most critical development—namely, that the FDA had told Reata not to apply for accelerated approval *because it had concerns about the washout period's adequacy*.

supposedly declined to comment on FDA interactions, neither of which related to Defendants' real time interactions with the FDA with respect to CARDINAL. *See* D. Br. at 45.[44]

Moreover, even if Defendants did have such a policy, it would not explain Meyer's and Huff's refusals to comment after their January 2020 meeting because Type C meetings *are major events* in the FDA approval process (*see* PX 3 at 4, 7; SOF V.D), especially where, as here, they involve a determination by the FDA *that trial data is inadequate to support approval*. Meyer and Huff's uncharacteristic refusal to comment directly after this major (negative) event demonstrates scienter. *See Dahhan v. Ovascience, Inc.*, 321 F. Supp. 3d 247, 255-56 (D. Mass. 2018) (company consistently reported the number of treatment cycles performed at the end of each quarter, its one-off refusal to disclose "the number of [cycles] . . . achieved this quarter," implied that it did so "to conceal poor sales figures and bolster the claim that [it] expected to achieve 1,000 cycles").

### 4.  Defendants' Linguistic Changes Following the January 2020 Meeting Demonstrate Scienter

In August 2020, when Huff and Meyer resumed commenting on Reata's FDA interactions (albeit incompletely), they also approved a subtle, but telling, change to the way Reata referred to "retained eGFR," calling it instead the "eGFR benefit during the off-treatment period." ¶ 287. Of course, the former implies an adequate washout period after which eGFR is retained. The latter merely describes eGFR measured at some (or any) time after treatment cessation. Sudden linguistic changes such as this are indicative of scienter. *See Skiadas v. Acer Therapeutics Inc.*, 19-cv-6137,

---

[44] Defendants first cite a conference call involving Phase 2 PHOENIX trial results. *See* DX 5 at 1. When asked whether Reata planned to pursue Phase 3 trials for PHOENIX's indications, Meyer responded that he generally did not comment on Reata's regulatory "plans" and, in any event, that Reata had not yet decided how or when it would proceed with Phase 3 trials. *Id.* Whether Reata generally declined to comment on its "plans" with respect to its initiation of new trials, however, does not demonstrate that Reata had a policy of commenting only on "major [FDA] events" with respect to pending trials, such as CARDINAL. In the only other call Defendants cite (*see* D. Br. at 45 (citing DX 11)), Huff *did not* decline to comment on Reata's regulatory plans or interactions. Rather, when asked whether an NDA for Omav could be filed within 12 months, Huff responded that while Reata still "need[ed] to go and interact with the FDA," the NDA filing would "be along similar timeframes for other NDAs for rare orphan diseases." DX 11 at 7. Defendants' claim that Reata had a policy of commenting only on major FDA events is therefore baseless.

2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020); *see also Skiadas*, 2020 WL 4208442, at *6 ("Defendants' decision to alter the wording of their public statements suggests that the first statement was inaccurate," supporting an inference of scienter).

### 5.    Defendants' Omission of the TSUBAKI Results from their Justification Analysis Demonstrates Scienter

In light of the FDA's concerns, Defendants submitted a "justification analysis" in connection with the Bard NDA. ¶¶ 116-25. The FDA, however, found the analysis uncompelling because it ignored the single most relevant Bard study—TSUBAKI—which was the *only* prior study to collect serial off-treatment eGFR measurements. ¶ 117.

Huff and Meyer were aware of TSUBAKI's design and results. *See* Sections I.B.3.c & II.B.1. Yet, they purposely omitted TSUBAKI from Reata's justification analysis, instead claiming that other studies showed Bard washed out within 14 days. ¶¶ 116-21. Unlike TSUBAKI, however, none of those studies collected serial off-treatment eGFR measurements. ¶¶ 117, 119-20. Thus, Reata was only able to extract off-treatment data for 15 patients, all of which had been accidentally collected and none of which had been collected more than six weeks off treatment. ¶ 119. As the FDA correctly observed, this sample set was woefully inadequate to draw any meaningful conclusion about Bard washout. ¶¶ 119-21. That Defendants excluded the only relevant data from their analysis, relying instead on objectively insufficient data, further demonstrates scienter.

### 6.    The Officer Defendants Had Motive and Opportunity

"Appropriate allegations of motive and opportunity may meaningfully enhance the strength of the inference of scienter." *Nathenson*, 267 F.3d at 412. Where plaintiffs allege that individual defendants were motivated to commit fraud "by the need to raise capital" and/or "the desire to sell stock at inflated prices," and those allegations are accompanied by allegations that the individual defendants "profited from the inflated stock value," it supports a strong inference of scienter.

46

*Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002).

***The Officer Defendants were motivated to raise capital at inflated share prices*:** During the Class Period, Reata had no approved products, making it wholly dependent upon funding from the capital markets for its continued existence. ¶¶ 414-18. Reata secured such funding through four secondary stock offerings during the Class Period. *Id*. Reata's dependence upon the success of these offerings "provided a motive for [D]efendants not to disclose negative [] information," *Yellowdog Partners LP v. Curo Group Holdings Corp.*, 18-cv-2662, 2019 WL 6492651, at *7 (D. Kan. Dec. 3, 2019), and instead, to release misleadingly positive news about CARDINAL's results shortly, and often immediately, prior to those offerings. ¶ 415. In doing so, Defendants were able to increase the prices at which they sold Reata's shares by as much as 65%, thus increasing Reata's net proceeds therefrom, which, in aggregate, amounted to $1.1 billion. *Id*. The fact of these offerings, their suspicious timing *vis-à-vis* Defendants' misleading disclosures, and Reata's dependence on the proceeds therefrom, contribute to a strong inference of scienter.[45]

***Huff and Meyer, along with Reata's CCO and CLO, personally profited from Reata's inflated stock price*:** The "[u]nusual" and "suspicious" timing of these individuals' stock sales "constitute[s] circumstantial evidence of scienter." *City of Birmingham Relief & Ret. Sys. v. Acadia Pharms., Inc.*, 21-cv-762, 2022 WL 4491093, at *13 (S.D. Cal. Sept. 27, 2022).

Neither Huff nor Meyer had previously sold Reata stock at any time during Reata's existence as a publicly traded company. Then, (i) shortly after the January and September 2020 meetings, and (ii) immediately after Reata's November 2020 disclosure of Phase 3's year 2 results,

---

[45] *See, e.g., Lemmer v. Nu-Kote Holding, Inc.*, 98-cv-161, 2001 WL 1112577, at *11 (N.D. Tex. Sept. 6, 2001), *aff'd*, 71 Fed. App'x 356 (5th Cir. 2003) ("specific planned acquisitions using stock" support alleged motive to artificially inflate shares); *see also Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028-29 (N.D. Cal. 2020) (where plaintiff alleged that the defendants "artificially inflated stock to provide financing to continue operations" by conducting a "secondary offering . . . a little over two weeks after" it issued the alleged false revenue statements, this "supported an inference that defendants made their revenue statements with fraudulent intent").

which omitted the FDA's position on the off-treatment measurements, Meyer and Huff began selling shares, benefitting from prices that approximately *quintupled* Reata's share price after its December 2021 corrective disclosure. Reata's CCO and CLO sold shares in the same suspicious manner.[46] This type of "personal financial gain" by Reata's top executives "weigh[s] heavily in favor of scienter." *Yellowdog Partners*, 426 F. Supp. 3d at 875 (quoting *Tellabs*, 551 U.S. at 325); *see also Acadia*, 2022 WL 4491093, at \*13 ("[T]he absence of any sales of stock prior to the class period supports an inference that the individual Defendants' sales were unusual or suspicious and weigh in favor of an inference of scienter.").[47]

Defendants incorrectly argue that the inference of scienter is negated because a portion of the alleged sales were effectuated pursuant to Rule 10b5-1 trading plans. *See* D. Br. at 48. But "the trading plans in question were not adopted until [well] after the motive and opportunity to mislead investors allegedly arose." *Acadia*, 2022 WL 4491093, at \*13; *see* ¶¶ 424, 426 (Meyer's and Huff's trading plans adopted November 19, 2019); DX 18 (CCO's trading plan adopted September 4, 2020). Moreover, Huff's and Meyer's November 2020 sales were not part of a series of prearranged transactions; they were the *only transactions* they ever made pursuant to those trading

---

[46] Between November 9, 2020 and June 15, 2021, Meyer sold 110,000 shares of Reata stock, recognizing over $17 million in proceeds. ¶¶ 419-24. On November 9-10, 2020, Huff sold over 81,000 shares, recognizing approximately $14 million. ¶¶ 425-26. On November 9, 2020, Reata's CCO sold 60,000 shares, recognizing roughly $9.75 million, and on November 11, 2020, Reata's CLO sold over 50,000 shares, recognizing roughly $9.2 million. ¶ 427.

[47] Contrary to Defendants' contentions (*see* D. Br. at 48-49), that Huff and Meyer, Reata's most knowledgeable employees with respect to Bard and CARDINAL, both sold their stock for the first time ever just after making misleading statements, shows scienter, regardless of whether lesser informed executives sold stock also. Defendants' authority does not hold otherwise. In *Abrams*, the court held that "unusual sales by *one insider* do not give rise to a strong inference of scienter when other defendants do not sell . . . their shares" as well. 292 F.3d at 435. Here, the CAC alleges that *four* senior executives sold shares in an identical, suspicious manner, including the two individuals most knowledgeable about the subject matter of the misrepresentations. For this same reason, Defendants' reliance on *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 258 F. Supp. 2d 576 (S.D. Tex. 2003), is misplaced. *See id.* at 594 (insider sales do not support scienter inference "*where the rest of the equally knowledgeable insiders* act in a way *inconsistent* with the inference").

48

plans. ¶¶ 422-27.[48] As such, the trading plans fail to negate the inference of scienter.

Contrary to Defendants' assertion (D. Br. at 48-49), there is no requirement that insiders sell a majority of their holdings before their sales can be deemed suspicious. *See Yellowdog Partners,* 426 F. Supp. 3d at 876.[49] Here, the stock sales are "suspicious," because they were "out of line with prior trading practices [and] [effectuated] at times calculated to maximize personal profit." *In re ArthroCare Corp. Sec. Litig*., 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010).

Finally, Defendants argue that the stock sales are not indicative of scienter because they were effectuated after the August 2020 partial corrective disclosure. *See* D. Br. at 48. However, while Reata's stock price fell on August 10, 2020, from $156.20 to $104.41, it rebounded to $174.66 *as a direct result of Defendants' November 9, 2020 misleading statements*, thereby exceeding Reata's stock price prior to the August 2020 disclosures.[50] Defendants' "substantial stock sales" immediately thereafter, "provide[d] a motive for [them] to temporarily prop up [Reata's] stock price," by issuing misleading information about CARDINAL before the truth was ultimately revealed. *See Acadia*, 2022 WL 4491093, at \*13.

### 7.    The "Core Operations" Doctrine Strengthens the Inference of Scienter

The scienter inference is also bolstered by the fact that the Officer Defendants are deemed to have knowledge of Reata's core operations. That is because "knowledge of core business matters can be inferred to [a company's] officers and directors." *Kurtzman v. Compaq Comput.*

---

[48] *See also Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1266 (10th Cir. 2022) ("[T]hat a trade was made under a 10b5–1 plan does not per se rebut the inference of scienter where, as here, a defendant was allegedly motivated to mispresent or withhold material information to affect a stock price in anticipation of a previously scheduled trade.").

[49] As the Fifth Circuit has recognized, whether an insider's sales represent a large enough percentage of their total holdings to raise an inference of scienter is highly-fact specific. As such, Defendants' citation to "cases in which courts held that different percentages of the stock sold did or did not significantly contribute to a strong inference of scienter," *see* D. Br. at 48 n.18, is unhelpful to the assessment of whether the CAC has raised such an inference here. *Alaska Elec. Pension Fund*, 768 Fed. App'x at 183 n.41.

[50] For this reason, Defendants' reliance on *Local 731 I.B. of T. Excavators & Pavers Pension Trust Fund v. Diodes, Inc.*, 67 F. Supp. 3d 782 (E.D. Tex. 2014) (*see* D. Br. at 48 n.19), is misplaced.

*Corp.*, 99-cv-1011, 2002 WL 32442832, at *11 (S.D. Tex. March 30, 2002). Defendants do not dispute that Bard was one of Reata's leading product candidates. *See* D. Br. at 44. Contrary to Reata's contention (*see* D. Br. at 44), many courts recognize an inference of senior management's knowledge of an important contract or business unit when it accounts for a large percentage of the company's business, even if it was not its *only* contract or unit.[51]

**III.      The CAC Adequately Alleges Control Person Liability**

Defendants' only challenge to the control person claims is that the CAC fails to allege Reata's predicate liability under Section 10(b) of the Exchange Act and Sections 11 and 12(a)(2) of the Securities Act. Because those arguments fail (*see* Sections I-II)*,* the Court should sustain the CAC's control person claims.[52]

**CONCLUSION**

For the foregoing reasons, Defendants' Motion should be denied.

[*SIGNATURE BLOCK ON FOLLOWING PAGE*]

---

[51] *See, e.g.*, *In re Venator*, 547 F. Supp. 3d at 664 (inference of scienter supported where company is "heavily dependent" on a specific facility); *In re OCA, Inc. Sec. & Derivative Litig.*, 05-cv-2165, 2006 WL 3747560, at *17 (E.D. La. Dec. 14, 2006) (inference of scienter supported by misstatements relating to largest asset); *In re Fibrogen, Inc.*, 21-cv-2623, 2022 WL 2793032, at *30 (N.D. Cal. July 15, 2022) (inference of scienter where "it would be 'absurd' to suggest that management did not know about the issues with their flagship product that jeopardized its FDA approval").

[52] If the CAC is dismissed in whole or part, Lead Plaintiff respectfully seeks leave to amend under Fed. R. Civ. P. 15.

50

Dated: November 23, 2022                    Respectfully submitted,

                                            **STECKLER WAYNE CHERRY
                                            & LOVE PLLC**

                                            */s/ Bruce W. Steckler*
                                            Bruce W. Steckler
                                            State Bar No. 00785039
                                            Austin P. Smith
                                            State Bar No. 24102506
                                            12720 Hillcrest Road, Suite 1045
                                            Dallas, TX 75230
                                            Telephone: 972-387-4040
                                            Facsimile: 972-387-4041
                                            Email: bruce@swclaw.com
                                                      austin@swclaw.com

                                            *Local Counsel for Lead Plaintiff*

                                            **KIRBY McINERNEY LLP**
                                            Daniel Hume
                                            Ira M. Press
                                            Meghan J. Summers
                                            250 Park Avenue, Suite 820
                                            New York, NY 10177
                                            Telephone: 212-371-6600
                                            Facsimile: 212-751-2540
                                            Email: dhume@kmllp.com
                                                      ipress@kmllp.com
                                                      msummers@kmllp.com

                                            *Lead Counsel for Lead Plaintiff*

51

## CERTIFICATE OF SERVICE

I certify that on November 23, 2022, a true and correct copy of **LEAD PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT** was served on all counsel of record by electronic mail pursuant to Fed. R. Civ. P. 5(d).

*/s/ Bruce W. Steckler*
Bruce W. Steckler

52