UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

| | |
|---|---|
| TIM DOYLE, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>REATA PHARMACEUTICALS, INC., J. WARREN HUFF, MANMEET S. SONI, COLIN J. MEYER, R. KENT MCGAUGHY, JR., JACK B. NIELSEN, WILLIAM E. ROSE, WILLIAM D. MCCLELLAN, JR., JAMES E. BASS, JEFFERIES LLC, SVB SECURITIES LLC F/K/A SVB LEERINK LLC, STIFEL, NICOLAUS & COMPANY, INCORPORATED, ROBERT W. BAIRD & CO., INCORPORATED, LADENBURG THALMANN & CO., INC., CANTOR FITZGERALD & CO., CITIGROUP GLOBAL MARKETS INC., BARCLAYS CAPITAL INC., GOLDMAN SACHS & CO. LLC,<br><br>Defendants. | Case No. 4:21-cv-00987-ALM LEAD<br><br>CLASS ACTION |

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

# TABLE OF CONTENTS

PAGE

Preliminary Statement...........................................................................................................1

Argument ...............................................................................................................................3

I.      The Particularity Pleading Standard Applies to All Claims ....................................3

II.     The CAC Alleges No Actionable Misstatement or Omission ................................4

        A.      The Very Documents on Which the CAC Relies Vitiate Plaintiffs' Claims .......................................................................................................4

        B.      Plaintiffs Fail to Allege Contemporaneous Information or Events Materially Inconsistent with Reata's Public Statements..............................8

                1.      *Reata Had No Obligation to Disclose Any Midstream FDA "Concerns."*............................................................................... 8

                2.      *All Claims Premised on the FDA's Conclusions About CARDINAL's Washout Period are Impermissible Attempts to Plead Fraud by Hindsight.*............................................... 11

                3.      *Many of the Challenged Disclosures Are Inactionable Opinions.*.................................................... 13

                4.      *Reata's Forward-Looking Statements Are Also Inactionable.* ........ 14

                5.      *The Opposition Fails to Identify Materially Adverse Facts Concealed from Investors During Any of the Class Period's Three Discrete Timeframes.* ................................... 16

III.    The CAC Does Not Raise a Compelling Inference of Scienter...........................21

Conclusion ............................................................................................................................25

## **TABLE OF AUTHORITIES**

PAGE(S)

CASES

*Abrams v. Baker Hughes Inc.*,
    292 F.3d 424 (5th Cir. 2002) ........................................................................... 23

*Alaska Elec. Pension Fund v. Asar*,
    768 F. App'x 175 (5th Cir. 2019) ................................................................... 25

*In re Alkermes Pub. Ltd. Co. Sec. Litig.*,
    523 F. Supp. 3d 283 (E.D.N.Y. 2021), *aff'd sub nom.*
    *Midwest Operating Engineers Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*,
    2021 WL 5782079 (2d Cir. Dec. 7, 2021)   ................................................... 7-8, 11

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2003 WL 21500525 (S.D. Cal. May 1, 2003) ................................................... 14

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018) ........................................................ 22, 25

*In re AstraZeneca Sec. Litig.*,
    559 F. Supp. 2d 453 (S.D.N.Y. 2008) ............................................................. 13

*In re BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ................................................... 13

*Busic v. Orphazyme A/S*,
    2022 WL 3299843 (N.D. Ill. Aug. 11, 2022) ................................................... 10

*Callinan v. Lexicon Pharmaceuticals, Inc.*,
    479 F. Supp. 3d 379 (S.D. Tex. 2020), *aff'd*, 858 F. App'x 162 (5th Cir. 2021) ........ 18-19, 22

*Collins v. Morgan Stanley Dean Witter*,
    224 F.3d 496 (5th Cir. 2000) ........................................................................ 5, 6

*Cox v. Bank of America, N.A.*,
    2017 WL 1622043 (S.D. Tex. May 2, 2017) ...................................................... 6

*Crutchfield v. Match Grp., Inc.*,
    529 F. Supp. 3d 570 (N.D. Tex. 2021) ............................................................. 24

*In re Delcath Sys., Inc. Sec. Litig.*,
    36 F. Supp. 3d 320 (S.D.N.Y. 2014) ............................................................... 23

*In re CV Therapeutics, Inc. Sec. Litig.*,
    2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) .................................................... 10

*Dresner v. Silverback Therapeutics, Inc.*,
2022 WL 16716165 (W.D. Wash. Nov. 4, 2022) ................................................................ 6

*Fin. Acquisition Partners LP v. Blackwell*,
440 F.3d 278 (5th Cir. 2006) ........................................................................................... 5

*Fisher v. Fennec Pharm. Inc.*,
2022 WL 7108945 (M.D.N.C. Oct. 12, 2022) ................................................................22

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016) ......................................................................... 4, 15

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018) ......................................................................... 17-18

*Hoey v. Insmed Inc.*,
2018 WL 902266 (D.N.J. Feb. 15, 2018) ................................................................. 8, 9, 19

*Janies v. Cempra, Inc.*,
816 F. App'x 747 (4th Cir. 2020) ................................................................................. 22

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
552 F. Supp. 3d 77 (D. Mass. 2021), *aff'd sub nom. Thant v. Karyopharm
Therapeutics Inc.,* 43 F.3d 214 (1st Cir. 2022)............................................................. 13

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ......................................................................................... 6

*Leavitt v. Alnylam Pharmaceuticals, Inc.*,
451 F. Supp. 3d 176 (D. Mass. 2020) ................................................................. 14, 15, 16, 17

*Lone Star Ladies Inv. Club. v. Schlotzky's Inc.*,
238 F.3d 363 (5th Cir. 2001) ......................................................................................... 3

*Lungu v. Antares Pharma Inc.*,
2022 WL 212309 (3d Cir. Jan. 25, 2022) ................................................................. 10, 13

*In re MannKind Sec. Actions*,
835 F. Supp. 2d 797 (C.D. Cal. 2011) ......................................................................... 15

*Marder v. Lopez*,
450 F.3d 445 (9th Cir. 2006) ......................................................................................... 6

*Midwest Operating Engineers Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*,
2021 WL 5782079 (2d Cir. Dec. 7, 2021) ................................................................. 22

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*,
2005 WL 4161977 (D. Colo. Oct. 20, 2005) ............................................................. 16

*North Port Firefighers' Pension—Loc. Option Plan v. Temple-Inland, Inc.*,
   936 F. Supp. 2d 722 (N.D. Tex. 2013) ................................. 21

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
   2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ....................... 24

*Paxton v. Provention Bio, Inc.*,
   2022 WL 3098236 (D.N.J. Aug. 4, 2022) ................................. *passim*

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018), *aff'd sub nom.*
   *Police & Fire Ret. Sys. of City of Detroit v. Plains All American Pipeline, L.P.*,
   777 F. App'x 726 (5th Cir. 2019) ............................................ 4

*Police & Fire Ret. Sys. of City of Detroit v. Plains All American Pipeline, L.P.*,
   777 F. App'x 726 (5th Cir. 2019) ............................................ 3

*Rice v. Intercept Pharms., Inc.*,
   2022 WL 837114 (S.D.N.Y. Mar. 21, 2022) .......................... 25

*In re Rockwell Med., Inc. Sec. Litig.*,
   2018 WL 1725553 (S.D.N.Y. Mar. 30, 2018) ........................ 9

*Sanders v. AVEO Pharm., Inc.*
   2015 WL 1276824 (D. Mass. Mar. 20, 2015) ....................... 10

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016) ................................... 9, 13, 15, 22

*Sarafin v. BioMimetic Therapeutics, Inc.*,
   2013 WL 139521 (M.D. Tenn. 2013), *aff'd sub nom.*
   *Kuyat v. BioMimetic Therapeutics, Inc.*,
   747 F.3d 435 (6th Cir. 2014) ................................................ 20

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ................................................ 10

*Shash v. Biogen Inc.*,
   2022 WL 4134479 (D. Mass. Sept. 12, 2022) .................... 12-13

*Skiadas v. Acer Therapeutics Inc.*,
   2020 WL 3268495 (S.D.N.Y. June 16, 2020) ...................... 24

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*,
   365 F.3d 353 (5th Cir. 2004) .......................................... 17-18

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
   551 U.S. 308 (2007) ....................................................... 4, 21

*Thant v. Karyopharm Therapeutics Inc.*,
    43 F.4th 214 (1st Cir. 2022) ........................................................................................ 9

*Vallabhaneni v. Endocyte, Inc.*,
    2016 WL 51260 (S.D. Ind. Jan. 4, 2016) ............................................................. 19, 20

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ....................................................................... 4

*Wolfe v. Aspenbio Pharma, Inc.*,
    2012 WL 4040344 (D. Colo. Sept. 13, 2012), *aff'd,* 587 F. App'x 493 (10th Cir. 2014) ...... 13

*Yanek v. Staar Surgical Co.*
    388 F. Supp. 2d 1110 (C.D. Cal. 2005) ..................................................................... 10

OTHER AUTHORITIES

FDA, Office of New Drugs, Manual of Policies & Procedures,
    *Good Review Practice: Refuse to File* (2018) ......................................................... 11

**PRELIMINARY STATEMENT**

Over hundreds of pages, the CAC spins a tale of a company that supposedly lied to investors about having FDA buy-in on a pivotal study design.[1]  To make its claims appear credible, the CAC repeatedly—dozens of times—characterizes key pieces of FDA correspondence as supposedly confirming the deception.  As the Opposition makes clear, however, the FDA correspondence eviscerates Plaintiffs' theory.  All but conceding as much, Plaintiffs ask the Court not to look at the documents that the CAC repeatedly purports to summarize.  Plaintiffs' request ignores Fifth Circuit law on incorporation by reference.

As a back-up, the Opposition pivots to two primary arguments.  First, Plaintiffs argue that even if the FDA did endorse CARDINAL's design (including its washout period), Reata failed to disclose unspecified, midstream "concerns" that the agency raised some unspecified time after the trial commenced.  Second, Plaintiffs ask the Court to infer that the results of a separate study (TSUBAKI) conducted only in Japan by a separate company alerted Reata that Bard's "real" washout period was eight weeks rather than four.  Both of these theories fail.

It is well settled that drug candidate sponsors need not disclose interim agency "concerns" and "recommendations" (including regarding potential trial design shortcomings) absent indication that they will necessarily preclude approval.  Plaintiffs argue that in making any disclosure about CARDINAL's results, Reata assumed an obligation to disclose any and all supposed FDA comments about its washout period.  But courts have held the opposite, recognizing that merely discussing a trial's results does not give rise to some sweeping obligation to report all non-final back-and-forth with the agency on the trial's design.  The

---

[1] All capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Opening Brief.  "Opening Brief" or "Br." refers to Defendants' Joint Motion to Dismiss the CAC (Dkt. No. 59).  "Opposition" or "Opp." refers to Lead Plaintiff's Memorandum of Law in Opposition (Dkt. No. 60).  Citations in the form of "Ex. _" are to the exhibits to the Bergman Declaration, while those in the form of "Pls. Ex. _" are to the exhibits to the Declaration of Daniel J. Hume in Support of the Opposition (Dkt No. 60-1).  Unless otherwise noted, all case citations herein omit any internal citations, quotation marks, alterations, and/or emphases.

Opposition further claims that Reata's views of the strength and implications of the CARDINAL results do not constitute protected opinions for lack of telltale phrases such as "think" or "believe."  Reams of authority, however, demonstrate that interpretations of clinical trial data are opinions *per se*, regardless of their precise framing, because evaluating scientific study results is inherently an exercise in judgment on which reasonable minds may disagree.

Regarding the Opposition's newfound reliance on the TSUBAKI study, the CAC's allegations lack any specificity, much less the particularity required by the PSLRA.  On the crucial question of when and how Reata supposedly learned that the study—which, by Plaintiffs' own admission, was *not* designed to assess how quickly Bard washes out—included an unfavorable, embedded finding on that issue, the CAC offers no details: no confidential witness, no internal email, no particulars.  Plaintiffs have never had a coherent explanation for why the FDA—which supposedly had been telling Reata for years that there was no path to approval— would have allowed the CARDINAL study to proceed, accepted the Bard NDA for review in 2021, and convened an advisory committee to review the application.  But TSUBAKI adds another layer of implausibility to Plaintiffs' narrative: the FDA has publicly stated that *even it* needed to build a special statistical model in 2021 to assess CARDINAL's washout period using data gleaned from both TSUBAKI and from CARDINAL itself before reaching a conclusion on the adequacy of CARDINAL's washout period.  Plaintiffs do not—because they cannot—allege that Reata made any similar determination before the FDA started to review the NDA in 2021.

More generally, the Opposition does not refute the Opening Brief's showing that the CAC fails to plausibly allege concealed, materially adverse facts during any of the class period's three discrete timeframes.  The Opposition all but concedes that the best Plaintiffs can do for any timeframe is locate vague FDA "concerns" and study design "recommendations" sometime

2

during a roughly *three-year* period.  Even if such facts could in theory support viable claims (and they cannot), courts routinely reject such temporally "unmoored" allegations as insufficient to plead that specific statements were false when made.

Finally, the Opposition's scienter arguments are most notable for declining even to acknowledge, much less attempt to explain away, what the Opening Brief established is clearly the most compelling—and decidedly non-fraudulent—inference available from the CAC's allegations: that Reata and the FDA both believed in good faith that CARDINAL (including its washout period) could potentially support Bard approval until the agency reviewed all of the final evidence in 2021.  That alone undermines Plaintiffs' position on a fraudulent intent inquiry that *requires* consideration of alternative explanations.  In all events, Plaintiffs' contentions in support of its fraud narrative disregard the scienter standard in the biopharmaceutical context and nowhere explain why the Executive Defendants would have chosen to cap off a supposed five-year fraud scheme by *retaining* two thirds or more of their stock holdings.

## ARGUMENT

## I.    THE PARTICULARITY PLEADING STANDARD APPLIES TO ALL CLAIMS

As an initial matter, all claims asserted in the CAC, including Securities Act claims, must be pled with particularity.  (Br. at 21-23.)  Plaintiffs do not dispute that their Securities Act claims are "based on the same underlying facts and allegations as [their] securities fraud claim[s] under the Exchange Act." *See, e.g.*, *Police & Fire Ret. Sys. of City of Detroit v. Plains All American Pipeline, L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) (citing *Lone Star Ladies Inv. Club v. Schlotzky's Inc.*, 238 F.3d 363, 368 (5th Cir. 2001)).  They protest, however, that the Securities Act claims name certain statutory defendants not targeted in the fraud counts and are set out in a "separate section" of the CAC that "'expressly disavow[s] and disclaim[s] any

3

allegations of fraud.'"  (Opp. at 16-17.)  But neither such "boilerplate disavowal[s] of an intent to plead fraudulent conduct" nor the mere fact of unique defendants relieves plaintiffs of their Rule 9(b) obligations where, as here, Securities Act claims are otherwise "substantively identical" to companion fraud claims.  *See, e.g.*, *In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 652-53, 646, 668-69 (S.D. Tex. 2021) (applying Rule 9(b) to Securities Act claims uniquely naming director and underwriter defendants); *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 618-19 (S.D. Tex. 2018) ("[b]oilerplate disavowals of an intent to allege fraud do not change the analysis"), *aff'd sub nom. Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726 (5th Cir. 2019); (Br. at 22-23).

## II.    THE CAC ALLEGES NO ACTIONABLE MISSTATEMENT OR OMISSION

### A.    <u>The Very Documents on Which the CAC Relies Vitiate Plaintiffs' Claims</u>

As shown in the Opening Brief, the FDA's SMP Letter and February 2019 Letter fundamentally contravene what the CAC repeatedly claims they say.  Thus, even for purposes of a motion to dismiss, Plaintiffs' core claim—that Reata *never* obtained the FDA's concurrence on CARDINAL's trial design—has been shown to be flatly wrong.  (Br. at 23-25 (citing cases)); *see also Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 582 (S.D.N.Y. 2016) ("plaintiffs' core premise . . . is belied by the text of the [FDA's no agreement letter] itself").

Plaintiffs urge in response that the Court should simply "disregard" the actual *documents* on motion to dismiss and instead accept the CAC's facially inaccurate characterizations thereof. (Opp. at 17-20.)  That position contravenes the Supreme Court's holding that "courts *must* consider" not only the complaint itself but also "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis added).  Plaintiffs' attempts to avoid this requirement have no merit.  First, contrary to Plaintiffs'

4

suggestion, documents may be incorporated into a complaint by reference even if they were not in the pleading party's possession—so long as that party "knew about" and "relied" upon them in asserting its claims. *Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006) (on motion to dismiss, a court considers "documents that the plaintiffs *either* possessed *or knew about* and upon which they relied in bringing suit") (emphasis added); (Br. at 6 n.2, 24 n.5). Indeed, "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings" so long as "they are referred to in the plaintiff's complaint and are central to her claim." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498-99 (5th Cir. 2000). The Opposition does not dispute that Plaintiffs "knew about" the SMP Letter and February 2019 Letter because of the Briefing Book, and Plaintiffs extensively purported to "rely" on them in the CAC—explicitly referring to them, claiming to characterize their contents, and highlighting them as key bases of Plaintiffs' falsity and scienter theories. (Br. at 23-24, 24 n.5 (citing CAC).) Plaintiffs suggest that the CAC reflects only "second-level references" to the SMP Letter and February 2019 Letter excerpted from the Briefing Book. (Opp. at 18-19.) But that is not so: the CAC goes *far* beyond the Briefing Book's footnote on these Letters, alleging, for example, that the Letters indicated "that the four-week washout period was inadequate and/or without basis, and that retained eGFR data predicated on such a washout period would be invalid and incapable of supporting FDA approval." (*Compare, e.g.*, CAC ¶¶ 104, 112, 131, 169, 178, 182, 189, 195, 236, 246, 299, 383, *with* Ex. 25 at 39 n.2.) The Opposition cites no authority suggesting that a plaintiff may choose to affirmatively deploy documents in this manner—engaging in self-serving speculation as to their actual contents—while avoiding incorporation by reference.

Plaintiffs also argue that, even if consideration is appropriate, the Court may not consider the SMP Letter and February 2019 Letter for the truth of their contents. (Opp. at 19.) That

misapprehends the basic difference between judicial notice and incorporation by reference, which are separate concepts.  Under the latter doctrine, as noted, incorporated documents attached to a motion to dismiss "*are considered part of the pleadings*."  *Cox v. Bank of Am., N.A.*, 2017 WL 1622043, at *2 (S.D. Tex. May 2, 2017) (emphasis added) (quoting *Collins*, 224 F.3d at 498-99); *see also Dresner v. Silverback Therapeutics, Inc.*, 2022 WL 16716165, at *4 (W.D. Wash. Nov. 4, 2022) (explaining that "[i]ncorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself") (quoting *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018)).  Courts thus "may assume" the "contents" of such documents "are true for purposes of a motion to dismiss." *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006); (Br. at 20).[2]

Plaintiffs alternatively strain to contend that the actual content of the Letters somehow supports their claims.  (Opp. at 20-22 & n.14.)  These efforts fall flat.  The SMP Letter did not, as Plaintiffs would have it, merely "ensure[] the investigation's 'safety.'"  (*Id.*; Br. at 8-9, 23-25.) It went on to provide "comments and recommendations" on the CARDINAL protocol, in which the agency repeatedly acknowledged the proposed "4-week drug treatment withdrawal period" and advised that off-treatment eGFR assessments at Week 52 and Week 104, respectively, "may" support "accelerated approval" after Year 1 or else would "be critical for demonstrating the efficacy of [Bard] and supporting full approval" after Year 2.  (*Id.*; Ex. 2 at 1-2.)  Neither the FDA nor Reata could have known in December 2016 how the agency would *ultimately interpret* the data collected in those assessments.  But there is simply no way to read the SMP Letter other than as reflecting the FDA's indication to Reata that the use of a four-week washout period was

---

[2] Plaintiffs also accuse Defendants of "improperly cherry-pick[ing]" the SMP Letter and February 2019 Letter for submission with their motion to dismiss.  (Opp. at 19.)  But their incorporation at this stage is purely a factor of Plaintiffs' own choices with respect to the CAC, which specifically identifies those particular documents as formal, written agency correspondence and purports to allege their contents.  (*See, e.g.*, CAC ¶¶ 99, 104-05, 178, 182.)

6

"appropriate" for CARDINAL.  (Opp. at 21-22, 21 n.14 (quoting CAC).)

As for the February 2019 Letter, Plaintiffs ask the Court to find language that simply is not there.  (Opp. at 20-22.)  On its face, nothing in that communication "indicat[ed] the FDA no longer concurred with [CARDINAL] Phase 3's design."  (*Id.* at 21 (emphasis omitted).)  Nor would such an advisory have made any logical sense because Phase 3 was well underway at that point.  (*See, e.g.*, CAC ¶¶ 91, 229; Br. at 11-12.)  Rather, the February 2019 Letter first "refer[s]" for context to several items, including FDA-Reata email exchanges regarding a possible end-of-Phase-2 meeting from the prior year, without suggesting in any way that Reata's continued work on Phase 3 in the interim had contravened agency directives.  (Ex. 7 at 1.)  The Letter then "encourage[s] [Reata] to submit a written response" to any open items from the SMP Letter (none of which had anything to do with the washout period) and "offer[s] to meet with [Reata] to discuss [its] development program and a path forward."  (*Id.*; Br. at 8-9, 11-12, 24-25.)  The February 2019 Letter also includes an observation that, "[i]n general," the FDA "encourage[s] sponsors to obtain FDA concurrence that a study intended to support a future marketing application is adequate and acceptable for this purpose."  (Ex. 7 at 1.)  The Opposition attempts to spin this language into some sort of reproach for, supposedly, commencing CARDINAL without agency signoff on the washout period.  It is clear on the face of the document, however, that the statement is little more than a recitation of the FDA's "general" practices and says nothing specific about Reata or CARDINAL, much less the washout period.  (*See id.*)

At bottom, the CAC casts the February 2019 Letter as *the document* by which the FDA told Reata of "its previously-expressed concerns with the adequacy of CARDINAL's washout period, and hence with the validity of CARDINAL's retained eGFR data."  (CAC ¶ 236.)  But "[n]o such language appears in the . . . document."  *In re Alkermes Pub. Ltd. Co. Sec. Litig.*, 523

7

F. Supp. 3d 283, 293-94 (E.D.N.Y. 2021), *aff'd sub nom. Midwest Operating Engineers Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079 (2d Cir. Dec. 7, 2021).

**B.      Plaintiffs Fail to Allege Contemporaneous Information or Events Materially Inconsistent with Reata's Public Statements**

*1.      Reata Had No Obligation to Disclose Any Midstream FDA "Concerns."*

Plaintiffs' claims should be dismissed because Reata was not required to disclose any "concerns" the FDA may allegedly have raised about the sufficiency of the four-week washout period during the course of the CARDINAL trial.  (Br. at 25-28 (collecting cases).)  Indeed, and as the Opposition all but concedes, "the law with respect to this issue is clear: *a biopharmaceutical corporation need not share a regulatory agency's response or criticism to a trial and its results if it does not constitute a final determination*."  *Hoey v. Insmed Inc.*, 2018 WL 902266, at \*14 (D.N.J. Feb. 15, 2018) (emphasis added); *see also Paxton v. Provention Bio, Inc.*, 2022 WL 3098236, at \*13 (D.N.J. Aug. 4, 2022) ("the Company had no duty to disclose interim, non-final discussions with the FDA").

Plaintiffs contend that Reata's September 2018 email exchange with the FDA warrants deviation from this general rule.  (Opp. at 28.)  As the above-discussed February 2019 Letter makes clear, however, those communications reflected nothing more than the FDA's "recommend[ation]" that Reata request a meeting to discuss its development program and "belie[f]" that such a meeting "would be beneficial."  (Ex. 7 at 1; Br. at 11-12, 37-38.)  Neither the CAC nor the Opposition suggests any such meeting was required as a regulatory matter or offers any facts to support Plaintiffs' self-serving speculation that the FDA's "offer" (Ex. 7 at 1) somehow indicated that the FDA no longer concurred with CARDINAL's design or that its prior "guidance could no longer be relied upon."  (*See* Opp. at 28.)  Indeed, the Opposition's proffered inferences are all the more implausible because the FDA could simply have issued a "clinical

8

hold" if it had the sort of "serious concerns about the study design" that Plaintiffs suggest.  *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 533-34 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016); (Br. at 28).  Unsurprisingly, the Opposition cites no case finding a duty to disclose non-final FDA back-and-forth—otherwise immaterial as a matter of black-letter law—on the basis of a single declined meeting invitation.

Plaintiffs also argue that Reata assumed an obligation to advise the market of any and all FDA "concerns" about CARDINAL's washout period by disclosing that "CARDINAL had been designed in accordance with FDA guidance" and that "CARDINAL's results demonstrated Bard's retained eGFR benefits."  (Opp. at 28-29.)  But the SMP Letter confirms that the FDA indeed provided signoff on the CARDINAL protocol, and Reata consistently warned investors that the FDA could nevertheless ultimately decline to approve Bard based on "'inadequate design . . . of [Reata's] clinical trials,'" among other possible reasons.  (Br. at 10.)  As for Reata's disclosures about the CARDINAL results, speaking positively about trial results does "not create a duty to disclose" even "'significant concerns'" from the FDA, so long as they do not constitute "the agency's final determination."  *Hoey*, 2018 WL 902266, at *14; *Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th 214, 222-23, 226 (1st Cir. 2022) ("a company is not, by virtue of making <u>some</u> disclosures about its products, obligated to disclose <u>all</u> potentially interesting information") (emphasis in original); *In re Rockwell Med., Inc. Sec. Litig.*, 2018 WL 1725553, at *10 (S.D.N.Y. Mar. 30, 2018) (defendants not "'duty-bound,' after 'having disclosed *something* about Triferic, to disclose *everything* about Triferic'" because "it is well settled that a corporation is not required to reveal all facts on a subject just because it reveals a single fact") (emphasis in original).

Plaintiffs claim in conclusory fashion that the purported "gravity of the FDA's concerns"

in this case changes the analysis.  (Opp. at 29-30.)  But nothing in the Briefing Book suggests that prior to late 2021, the FDA had found—much less communicated to Reata—that *full* approval of Bard following Year 2 of CARDINAL Phase 3 was not viable.  The mere fact that the agency expressed concerns in 2020 about *accelerated* approval cannot move the ball for Plaintiffs, because Reata affirmatively disclosed as much.  (Br. at 13-14, 39-40; Ex. 25 at 13, 39.)  In any event, courts have consistently recognized that even FDA-identified "deficiencies that require[] significant additional work" do not without more create a duty to disclose so long as eventual approval remains in play.  *Busic v. Orphazyme A/S*, 2022 WL 3299843, at *13-14 (N.D. Ill. Aug. 11, 2022) (collecting cases); *Lungu v. Antares Pharma Inc.*, 2022 WL 212309, at *5-6 (3d Cir. Jan. 25, 2022) (company not obligated to disclose multiple "review issue[s]" and FDA concerns because statements constituted mere "interim feedback").[3]  Once again, moreover, the FDA's own actions, including in *accepting the Bard NDA for review in April 2021*, belie the definitiveness that Plaintiffs ascribe to its purported "concerns" about CARDINAL.  The Opposition suggests in a footnote that the Court should disregard the FDA's decision to accept

---

[3] Plaintiffs' authorities concern sponsors that proclaimed confidence about FDA approval prospects while failing to disclose formal communications with the agency expressly identifying issues that would preclude approval if unaddressed.  If anything, the nondisclosure in these cases is so extreme as to underscore the unmistakably more mundane agency back-and-forth at issue here.  In *Schueneman v. Arena Pharms., Inc.*, for example, the defendant expressed "confiden[ce]" about its drug candidate's approval prospects, including based on "all the animal studies that ha[d] been completed," while knowing "for years" that it was causing cancer in rat trials and that the FDA "wanted evidence that it was not a threat to humans" and had asked the company "to 'defend continuation'" of its clinical testing, among other "'highly unusual'" and "'out-of-process'" requests.  840 F.3d 698, 700-02, 707-09 (9th Cir. 2016).  *Yanek v. Staar Surgical Co.* concerned a company that failed to disclose receipt of a formal FDA notice after an inspection revealed "'significant objectionable conditions'" in its manufacturing facilities and precipitated warnings that the subject device "would not be approved until the violations had been addressed."  388 F. Supp. 2d 1110, 1119, 1130-32 (C.D. Cal. 2005).  *Sanders v. AVEO Pharm., Inc.* saw a sponsor only partially disclose a meeting in which the FDA "requested that the NDA submission be postponed," "questioned whether the NDA should be filed at all," and "expressly warned" that "the sole pivotal clinical trial['s] demonstrat[ion] [of] an adverse trend in overall survival" could "affect approvability."  2015 WL 1276824, at *4-6 (D. Mass. Mar. 20, 2015).  And in *In re CV Therapeutics, Inc. Sec. Litig.*, the sponsor outright "misrepresented that the FDA had scheduled [its drug] for review" by an advisory committee, failed to disclose a formal letter stating that "'[s]ubstantial additional clinical data are needed'" and that the "Agency has three specific safety concerns *that will need to be addressed prior to approval*," and concealed receipt of an "'FDA Discipline Review Letter.'"  2004 WL 1753251, at *1, 5-9 (N.D. Cal. Aug. 5, 2004) (emphasis added).

the NDA as purely administrative.  (Opp. at 24 n.17.)  But the agency itself has explained that "use of a trial design that is inappropriate . . . for the particular claim" or "use of obviously inappropriate or clinically irrelevant endpoints" constitute grounds for so-called "refuse to file" action.  *See* FDA, Office of New Drugs, Manual of Policies & Procedures, *Good Review Practice: Refuse to File* (2018), at 20.

> 2.     *All Claims Premised on the FDA's Conclusions About CARDINAL's Washout Period are Impermissible Attempts to Plead Fraud by Hindsight.*

The Opening Brief showed that Plaintiffs' claims are impermissibly founded upon the FDA's eventual conclusion in December 2021 that CARDINAL's four-week washout period was insufficient.  (Br. at 29-32 (explaining that the Fifth Circuit prohibits "hindsight" pleading).)  In the CAC, Plaintiffs spent *dozens* of CAC paragraphs alleging that, "as the Briefing Book explained, Bard required eight (8) weeks for washout."  (CAC ¶¶ 15, 115, 127, 131, 345, 354, 368.)  In their Opposition, Plaintiffs now claim instead that the "CAC does *not* rely upon the FDA's 2021 determination that Bard washout took eight weeks."  (Op. at 30-32 (emphasis added).)  The disavowal highlights the fundamental infirmity of the CAC's core falsity theory.

Plaintiffs urge that their claims turn not on the washout period's supposed inadequacy but "on the FDA's September 2018 and February 2019 communications indicating that it no longer concurred on CARDINAL's design."  (*Id.* at 31.)  As shown, however, any suggestion that this correspondence reflected some about-face by the FDA on the trial design it green-lit in the SMP Letter is the stuff of "pure fantasy."  *Alkermes*, 523 F. Supp. 3d at 293-94.

Plaintiffs also suggest that the FDA advised Reata during the class period that the results of a study conducted in Japan by a Japanese development partner "rendered CARDINAL's off-treatment measurements uninterpretable."  (Op. at 31.)  That is not supported by any well-pleaded factual allegations.  Nothing in the CAC—or the Briefing Book on which it relies—

11

suggests that the FDA discussed with Reata any aspect of the TSUBAKI study conducted by Kyowa Kirin prior to Reata's submission of the Bard NDA.  Indeed, Plaintiffs allege no reason to think that the FDA would even have *seen* TSUBAKI's off-treatment data prior to review of the NDA: TSUBAKI was not an FDA-sanctioned study, and was conducted in Japan under the oversight of the Japanese Pharmaceutical and Medical Devices Agency.  (*See, e.g.*, CAC ¶¶ 46, 118; Pls. Ex. 4 at 2-4, 10, 13.)

Regardless, there is no indication that the FDA had reached a conclusion about how to interpret *TSUBAKI or CARDINAL* until 2021, after it analyzed the output of both via the "fit-for-purpose PK/PD model" that it built to review the Bard NDA.  (*See, e.g.*, Ex. 27 at 144:6-15 ("[r]esults from TSUBAKI therefore *suggest*[] the 4-week washout in CARDINAL *might* not have been sufficient," prompting FDA to "develop[] a fit-for-purpose PK/PD model") (emphasis added); *id.* at 145:7-8 ("The PK/PD model was developed based on TSUBAKI and CARDINAL Phase 3 data.").)  Plaintiffs perplexingly suggest that the FDA only built its model as some sort of academic exercise, having already concluded "years earlier" that CARDINAL's washout period was flawed.  (Opp. at 34-35 & 35 n.31.)  That makes no sense in the context of the FDA's decision to review the Bard NDA, and is belied by the plain language of the Briefing Book and AdCom Meeting transcript.  (*See* Ex. 25 at 22-23, 49 ("The FDA developed a fit-for-purpose PK/PD model *with the primary objective to address the adequacy of the 4-week washout period in CARDINAL Phase 3*.") (emphasis added); *id.* at 61; Ex. 27 144:13-15.)  In summary, that the FDA may *eventually* have concluded from a collection of data that included TSUBAKI and CARDINAL that a 4-week washout period was not long enough is no substitute for particularized facts showing that it settled on and communicated that view to Reata months or years earlier.  *See Shash v. Biogen Inc.*, 2022 WL 4134479, at \*14 (D. Mass. Sept. 12, 2022)

12

("[s]cientific conclusions cannot be misleading merely because the FDA disagreed with the conclusion"); *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 470-71 (S.D.N.Y. 2008) ("FDA Briefing Document" merely suggests that "when the FDA Advisory Committee met . . . [the sponsor] had its side of the case and the FDA staff had its side"); (*see also infra* pp. 14, 17-18).

### 3. Many of the Challenged Disclosures Are Inactionable Opinions.

Many of the disclosures targeted in the CAC constitute opinions on the strength or implications of the CARDINAL (or prior study) results. As shown in the Opening Brief, those are inactionable even if "the FDA interpreted the . . . study results differently (adjusting for alleged methodological errors)" and even if "[D]efendants' view of the data may have been erroneous." *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 552 F. Supp. 3d 77, 89 (D. Mass. 2021), *aff'd sub nom. Thant*, 43 F.4th 214; (Br. at 32-35).

Plaintiffs argue that "most" of the statements at issue are "not opinions" because they lack phrases such as "'thought'" or "'believed.'" (Opp. at 33.) But "the substance and context of a statement may indicate an opinion even where no qualifying language is used," and courts have accordingly recognized that "interpretations of clinical trial data are considered opinions" regardless of their precise framing. *Shash*, 2022 WL 4134479, at *8; *cf. In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016) ("the statement that 'the 2008 Texas Longhorn football team was better than the 2008 Oklahoma Sooner football team'. . . . can be evaluated against objective evidence" but is nevertheless "a paradigmatic example of an opinion"). The Opposition cites no authority to the contrary, because the case law is uniform.[4]

---

[4] *See, e.g.*, *Lungu*, 2022 WL 212309, at *3 ("Interpretations of clinical trial data are considered opinions, which are only actionable under the securities law if they are not honestly believed and lack a reasonable basis."); *Sanofi*, 87 F. Supp. 3d at 543 ("Courts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."); *Wolfe v. Aspenbio Pharma, Inc.*, 2012 WL 4040344, at *8 (D. Colo. Sept. 13, 2012) ("Interpretations of the results of various clinical studies are essentially no different than opinions,

13

Plaintiffs also claim that, even if opinions, Reata's statements were nevertheless misleading for failure to disclose certain supposedly conflicting information, including the FDA's "concerns," the agency's recommendation not to apply for accelerated approval, and the TSUBAKI results.  (Opp. at 34.)  As discussed, however, nothing about either of the former indicated that the FDA had reached a view of the appropriate washout period or concluded that full approval was foreclosed—a stark and telling contrast to Plaintiffs' primary authority.  *See In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *1, 9 (S.D. Cal. May 1, 2003) (FDA expressly advised sponsor during formal meeting that the "study designs [were] inconsistent with clinical practice" and "the current study data [was] not considered pivotal data for an NDA").  Regarding TSUBAKI, Plaintiffs plead no facts to suggest that Reata *ever* interpreted the results to suggest CARDINAL's washout period was inadequate, much less prior to the issuance of the Briefing Book in 2021.  And as explained, that document makes clear that *even the agency* had to develop a proprietary model using TSUBAKI and CARDINAL Phase 3 results before arriving at any such conclusion.

Finally, Plaintiffs' suggestion that Reata's scientific basis for believing in the sufficiency of CARDINAL's washout period was "objectively unreasonable" is unfounded.  (Opp. at 35.)  The Briefing Book in no way suggests as much.  If anything, FDA's characterization of the washout period as "uncertain[]" and its need to develop its own model to digest the data suggest that the agency's eventual conclusion was far from pre-ordained.  (Br. at 16-17, 31, 34-35.)

        **4.**      *Reata's Forward-Looking Statements Are Also Inactionable.*

Reata's statements regarding the possibility that the CARDINAL results "*could*" support

---

because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."), *aff'd*, 587 F. App'x 493 (10th Cir. 2014); *Paxton*, 2022 WL 3098236, at *11 ("[i]nterpretations of clinical trial data are considered opinions"); *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 183-84 (D. Mass. 2020).

eventual FDA approval and Reata's "*plan*" to proceed with an NDA filing are textbook forward-looking statements protected by the PSLRA safe harbor and companion bespeaks caution doctrine.  (Br. at 9-11, 35-37); *see also Leavitt*, 451 F. Supp. 3d at 183, 186-87 (targeted statements "anticipated a hoped-for future event, FDA approval, and fit squarely within the PSLRA's safe harbor").  Plaintiffs argue that any statement including a reference to the FDA's past guidance on the CARDINAL design or indication that the study could support approval of Bard is necessarily actionable.  (Opp. at 36-37.)  In contrast to Plaintiffs' cases, however,[5] the CAC's own incorporated documents show that the FDA *did* green-light CARDINAL, including its washout period, and advised that its off-treatment data "will be critical for demonstrating the efficacy of [Bard] and supporting full approval."  (Ex. 2 at 1-2; Br. at 8-9, 24-25.)

The Opposition also contends that Reata's "actual knowledge" of falsity—in particular, of the FDA's "concern[s] about CARDINAL's off-treatment measurements"—precludes application of the safe harbor.  (Opp. at 37.)  But courts have rejected the notion that mere awareness of agency concerns nullifies the protection offered to forward-looking statements.  *See Sanofi*, 87 F. Supp. 3d at 538 ("plaintiffs do not allege concrete factual particulars that support an inference that the statements were 'made with actual knowledge that they were false or misleading'" because complaint "alleges only that defendants were aware of the FDA's concerns").  And the CAC alleges no basis to conclude that Reata spoke of Bard's approval prospects while knowing it had none.  *See Gillis*, 197 F. Supp. 3d at 585-86 (statements regarding FDA approval inactionable because complaint did "not adequately plead" that they "were made with actual knowledge that they were false or misleading").

---

[5] In *In re MannKind Sec. Actions*, for example, defendants "never obtained [the FDA's] agreement" as to their comparative study protocol and "conducted the bulk" of it "before even meeting with the FDA," and the "FDA never indicated to Defendants" that the study "would constitute proof" on the critical issue.  835 F. Supp. 2d 797, 801-02 (C.D. Cal. 2011).

Finally, the Opposition attacks the warnings included in Reata's disclosures as "insufficiently specific." (Opp. at 37-38.) This "argument overlooks the language of the cautionary statements provided, and it overstates the standard for 'meaningful cautionary statements.'" *Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, 2005 WL 4161977, at *9 (D. Colo. Oct. 2005) (rejecting claim that the defendant's disclosures lacked sufficient precision given warnings "that the Company might not be able to demonstrate efficacy, that a second Phase 3 trial might be necessary, and that the FDA approval might be delayed or not obtained at all"). Reata cautioned that Bard might fail to receive approval due to "inadequate design or implementation of [its] clinical trials," "failure to demonstrate to the satisfaction of regulatory authorities that [it was] safe and effective for its proposed indication," or agency disagreement that CARDINAL "provid[ed] adequate data on safety or efficacy." They also advised that Reata could be "required by the FDA . . . to conduct additional clinical trials." (Br. at 9-11.) These are precisely the sorts of warnings that courts recognize as warranting safe harbor protection. *See, e.g.*, *Leavitt*, 451 F. Supp. 3d at 186-87; *Paxton*, 2022 WL 3098236, at *11-12.

> 5.      *The Opposition Fails to Identify Materially Adverse Facts Concealed from Investors During Any of the Class Period's Three Discrete Timeframes.*

To the extent not vitiated by the well-settled principles discussed above, Plaintiffs' claims fail because the CAC does not plausibly allege that Reata's disclosures were contradicted by any contemporaneous material facts concealed from investors. Indeed, and as shown in the Opening Brief, Plaintiffs have not identified any contradictory information that could support a claim corresponding to any of the three discrete timeframes that comprise the putative class period. (Br. at 37-42.) The Opposition does nothing to remedy this fatal defect. (Opp. at 23-27.)

***November 14, 2016 – November 14, 2019***. As pled, Plaintiffs' falsity allegations for the period from November 2016 to November 2019 depend entirely on the SMP Letter, the FDA's

16

September 2018 emails, and the February 2019 Letter.  For all of the reasons discussed above and in the Opening Brief, none of those can support a claim.  (Br. at 37-38.)

The Opposition pivots yet again to focus on TSUBAKI, arguing that Defendants learned that "Bard took *eight weeks*" (rather than four) "to wash out" when Kyowa Kirin completed the TSUBAKI study in Japan in November 2017.  (Opp. at 13, 22, 26-27, 31, 34.)  As the CAC itself acknowledges, however, TSUBAKI focused primarily on the "*on*-treatment effects of Bard on" kidney function—with *off*-treatment assessment constituting a mere "exploratory endpoint"— and no results implicating the washout period were published until years later.  (*See, e.g.*, CAC ¶¶ 117-18 (emphasis added) ("[c]ontemporaneous, published accounts of TSUBAKI . . . focused on TSUBAKI's results relating to its primary and secondary endpoints: on-treatment effects of Bard"); *see also* Opp. at 13); *cf. Leavitt*, 451 F. Supp. 3d at 183 (D. Mass. 2020) ("exploratory endpoints are not the focal point of a clinical trial and are less likely to show an effect").  Plaintiffs nevertheless insist that Reata *must have* not only possessed Kyowa Kirin's off-treatment data as of November 2017, but also interpreted it in the same way that the FDA eventually would four years later.  Plaintiffs allege no well-pled facts to support this logical leap.  (*See* Br. at 32.)  Instead, they offer only that Reata generally had "access" to Kyowa clinical data by virtue of a sub-licensing agreement, and refer to an analyst call in which Reata executives discussed Kyowa's recent presentation of *on-treatment* results at an ASN Conference—without any discussion of the study's "exploratory endpoint."[6]  (CAC ¶¶ 118-19, 392; Opp. at 4, 9, 13, 42; Pls. Ex. 4 at 2-5, 10-11; Pls. Ex. 5 at 15-19.)  This is hardly the sort of "who, what, when, and where [that] must be laid out *before* access to the discovery process is granted."  *See*

---

[6] The Opposition asserts that Reata's call slides "referenced the existence of . . . off-treatment measures."  (Opp. at 13.)  The apparent predicate for this claim is a single figure in a 30-page presentation deck showing an overall timeline of the TSUBAKI study design.  (*Id.*; Pls. Ex. 5 at 14.)

17

*Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 362 (5th Cir. 2004) (emphasis in original); *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (complaint "silent" as to when "ProNAi's scientists had concluded that [a prior] study had come up empty" as to efficacy results on drug candidate).

Along the same lines, Plaintiffs' argument that the "only logical inference" is that the FDA communicated its purported "concerns" about CARDINAL's washout period "shortly after" TSUBAKI's completion in November 2017 is rank speculation. (Opp. at 12, 23-24 & 24 n.15.) As discussed above, nothing suggests that the FDA raised TSUBAKI's off-treatment data to Reata—or, indeed, even *saw* that data—any time before accepting the Bard NDA in 2021. And the FDA's own statements belie any suggestion that the raw TSUBAKI off-treatment data revealed that a 4-week washout period was deficient. (*See supra* pp. 11-14; *see also* Ex. 25 at 22-23, 49, 61 (FDA developed its own model using data from TSUBAKI, among other inputs).)

The Opposition also emphasizes that, according to the Briefing Book, the FDA purportedly "voiced concern about the design of CARDINAL Phase 3" sometime "[d]uring the course of development." (Opp. at 24-25; Ex. 25 at 10-11, 39.) Even assuming that Reata were required to disclose any such midstream "concern" (which it was not), Plaintiffs concede that the Briefing Book does nothing to particularize the timeframe for any relevant communications beyond situating them—*at best*—in the three-year window "between August 2017 and September/October 2020." (Opp. at 24.) Contrary to Plaintiffs' suggestion that timing is irrelevant to the viability of their claims (*id.* at 23), courts have frequently dismissed securities claims staked on falsity allegations similarly "unmoored in time." *Gregory*, 297 F. Supp. 3d at 408-09 (complaint "allege[d] merely" timeframes "from October 2014 until February 2015" and "from May 2015 to July 2016"); *Callinan v. Lexicon Pharms., Inc.*, 479 F. Supp. 3d 379, 405-06

18

(S.D. Tex. 2020) (rejecting plaintiff's attempt to situate alleged misconduct within three-year period), *aff'd*, 858 F. App'x 162 (5th Cir. 2021); *Hoey*, 2018 WL 902266, at *13 (allegations insufficiently particularized due to possibility that regulator communicated "inadequacy" of primary endpoint to sponsor between December 2015 and June 2016, rather than "by the summer of 2015," as plaintiff alleged); *cf. Vallabhaneni v. Endocyte, Inc.*, 2016 WL 51260, at *10 (S.D. Ind. Jan. 4, 2016) ("detail of the 'who, what, when, where, and how'" was "critical" because "Plaintiff's case falls apart" if Defendants did not have "advanced knowledge" of study futility). Certainly, for example, Plaintiffs cannot state claims with respect to the 2019 SPO offering documents *while also conceding that the supposedly undisclosed events may well have not occurred until late 2020.*

Plaintiffs' argument that the FDA "*must have*" made its "recommend[ation]" that Reata "conduct a separate study to characterize the time course for resolution of [Bard]'s pharmacodynamic effect or modify CARDINAL Phase 3 to obtain the information" sometime "prior to August 2019" fails for similar reasons. (Opp. at 24-26 (emphasis added); Ex. 25 at 39.) It also incorrectly assumes that Phase 3 was complete by August 2019, when, by Plaintiffs' own allegations, Reata did not even finish *enrollment* for that *two-year* Phase until "the second half of 2018" and would not be in position to announce Year 2 results until November 2020. (CAC ¶¶ 238, 288-289, 383; Opp. at 26.) All of that provides months of additional time—if not more than a full year—in which the FDA could have made its purported "ultimate[]" recommendation that Reata "include additional off-treatment eGFR measurements" somewhere in Phase 3. (Ex. 25 at 39; Br. at 39-40.) The Opposition's insistence on August 2019 also runs counter to the CAC's concession that the FDA's "recommendation" could have been made as "late[]" as "the January 2020 FDA Meeting." (CAC ¶ 112.) Regardless, the Opposition does not even *attempt* to refute

19

that agency "recommendation[s]" on the design or administration of otherwise green-lit studies do not require disclosure where, as here, no facts suggest that they were necessary pre-conditions to eventual approval.  (Br. at 40-41); *Sarafin v. BioMimetic Therapeutics, Inc.*, 2013 WL 139521, at \*11 (M.D. Tenn. 2013) ("the fact that the FDA told BMTI to give 'serious consideration'" to study protocol modifications "does not mean that the approved protocol was somehow rejected") (citing cases), *aff'd sub nom. Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435 (6th Cir. 2014); *Vallabhaneni*, 2016 WL 51260, at \*9-10 (disregarding confidential witness report regarding FDA suggested change to study protocol because it was "impossible to determine . . . how severe [the FDA's] questioning actually was" and "unclear why the FDA allowed [the study] to proceed to Phase 3 trials and continue for another 3 years[]").

*February 19, 2020 – December 1, 2020*.  Plaintiffs argue that the Briefing Book "unequivocally states" that the "FDA told Reata" in January and September 2020 that "TSUBAKI's results . . . indicated a longer washout period than used in CARDINAL," supposedly taking both accelerated *and* full approval for Bard off the table.  (Opp. at 22-23.)  But it is Plaintiffs, not Defendants, who "re-writ[e] the Briefing Book[]" on this point.  (*Id.* at 23.)  The relevant passage of the Briefing Book—appearing under the heading "*Accelerated Approval*"—says absolutely nothing about TSUBAKI, and indicates only that the agency "did not agree with the proposed approach" of submitting an NDA for Bard "under the accelerated approval pathway" based on the first year of CARDINAL Phase 3 results (which Reata disclosed) out of "concern[] about the interpretability of the eGFR findings" gathered to that point.  (Ex. 25 at 39 (emphasis added).)  Nothing suggests that full approval after Year 2 did not remain possible, and, of course, the FDA accepted the NDA for full approval following Year 2.

20

*__March 1, 2021 – November 8, 2021__*.  Finally, Plaintiffs' passing arguments about the 2021 timeframe fall flat.  (Opp. at 27.)  The Opposition complains that Reata's August 2021 10-Q did not "disclose the previously concealed information"—a false premise given that, for all of the reasons discussed in the Opening Brief and herein, the CAC *does not allege* any materially adverse information that went undisclosed during earlier portions of the class period.  And it bizarrely claims that Reata did not disclose *any* concern about Bard's washout period (*id.*), ignoring that Reata advised in August 2021 that the FDA had indicated that whether Bard's off-treatment eGFR impact constituted "an irreversible effect on kidney function or a reversible pharmacodynamic effect" was "*a critical ongoing review issue*" with respect to the NDA.  (Br. at 15, 40 n.13, 41-42; Ex. 22 at 22 (emphasis added)); *see also Paxton*, 2022 WL 3098236, at *13 (company sufficiently explained risks posed by FDA discussions following "'mid-cycle review meeting'" at which agency raised "'various questions and preliminary concerns'").

## III.    THE CAC DOES NOT RAISE A COMPELLING INFERENCE OF SCIENTER

Plaintiffs' Exchange Act claims should also be dismissed because the CAC fails to raise the requisite inference of scienter.  (Br. at 42-50.)  The Opposition offers no basis to conclude otherwise.  (Opp. at 38-50.)  As an initial matter, Plaintiffs fail to grapple in any way with what is plainly the most compelling available inference, set out in the Opening Brief.  (Br. at 49-50.)  The Supreme Court has long directed that the scienter inquiry is "inherently comparative," and any proffered inference of fraud must be "strong in light of other explanations."  *Tellabs*, 551 U.S. at 323-24; *see also N. Port Firefighters' Pension—Loc. Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 737-38 (N.D. Tex. 2013) ("[i]n evaluating scienter, a court must engage in a comparative evaluation" and "consider, not only inferences urged by the plaintiff[,] but also competing inferences rationally drawn from the facts alleged").  The Opposition's decision not to

21

engage the obvious non-fraudulent explanation undermines Plaintiffs' effort to establish scienter. *See, e.g.*, *Janies v. Cempra, Inc.*, 816 F. App'x 747, 751 (4th Cir. 2020) ("most cogent inference" was "that the defendants had great confidence in [drug]'s prospects . . . and that the FDA simply disagreed with the defendants' assessment").

The arguments Plaintiffs do advance fare no better.  The Opposition claims that the CAC's allegations about the FDA's "concern[s]," its "recommend[ation]" to "modify" CARDINAL Phase 3, and its indication that Reata should pursue full rather than accelerated approval support an inference of scienter in and of themselves.  (Opp. at 39-40.)  But none of these are purported facts known to management that would "*necessarily prevent*" eventual "regulatory approval"—the scienter standard adopted by courts in this Circuit for the pharmaceutical context, which Plaintiffs ignore.  *Callinan*, 479 F. Supp. 3d at 430; *see also Midwest Operating Engineers Pension Tr. Fund v. Alkermes Pub. Ltd. Co.*, 2021 WL 5782079, *3 (2d Cir. Dec. 7, 2021); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757, 765-66 (S.D.N.Y. 2018).  Rather, they are at best the sort of "interim feedback" on possible study "design shortcomings" that courts have recognized do *not* support an inference of scienter as a matter of law.  *Sanofi*, 87 F. Supp. 3d at 534; *Fisher v. Fennec Pharms. Inc.*, 2022 WL 7108945, *5 (M.D.N.C. Oct. 12, 2022) (defendants' knowledge of manufacturing deficiencies insufficient to establish scienter absent "facts tending to show that the defendants knew the deficiencies were so serious that they were likely to cause serious problems for the NDA"); (Br. at 43 (collecting cases)).  Plaintiffs' authorities are once again notable for their night-and-day contrast with the circumstances at bar.  (*See supra* pp. 10 n.3, 15 n.5.)

The Opposition relies on the fact that Defendants Huff and Meyer are senior executives with lengthy tenures at the Company and significant familiarity both with the FDA approval

22

process and with Bard.  (Opp. at 41-43, 49-50.)  But these contentions disregard the well-settled Fifth Circuit law that a "pleading of scienter may not rest on the inference that defendants must have been aware of the misstatement based on their positions within the company." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002); *see also Paxton*, 2022 WL 3098236, at *15 ("[c]ourts have consistently concluded that allegations" regarding drug's "central[] importan[ce] to the Company's business" are "insufficient to support a strong inference of scienter").  They also miss the point as a logical matter.  Courts will infer scienter where, for example, individual defendants speak frequently or otherwise evince knowledge of a particular topic *only where the complaint plausibly alleges materially adverse information for those individuals to know in the first place.  See, e.g.*, *In re Delcath Sys., Inc. Sec. Litig.*, 36 F. Supp. 3d 320, 326-29, 335-36 (S.D.N.Y. 2014) (court inferred from CEO's "public statements" a knowledge of drug trial results reflecting "'unprecedented'" levels of "toxicity," including heightened death rates).  Because there are no particularized allegations indicating that *anyone* at Reata (or the FDA) knew before publication of the Briefing Book that the FDA would not approve Bard, Huff's and Meyer's roles and experience are irrelevant for scienter purposes.

Regarding TSUBAKI, and as discussed, the CAC fails to allege when Huff or Meyer even acquired the off-treatment data, much less pleads particularized facts establishing whether, when, or how they read those results to preclude approval of Bard.  (*See supra* pp. 14, 17-18.)  Nor does the Opposition cite a case suggesting that scienter may be inferred entirely from the arguably unfavorable results of an entirely separate trial conducted by a different company.

Plaintiffs likewise fail to wring fraudulent intent from Reata's adherence to its policy of commenting on the FDA process only upon "major event[s]."  (Br. at 45-46; Opp. at 43-45.)  Plaintiffs complain that Reata "only" discussed the policy on two other occasions.  (*Id.* at 44-45.)

23

But they nowhere explain why Reata would or should have repeatedly detailed its policy once a matter of public record.  In any event, an exhaustive catalog of policy citations is hardly required to see that observance of this sensible practice is a more compelling explanation for Reata's no-comment responses than some elaborate, five-year fraud.  Plaintiffs also suggest that the January 2020 Type C meeting *was* a "major event[]" warranting comment under Reata's policy.  (Opp. at 45.)  But this ignores that Reata *did* disclose that meeting, the FDA's "concerns" with an NDA for accelerated approval, the possibility that the "FDA could recommend that [Reata] wait for the second-year data from CARDINAL," and the eventual decision to do so—in August and November 2020 *after* the matters had been settled through "follow up informal meetings" and the provision of "written responses" to FDA questions.  (Br. at 13-14, 39, 46); *Paxton*, 2022 WL 3098236, at *13 ("Company made a timely disclosure once the FDA's decision was final").[7]

Nor can the Opposition rescue the CAC's deficient "motive and opportunity" allegations. (Br. at 47-49.)  The case law is legion that "a stock offering occurring during a class period is insufficient to give rise to a strong inference of scienter."  *Paxton*, 2022 WL 3098236 at *15 (collecting cases); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007); *Crutchfield v. Match Grp., Inc.*, 529 F. Supp. 3d 570, 602 (N.D. Tex. 2021).  As for the insider stock sales, all seven transactions took place *nine months or longer after* (and at prices well below) the Company stock's acknowledged class period "peak" and after Reata had disclosed both (i) that the FDA had "expressed concerns" with an accelerated approval approach and (ii) that the Company had determined to wait and pursue

---

[7] Plaintiffs' argument that Reata's alleged switch to the phrase "eGFR benefit during the off-treatment period" instead of "retained eGFR" evinces fraudulent intent is unsupported by their sole case.  (Opp. at 45-46; *see also* Br. at 46-47.)  In *Skiadas v. Acer Therapeutics Inc.*, the defendant moved from the "unqualified" assertion "'the FDA agreed that additional clinical development is *not needed*'" to the "hedged" disclosure "'is not *likely* needed'"—a change apparent to "[a]ny competent speaker of the English language" and a far cry from the sort of technical terminological adjustment at issue here.  2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020) (emphasis added).

24

full approval based on the Year 2 data.  (Br. at 48-49; Ex. 16 at 16; Ex. 17 at 17; CAC ¶¶ 279, 289, 420, 425, 427, 435.)  Six of the seven occurred *within a week* of the latter disclosure in Reata's November 2020 10-Q—the sort of filing whereafter "stock sales of insiders customarily take place."  *Rice v. Intercept Pharms., Inc.*, 2022 WL 837114, at *19 (S.D.N.Y. Mar. 21, 2022); (CAC ¶¶ 420, 425, 427; Ex. 17 at 17).  Plaintiffs contend that the applicable Rule 10b5-1 trading plans are somehow irrelevant because they were purportedly adopted during the class period.  (Opp. at 48-49.)  But that suggestion is itself substantially "mitigated" by the sheer "length[]" of Plaintiffs' proposed period, which runs *five years* and thus unsurprisingly captures the trading plans' implementation *nearly a year before* the earliest trades took place.  *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 183 (5th Cir. 2019); (CAC ¶¶ 424-26; Br at 49).  In any event, the CAC "fails to raise any inference that the plans themselves were suspect."  *Aratana*, 315 F. Supp. 3d at 764; *Rice*, 2022 WL 837114, at *20.  Lastly, the Opposition fails to explain why Company executives, finally reaching the "payoff" of nearly a half decade's worth of fraud, would cash in by selling *no more than 25% to 33%* of their total stock holdings.  (Br. at 48.)[8]

## CONCLUSION

For the reasons set forth above and in the Opening Brief, the CAC should be dismissed with prejudice.

*[SIGNATURE BLOCK ON FOLLOWING PAGE]*

---

[8] The Opposition does not even bother to refute that the CAC makes no attempt to allege scienter as to Defendant Soni, requiring dismissal of the fraud claims as against him.  (Br. at 43 n.14.)  In addition, if the Court dismisses Plaintiffs' predicate claims under the Exchange Act and/or Securities Act, there is no dispute that the corresponding control-person claims necessarily fail as well.  (Br. at 50; Opp. at 50.)

Dated:   Dallas, TX                                      Respectfully submitted,
             January 9, 2023

**DAVIS POLK & WARDWELL LLP**              **VINSON & ELKINS**

Neal A. Potischman*                          /s/ John C. Wander
Michael Yu*                                  John C. Wander
1600 El Camino Real                          Texas Bar No. 00791877
Menlo Park, CA 94025                         Robert P. Ritchie
Telephone: 650-752-2000                      Texas Bar No. 24079213
Facsimile: 650-752-2111                      2001 Ross Avenue, Suite 3900
Email: neal.potischman@davispolk.com         Dallas, TX 75201
          michael.yu@davispolk.com           Telephone: (214)-220-7878
                                             Facsimile: (214)-999-7878
Craig J. Bergman*                            Email: jwander@velaw.com
Keith Dore*                                           rritchie@velaw.com
450 Lexington Ave
New York, NY 10017
Telephone: 212-450-4000
Facsimile: 212-701-5800
Email: craigbergman@davispolk.com
          keith.dore@davispolk.com

*Admitted Pro Hac Vice

*Counsel for the Reata Defendants*

**SHEARMAN & STERLING LLP**

 /s/ R. Thaddeus Behrens
R. Thaddeus Behrens
Texas Bar No. 24029440
Daniel H. Gold
Texas Bar No. 24053230
Matthew A. McGee
Texas Bar No. 24062527
2601 Olive Street, 17th Floor
Dallas, TX 75201
Email: thad.behrens@shearman.com
          dan.gold@shearman.com
          matt.mcgee@shearman.com

*Counsel for the Underwriter Defendants*

26