# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## SHERMAN DIVISION

| | |
|---|---|
| TIM DOYLE, Individually and On Behalf of All Others Similarly Situated, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> REATA PHARMACEUTICALS, INC., *et al.*, <br><br> Defendants. | Case No. 4:21-cv-00987-ALM LEAD <br><br> <u>CLASS ACTION</u> <br><br> Judge Amos L. Mazzant, III |

**DECLARATION OF DANIEL HUME IN SUPPORT OF:**
**(I) LEAD PLAINTIFF'S MOTION FOR FINAL APPROVAL OF**
**CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION; AND**
**(II) LEAD COUNSEL'S MOTION FOR AN AWARD OF ATTORNEYS' FEES**
**<u>AND REIMBURSEMENT OF LITIGATION EXPENSES</u>**

**TABLE OF CONTENTS**

**Page**

TABLE OF EXHIBITS ...........................................................................................................iii

I.      Introduction.......................................................................................................... 1

II.     Factual Background ............................................................................................. 6

III.    Procedural History .............................................................................................. 9

        A.      Commencement of the Action and Appointment of Lead Plaintiff
                and Lead Counsel............................................................................... 9

        B.      Lead Counsel's Investigation and Filing of the CAC............................ 9

        C.      Defendants' Motion to Dismiss the CAC ........................................... 10

        D.      Settlement Negotiations and Discovery............................................... 12

        E.      Confirmatory Discovery and Papering the Settlement ........................ 14

        F.      Preliminary Approval of the Settlement .............................................. 15

IV.     Lead Plaintiff's Compliance with the Court's Preliminary Approval Order
        Requiring Issuance of Notice............................................................................. 15

V.      The Settlement Falls within a Reasonable Range of Recovery ........................ 17

VI.     The Risks of Continued Litigation..................................................................... 19

        A.      Risks on Defendants' Pending Motion to Dismiss .............................. 19

        B.      Risks to Proving Falsity and Scienter ................................................. 20

        C.      Risks to Proving Loss Causation and Damages................................... 20

        D.      Additional Risks of Continued Litigation, Trial, and Appeals ............ 22

VII.    The Proposed Plan of Allocation ...................................................................... 23

VIII.   Lead Counsel's Application for an Award of Attorneys' Fees, Reimbursement
        of Litigation Expenses, and an Award for Lead Plaintiff's Costs and Expenses ............ 25

        A.      Lead Counsel's Request for an Award of Attorneys' Fees................... 26

                1.      Lead Counsel's Fee Request Is Reasonable under both the
                        Percentage Method and the Lodestar Cross-Check Method.................... 26

a.    Lead Counsel's Fee Request Is Reasonable under the Preferred Percentage-of-the-Fund Method ................................. 26

b.    A Lodestar Cross-check Confirms the Reasonableness of the Requested Fee .................................................................... 27

2.    The *Johnson* Factors Further Support the Reasonableness of the Requested Fee ..................................................................... 28

a.    The Skill and Qualifications of Plaintiffs' Counsel and the Quality of the Work Performed .............................................. 28

b.    The Time and Labor Expended...................................................... 29

c.    The Novelty and Difficulty of the Questions Presented .............. 31

d.    The Contingent Nature of the Fee................................................. 32

e.    The Amount Involved and the Result Obtained ........................... 33

B.    Lead Counsel's Request for Reimbursement of Litigation Expenses .................. 34

C.    The Reaction of Lead Plaintiff and the Settlement Class ..................................... 35

D.    Lead Counsel's Request for an Award of Reasonable Costs and Expenses for Lead Plaintiff........................................................................................ 36

IX.    Conclusion ....................................................................................................................... 36

## TABLE OF EXHIBITS

| Exhibit | Description |
|---------|-------------|
| 1 | Declaration of Jessie Mahn Regarding: (I) Mailing of Notice and Proof of Claim Form; (II) Publication of Summary Notice; (III) Call Center Services; (IV) the Settlement Website; and (V) Requests for Exclusion and Objections Received to Date |
| 2 | Declaration of Marlene Igel-Harris on Behalf of Wespath in Support of: (I) Lead Plaintiff's Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses |
| 3 | Declaration of Daniel Hume, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Kirby McInerney LLP |
| 4 | Declaration of Robert V. Prongay, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Glancy Prongay & Murray LLP |
| 5 | Declaration of Bruce William Steckler, Esq. in Support of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses Filed on Behalf of Steckler Wayne & Love PLLC |
| 6 | Declaration of Jed D. Melnick in Support of Final Approval of Class Action Settlement |
| 7 | Declaration of Brian T. Fitzpatrick |
| 8 | True and correct copy of Edward Flores & Svetlana Starykh, *Recent Trends in Securities Class Action Litigation: 2023 Full-Year Review*, NERA Economic Consulting (Jan. 23, 2024) |
| 9 | True and correct copy of Laarni T. Bulan & Laura E. Simmons, *Securities Class Action Settlements: 2022 Review and Analysis*, Cornerstone Research (2023) |
| 10 | Table compiled by Lead Counsel with: (1) billing rates for plaintiffs' firms in cases involving securities and other comparable complex class actions; and (2) billing rates of law firms that regularly defend securities and comparable complex class actions |

I, Daniel Hume, declare, pursuant to 28 U.S.C. § 1746, as follows:

## I.       Introduction

1.       I am a partner of the law firm Kirby McInerney LLP ("Kirby McInerney"), the Court-appointed Lead Counsel ("Lead Counsel") and counsel for the Court-appointed Lead Plaintiff UMC Benefit Board, Inc., US Equity Fund-P Series, a series of the Wespath Funds Trust, US Equity Index Fund-P Series, a series of the Wespath Funds Trust, Wespath Institutional Investments LLC, US Equity Index Fund-I Series, a series of the Wespath Funds Trust, and US Equity Index Fund-I Series, a series of the Wespath Funds Trust ("Lead Plaintiff" or "Wespath") in the above-captioned action (the "Action").[1] I am admitted *pro hac vice* to practice before this Court. I have personal knowledge of the matters set forth herein based on my supervision of and active participation in all material aspects of the Action.

2.       I respectfully submit this declaration in support of Lead Plaintiff's motion, pursuant to Rule 23(e) of the Federal Rules of Civil Procedure, for final approval of the proposed $45,000,000 settlement (the "Settlement") that the Court preliminary approved by Order dated November 27, 2023 (the "Preliminary Approval Order") (ECF No. 76), as well as of the proposed plan for allocating the proceeds of the Net Settlement Fund to eligible Settlement Class Members (the "Plan of Allocation") (collectively, the "Final Approval Motion").

3.       I also respectfully submit this declaration in support of Lead Counsel's motion, on behalf of all Plaintiffs' Counsel,[2] for: an award of attorneys' fees in the amount of 30% of the

---

[1] Unless otherwise defined, all capitalized terms herein have the same meanings as set forth in the Stipulation and Agreement of Settlement dated October 30, 2023 (the "Stipulation"). *See* ECF No. 74-2. References herein to "Ex. __" are to the exhibits annexed hereto. Citations to exhibits that have attached exhibits will be referenced as "Ex. __-__." The first numerical reference is to the entire exhibit and the second alphabetical reference is to the exhibit within that exhibit.

[2] "Plaintiffs' Counsel" collectively refers to Kirby McInerney, Glancy Prongay & Murray LLP ("Glancy"), and Court-appointed Local Liaison Counsel, Steckler Wayne & Love PLLC ("Steckler").

Settlement Fund, which equates to $13,500,000, plus interest earned at the same rate as the Settlement Fund; reimbursement of Plaintiffs' Counsel's out-of-pocket Litigation Expenses in the amount of $204,323.08, plus interest earned at the same rate as the Settlement Fund; and an award in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA") of $10,000 for costs and expenses incurred by Lead Plaintiff related to its representation of the Settlement Class (the "Fee and Expense Application").

4.      The proposed Settlement now before the Court provides for the resolution of all claims in the Action in exchange for a cash payment of $45,000,000. As detailed below, Lead Counsel respectfully submits that the Settlement is fair, reasonable, and adequate and should be finally approved by the Court.

5.      This case was vigorously litigated from its commencement in December 2021 through the execution of the Stipulation on October 30, 2023. As explained in greater detail herein, the Settlement was achieved only after Plaintiffs' Counsel, *inter alia*: (i) conducted a comprehensive investigation into the merits of the claims alleged and the likely damages that could be recovered by the Settlement Class, which included a review and analysis of publicly available information concerning Defendants[3] as well as consultations with merits and damages experts, including an expert on the Food and Drug Administration ("FDA")'s drug approval process; (ii) prepared the detailed Consolidated Amended Class Action Complaint ("CAC") (ECF No. 37); (iii) researched and drafted a comprehensive opposition to Defendants' motion to dismiss (ECF No. 60); (iv) engaged in months of arm's length settlement negotiations overseen by Jed Melnick, Esq.

---

[3] "Defendants" refers collectively to: (i) Reata Pharmaceuticals, Inc. ("Reata"); (ii) J. Warren Huff, Colin J. Meyer, and Manmeet Soni (the "Officer Defendants"); (iii) R. Kent McGaughy, Jr., Jack B. Nielsen, William E. Rose, William D. McClellan, Jr., and James E. Bass (the "Director Defendants" and together with Reata and the Officer Defendants, the "Reata Defendants"); and (iv) Jefferies LLC, SVB Securities LLC, f/k/a SVB Leerink LLC, Stifel, Nicolaus & Company, Incorporated, Robert W. Baird & Co., Inc., Ladenburg Thalmann & Co., Inc., Cantor Fitzgerald & Co., Citigroup Global Markets Inc., Barclays Capital Inc., and Goldman Sachs & Co. LLC (the "Underwriter Defendants").

of JAMS ("Mr. Melnick"), which involved, among other things, two formal mediation sessions, the exchange of multiple written mediation submissions, and the review of over two million pages of non-public documents produced by the Reata Defendants; and (v) engaged in substantial, additional confirmatory discovery, including a review of thousands of additional pages of non-public documents produced by the Reata Defendants and interviews with Officer Defendants J. Warren Huff and Colin J. Meyer. As a result, Lead Plaintiff and Plaintiffs' Counsel were well-informed of the strengths and weaknesses of the claims and defenses in the Action prior to executing the Stipulation.

6.      As discussed in detail below, the Settlement confers a substantial, immediate benefit to the Settlement Class and is eminently fair, reasonable, and adequate in light of the risks, delays, and expenses of continuing to litigate the Action through a decision on Defendants' pending motion to dismiss, class certification, discovery, summary judgment, trial, and inevitable appeals.

7.      According to NERA Economic Consulting ("NERA"), the median settlement between 2014 and 2023 in securities cases with investor losses between $1 billion and $4.999 billion recovered 1.3% of investor losses. *See* Ex. 8 at 25. The $45 million Settlement here represents *over three times* that amount, equating to 4% of the $1.138 billion in class-wide damages that Lead Plaintiff and Lead Counsel believe could have been recovered in the Action in the event of a trial victory that withstood subsequent appeals. The $45 million Settlement is also well above the median settlement value in securities class actions settled in both 2022 and 2023, reported by Cornerstone Research and NERA to be $13 million and $14 million, respectively. *See* Ex. 9 at 1; Ex. 8 at 20.

8.      Moreover, the Settlement was achieved in the face of vigorous opposition by

3

Defendants who, absent settlement, would have continued to raise numerous defenses that could have significantly reduced the Settlement Class's recovery or eliminated it altogether. For example, had the Action continued, Defendants would have continued to challenge the falsity of the alleged misstatements, arguing that they were either truthful or nonactionable under the PSLRA safe harbor and/or the standards set forth in *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). Defendants would also have continued to argue that they had no duty to disclose the allegedly omitted information. Additionally, Defendants would have continued to assert that even if their alleged statements were false and/or misleading, they were not made with scienter.

9.      Had the litigation continued, Defendants would also likely have argued that (i) one or more of the alleged corrective disclosures were not actually corrective of any misleading statement, and/or (ii) they did not cause any claimed losses, including because, at the time of the alleged disclosures, Reata also announced other news unrelated to the alleged fraud that could have impacted Reata's share price. Thus, issues relating to loss causation and damages, including disaggregation and the proper treatment of confounding information, would likely have come down to an unpredictable battle of the experts. Accordingly, in the absence of settlement, there was a very real risk that the Settlement Class could have recovered nothing or an amount significantly less than the negotiated Settlement Amount.

10.     With respect to the proposed Plan of Allocation, Lead Counsel submits that the Plan is fair, reasonable, and adequate. As discussed further herein, the Plan of Allocation was developed by Lead Counsel with the assistance of Lead Plaintiff's consulting damages expert and provides for distribution of the Net Settlement Fund to Settlement Class Members who submit eligible Claim Forms on a *pro rata* basis based on their losses attributable to the alleged fraud. As

such, the proposed Plan of Allocation also warrants this Court's approval.

11.     With respect to the Fee and Expense Application, Lead Counsel submits that the requested fee of 30% of the Settlement Fund represents a fair market rate for Plaintiffs' Counsel's services and is fair to both the Settlement Class and Plaintiffs' Counsel.

12.     The requested fee is lower than the figure proposed in the Notice (*see* Ex. 1-A ¶¶ 5, 73) and is well within the parameters recognized as appropriate in federal securities class actions, such as this litigation, both under a percentage-of-recovery analysis and under a lodestar cross-check analysis. The fee request is further supported by the contingent risk borne by Plaintiffs' Counsel, the quality of their representation, the nature of the legal services performed, the risks of this litigation, and the substantial benefit that Plaintiffs' Counsel conferred on the Settlement Class. Moreover, the out-of-pocket Litigation Expenses incurred were all reasonable and necessary for the prosecution of the Action and are considerably less than the maximum figure proposed in the Notice available to the Settlement Class. *See id*.

13.     Significantly, following the dissemination of 30,582 Notice Packets to potential Settlement Class Members and nominees, no objections have been filed to date to any aspect of the Settlement, Plan of Allocation, or Fee and Expense Application. *See* Ex. 1 ¶¶ 10, 22. Additionally, to date, there have been no requests for exclusion from the Settlement Class. *See id.* ¶ 20. The deadline for Settlement Class Members to file objections to the Settlement and/or request exclusion from the Settlement Class is March 8, 2024. *See* Ex. 1 ¶¶ 19, 21; Ex. 1-A ¶¶ 74, 80.

14.     For these reasons and those discussed below, Lead Counsel respectfully submits that: the $45 million Settlement is an excellent result for the Settlement Class and should be approved as fair, reasonable, and adequate; the proposed Plan of Allocation is equitable and just and should be approved; and the requested fee award of 30% of the $45 million Settlement Fund

and reimbursement of Plaintiffs' Counsel's Litigation Expenses should be awarded in full.

## II.    Factual Background

15.    Reata is a biopharmaceutical company headquartered in Plano, Texas. *See* CAC ¶ 3. During the Class Period, Reata sought to develop its leading drug candidate, bardoxolone methyl ("Bard"), as a treatment for Alport Syndrome, a form of chronic kidney disease ("CKD"). *See id.*

16.    CKD involves the deterioration of the kidneys' ability to filter waste products from the bloodstream. *See id.* ¶ 55. The kidneys' filtering ability, known as the "glomerular filtration rate" or "GFR" is measured by a metric termed "estimated GFR" or "eGFR." *Id.* ¶¶ 55-56.

17.    A drug that boosts eGFR can indicate efficacy in treating CKD. *See id.* ¶¶ 69-72. However, reliance on eGFR alone leaves uncertainty as to whether the treatment merely produces short-term pharmacodynamic ("PD") effects that vanish after treatment ends, or whether the treatment truly slows the decline in kidney function and thus alters the course of the disease. *See id.* ¶¶ 4, 71, 73. Measuring "retained eGFR" resolves this uncertainty by removing a drug's PD effects, thus clarifying the remaining effects as disease-modifying. *See id.* ¶¶ 4, 74-83. Retained eGFR measurements remove a drug's PD effects from the equation by measuring eGFR after (i) ceasing drug treatment, and (ii) waiting for an additional "washout period" sufficient for the drug's PD effects to be fully eliminated from the body. *See id.*

18.    To market Bard as a treatment for Alport Syndrome, Reata needed FDA approval, which required a clinical study demonstrating Bard's efficacy and safety. *See id.* ¶ 3. The Class Period began on November 14, 2016, when Reata announced that it had received "guidance" from the FDA on how that study should be designed and what results would be sufficient to support FDA approval of Bard. *See id.* ¶ 5. Per Defendants' account of the FDA's guidance: (i) the FDA

required evidence that Bard had a retained eGFR benefit; and (ii) to generate such evidence, the study should be designed to measure eGFR levels following (a) extended Bard treatment (*i.e.*, one and two years on-treatment), and (b) a four-week washout period. *See id.*

19.   Reata commenced that clinical study, known as CARDINAL, in early 2017 and completed it in late 2020. *See id.* ¶ 6. Per the FDA's purported guidance, CARDINAL measured participants' "retained eGFR" after one year on-treatment following a four-week washout period and again after two years on-treatment following a four-week washout period. *See id.* ¶¶ 89-92. Throughout the trial, Defendants repeatedly represented that CARDINAL's design faithfully reflected the above-mentioned FDA guidance, and that the FDA's guidance, including with respect to the four-week washout period, had not changed during the course of the trial. *See id.* ¶¶ 6, 94, 134, 298. Defendants also repeatedly represented that Bard's PD effects fully washed out in 10-14 days and, as a result, CARDINAL's use of a four-week washout period was more than sufficient to demonstrate Bard's efficacy. *See id.* ¶¶ 9, 114, 141-43.

20.   As the trial progressed and CARDINAL's results appeared to successfully demonstrate Bard's retained eGFR benefits, Reata's share price more than sextupled, rising from below $30 per share to above $200 per share. *See id.* ¶ 10. Allegedly taking advantage of this price inflation, Defendants conducted four secondary public offerings during the Class Period, in which they sold more than 11.9 million Reata shares for more than $1.1 billion. *See id.* Officer Defendants Huff and Meyer, as well as certain other Reata officers, realized a further $50 million from selling personal Reata shareholdings as Reata's shares neared their peak prices. *See id.* ¶¶ 10, 419-27.

21.   Shortly after (i) announcing, on November 9, 2020, positive CARDINAL retained eGFR results following two years on-treatment and a four-week washout period, which caused Reata's share price to jump 32.4% that day, and (ii) completing its fourth secondary public offering

on December 1, 2020, Reata submitted a New Drug Application ("NDA") with the FDA in February 2021, with the CARDINAL results as its centerpiece (the "Bard NDA"). *See id.* ¶ 11.

22.    The FDA scheduled a public Advisory Committee meeting to consider the Bard NDA for December 8, 2021. *See id.* ¶ 12. On December 6, 2021, the FDA released a 96-page report concerning the Bard NDA (the "FDA Briefing Book"). *See id.* ¶¶ 12-13. Lead Plaintiff contends that the FDA Briefing Book revealed that Reata had not been transparent with investors concerning its interactions with the FDA. *See id.*

23.    The FDA Briefing Book explained that Reata allegedly had not obtained FDA concurrence on CARDINAL's design – most specifically, on CARDINAL's four-week washout period. *See id.* ¶ 14. Rather, the FDA Briefing Book explained that the FDA had allegedly repeatedly questioned the adequacy of a four-week washout period throughout the trial's duration. *See id*. Consequently, the FDA allegedly was not convinced that CARDINAL's "retained eGFR" results were truly indicative of Bard's efficacy. *See id.* ¶ 15.

24.    Following the FDA Briefing Book's publication, Reata's shares lost 37.8% of their value that same day, falling from $78.69 to $48.92 per share, on trading volume of 5.5 million shares – the second most active trading day in Reata's existence. *See id.* ¶ 17. On December 9, 2021, after the Advisory Committee voted unanimously against Bard's approval, Reata's share price fell further still, declining by $25.31 per share, or 46.5%, to close at $29.11 per share, on even heavier trading volume. *See id.*

25.    Throughout the Class Period, Defendants allegedly made materially false and/or misleading statements – including in connection with Reata's secondary stock offerings – concerning the FDA's guidance, CARDINAL's design and results, and Bard's washout period. As a result, Lead Plaintiff and Settlement Class Members allegedly suffered significant losses and

damages. *See id.* ¶ 18.

## III.    Procedural History

### A.    Commencement of the Action and Appointment of Lead Plaintiff and Lead Counsel

26.    On December 20, 2021, Tim Doyle commenced a securities class action in this Court against Reata and Officer Defendants Huff and Soni, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") during the period between November 9, 2020 and December 8, 2021, inclusive (the "Initial Class Period"). *See* ECF No. 1. Two other putative class actions involving Reata followed.[4]

27.    On February 18, 2022, Wespath moved for appointment as Lead Plaintiff and further moved the Court to appoint Kirby McInerney as Lead Counsel and Steckler as Local Counsel. *See* ECF No. 20. Several other movants also filed for appointment as lead plaintiff along with their respective chosen counsel. *See* ECF Nos. 18-19, 21-24.

28.    On April 22, 2022, the Court appointed Wespath as Lead Plaintiff, Kirby McInerney as Lead Counsel, and Steckler as Local Liaison Counsel. *See* ECF Nos. 33-34.

### B.    Lead Counsel's Investigation and Filing of the CAC

29.    Lead Counsel conducted an extensive investigation prior to filing the CAC. Specifically, Lead Counsel investigated Reata's allegedly wrongful acts by, among other things: (i) engaging the services of a highly experienced private investigator; and (ii) reviewing and analyzing (a) Reata's public filings with the U.S. Securities and Exchange Commission ("SEC"), (b) public reports, including research reports, prepared by securities and financial analysts, as well as news articles concerning Reata, (c) Reata's investor call transcripts, and (d) other publicly

---

[4] *See Filbert v. Reata Pharms. Inc., et al.*, No. 22 Civ. 00012 (E.D. Tex.); *Laborers' Dist. Council, et al. v. Reata Pharms. Inc., et al.*, No. 22 Civ. 00041 (E.D. Tex.).

available material related to Reata and the Individual Defendants. Lead Counsel also consulted with merits and damages experts, including an expert on the FDA approval process.

30.    On June 21, 2022, Lead Plaintiff filed the CAC asserting claims against: (i) Reata and the Officer Defendants under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder; (ii) the Officer Defendants under Section 20(a) of the Exchange Act; (iii) Reata, the Director Defendants, the Underwriter Defendants, and Officer Defendants Huff and Meyer, under Section 11 of the Securities Act of 1933 (the "Securities Act"); (iv) all Defendants under Section 12(a)(2) of the Securities Act; and (v) the Officer Defendants and the Director Defendants under Section 15 of the Securities Act. *See* CAC ¶¶ 449-63, 527-602.

31.    Among other things, the CAC alleged that Defendants made false and misleading statements and omitted to disclose material adverse information concerning the CARDINAL trial, including in the offering documents for Reata's November 14, 2019 and December 1, 2020 secondary stock offerings (the "2019 Offering" and the "2020 Offering," respectively). *See id*. The CAC further alleged that the prices of Reata's publicly traded securities were artificially inflated as a result of Defendants' allegedly false and misleading statements, and declined when the truth was revealed. *See id*. Notably, the CAC expanded the Initial Class Period to include all purchases of Reata common stock during the period between November 14, 2016 through December 8, 2021, inclusive (the "Class Period" or "Settlement Class Period"). *See id*. ¶ 1.

**C.    Defendants' Motion to Dismiss the CAC**

32.    On September 7, 2022, Defendants moved to dismiss the CAC. *See* ECF No. 59. Defendants' motion raised numerous legal issues aimed at undermining Lead Plaintiff's claims.

33.    Defendants argued, among other things, that Lead Plaintiff failed to allege with the required specificity, why the alleged misstatements were false or misleading, and failed to plead

the highly particularized allegations of scienter required by Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA. With regard to falsity, Defendants argued that the CAC's allegations were insufficiently particularized because the CAC allegedly failed to plead the dates on which the FDA purportedly expressed concerns about the adequacy of CARDINAL's four-week washout period and thus, the dates on which Defendants' statements allegedly became false and/or misleading. *See id.* at 23-25, 37-41. Defendants also argued that many of the alleged misstatements were either protected by the PSLRA safe harbor or were non-actionable statements of opinion under *Omnicare*. *See id.* at 32-37. Defendants further argued that the FDA had not, in fact, expressed any real concerns about the four-week period's adequacy and even if they had, Defendants had no duty to disclose such "interim feedback" from the FDA. *See id.* at 25-28.

34.     With respect to scienter, Defendants argued that Lead Plaintiff failed to allege particularized facts concerning the state of mind of any of the Officer Defendants. *See id.* at 42-49. Specifically, Defendants argued, *inter alia*, that: (i) the CAC improperly relied on the "core operations" doctrine; (ii) scienter could not be inferred from the Officer Defendants' mere refusal to comment on Reata's FDA interactions and/or their decision to remove the term "retained eGFR" from Reata's SEC filings; and (iii) the CAC's motive allegations were insufficient. *See id.*

35.     On November 23, 2022, Lead Plaintiff filed its opposition to the motion to dismiss. *See* ECF No. 60. With respect to falsity, Lead Plaintiff argued that: (i) Defendants' motion improperly relied upon non-public documents that were not incorporated by reference into the CAC; (ii) the CAC had, in fact, alleged the timeframe in which the FDA's concerns were communicated to Reata with the necessary particularity; (iii) none of the alleged statements were non-actionable statements of opinion; and (iv) none of the statements identified by Defendants were protected by the PSLRA safe harbor because they were (a) not forward-looking and/or (b)

not accompanied by sufficiently meaningful cautionary language. *See id.* at 17-27, 32-38. Lead Plaintiff also argued that Defendants, did, in fact, have a duty to disclose the FDA's concerns because: (i) disclosure was necessary to prevent Defendants' statements regarding the FDA's purported guidance from being misleading; and (ii) those concerns were not mere interim feedback regarding methodology and process; they were concerns about a key trial measurement that was *critical* to Bard's approval. *See id.* at 28-30.

36.     Lead Plaintiff also argued that the CAC's allegations were more than sufficient to raise a strong inference of scienter, including allegations that the Officer Defendants: (i) frequently spoke to investors in detail about Bard, CARDINAL, and Reata's FDA interactions, thus demonstrating their intimate knowledge and expertise on the subject matter of the alleged misrepresentations; (ii) abruptly refused to comment on Reata's FDA interactions and removed references to "retained eGFR" from Reata's SEC filings *following major negative events* with the FDA; and (iii) were not only motivated to raise capital at inflated share prices, but *personally profited* from those inflated prices to the tune of tens of millions of dollars by selling their Reata shares in a suspicious and unusual manner. *See id.* at 39-50.

37.     On January 9, 2023, Defendants filed their reply brief in further support of their motion to dismiss. *See* ECF No. 65.

**D.      Settlement Negotiations and Discovery**

38.     While Defendants' motion to dismiss was *sub judice*, the Parties agreed to engage in mediation, and they selected Mr. Melnick, one of the country's leading neutrals, to mediate the Parties' settlement negotiations.

39.     On February 10, 2023, the Parties notified the Court of their intention to mediate with Mr. Melnick. *See* ECF No. 66. On February 13, 2023, the Court formally referred the Action

to mediation and assigned Mr. Melnick as mediator. *See* ECF No. 67.

40. In advance of the first formal mediation session, Lead Plaintiff and the Reata Defendants exchanged and provided to Mr. Melnick detailed mediation statements and exhibits that addressed the issues of liability and damages.

41. On April 25, 2023, Lead Counsel, Glancy, and counsel for the Reata Defendants, along with certain of the Reata Defendants and Lead Plaintiff's Associate General Counsel, participated in a formal mediation session with Mr. Melnick and his staff in New York, New York. The April 2023 mediation session ended without an agreement to settle. However, the Reata Defendants agreed to produce to Lead Plaintiff non-public documents relating to matters alleged in the CAC, including documents reflecting Reata's non-public communications with the FDA, to further the Parties' settlement negotiations.

42. Over the next several months, the Reata Defendants produced, and Lead Plaintiff and Plaintiffs' Counsel reviewed, over two million pages of documents. Plaintiffs' Counsel also actively engaged with experts across a variety of disciplines, including experts in the fields of FDA administration and financial economics, to more fully understand the issues involved and what it would ultimately take to present Lead Plaintiff's case to a jury.

43. Thereafter, Lead Counsel and counsel for the Reata Defendants exchanged supplemental written submissions and exhibits and participated with client representatives in a second formal mediation session with Mr. Melnick and his staff on July 24, 2023 in Dallas, Texas.

44. Following the second mediation session, Mr. Melnick made a mediator's proposal to resolve the Action for $45,000,000 in cash for the benefit of the Settlement Class. The Parties accepted Mr. Melnick's recommendation on July 27, 2023.

45. Mr. Melnick has submitted a declaration regarding the Parties' settlement

13

negotiations, which he describes as "rigorous," "professional," and "highly adversarial." Ex. 6 ¶¶ 2, 13. Mr. Melnick's declaration also states that, in his opinion, the Settlement is "reasonable," "arm's length," "consistent with the risks and potential rewards" of the case, and represents "a well-reasoned and sound resolution of the complicated and uncertain claims" at issue in the Action. *Id.* ¶ 2.

### E.      Confirmatory Discovery and Papering the Settlement

46.     On September 1, 2023, the Parties memorialized the Settlement in a confidential Term Sheet to Settle Class Action (the "Term Sheet"). The Term Sheet set forth the Parties' agreement to settle and release all claims asserted in the Action in return for a cash payment by or on behalf of Defendants of $45,000,000 for the benefit of the Settlement Class, subject to certain terms and conditions and the execution of a "long form" stipulation and related papers.

47.     Thereafter, the Parties worked diligently to negotiate the full settlement terms. They also engaged in substantial confirmatory discovery. Specifically, the Reata Defendants produced, and Plaintiffs' Counsel's reviewed, an additional 16,023 pages of non-public documents. Lead Counsel also conducted interviews with Officer Defendants Huff and Meyer on September 29, 2023 and October 3, 2023, respectively.

48.     On October 30, 2023, the Parties executed the Stipulation, which was filed with the Court on November 3, 2023 (ECF No. 74-2) in connection with Lead Plaintiff's unopposed motion for preliminary approval of the Settlement (the "Preliminary Approval Motion"). *See* ECF No. 74.

49.     Pursuant to the Stipulation, Defendants agreed to make a cash payment of $45 million and stipulated for settlement purposes to certification of the following Settlement Class:

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Reata between November 14, 2016 and December 8, 2021, inclusive (the "Settlement Class Period"), including all persons or entities who purchased or otherwise acquired Reata common stock pursuant and/or traceable to

Reata's 2019 Offering and/or 2020 Offering (the "Offerings Subclass"). Stipulation ¶¶ 1(zz), 2. Upon the Settlement becoming effective, the Parties will provide mutual releases, as defined in the Stipulation.

### F.      Preliminary Approval of the Settlement

50.      On November 3, 2023, Lead Plaintiff filed the Preliminary Approval Motion. *See* ECF No. 74.

51.      On November 27, 2023, the Court entered the Preliminary Approval Order, which, among other things: (i) certified the Settlement Class for settlement purposes; (ii) preliminarily approved the Settlement; (iii) approved the form of Notice, Summary Notice, and Claim Form, and directed that notice of the Settlement be disseminated to potential Settlement Class Members; (iv) established procedures and deadlines by which Settlement Class Members could participate in the Settlement, request exclusion from the Settlement Class, or object to the Settlement, the proposed Plan of Allocation, and/or the Fee and Expense Application; and (v) set a schedule for filing opening and reply papers in support of final approval of the Settlement, Plan of Allocation, and Fee and Expense Application. *See* ECF No. 76 ¶¶ 1-4, 7-19, 26. The Preliminary Approval Order also scheduled a Settlement Hearing for March 29, 2024 to determine, among other things, whether the Settlement should be finally approved as fair, reasonable, and adequate. *See id*. ¶ 5.

### IV.     Lead Plaintiff's Compliance with the Court's Preliminary Approval Order Requiring Issuance of Notice

52.      The Preliminary Approval Order found Lead Plaintiff's proposed method of notice to be adequate and directed that the Notice Packet, comprised of the Notice and the Claim Form, be disseminated to all Settlement Class Members who could be identified with reasonable effort, as well as to brokerage firms and other nominees. *See id.* ¶¶ 7-9. The Preliminary Approval Order also set the March 8, 2024 deadline for Settlement Class Members to submit objections to the

Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class. *See id.* ¶¶ 16-19.

53.     Pursuant to the Preliminary Approval Order, Lead Counsel instructed Epiq Class Action & Claims Solutions, Inc. ("Epiq"), the Court-approved Claims Administrator, to disseminate copies of the Notice Packet to potential Settlement Class Members and to publish the Summary Notice. The Notice contains, among other things: a description of the Action; the definition of the Settlement Class; a summary of the terms of the Settlement and the proposed Plan of Allocation; and a description of Settlement Class Members' rights to participate in the Settlement, object to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to exclude themselves from the Settlement Class. *See* Ex. 1-A ¶¶ 1-4, 11-23, 28-38, 49-72, 74-86. The Notice also informs Settlement Class Members of Lead Counsel's intention to apply for (i) an award of attorneys' fees in an amount not to exceed 33⅓% of the Settlement Fund, (ii) reimbursement of Plaintiffs' Counsel's Litigation Expenses in an amount not to exceed $500,000, and (iii) an award of $10,000 for the costs incurred by Lead Plaintiff in connection with its representation of the Settlement Class. *See id.* ¶¶ 5, 73.

54.     To disseminate the Notice, Epiq obtained Reata's list of shareholders who purchased or otherwise acquired Reata common stock during the Settlement Class Period. *See* Ex. 1 ¶ 5. In addition, Epiq maintains a proprietary list with names and addresses of known broker firms, dealers, banks, and other institutions involving publicly traded securities (the "Broker Mailing Database"). *See id.* ¶ 6. On December 26, 2023, Epiq disseminated 1,573 copies of the Notice Packet by first-class mail to the individuals and entities contained within Reata's list of shareholders and the Broker Mailing Database. *See id.* ¶¶ 5-7. As of February 21, 2024, Epiq had disseminated a total of 30,582 Notice Packets. *See id.* ¶ 10.

16

55.     On January 8, 2024, in accordance with the Preliminary Approval Order, Epiq also caused the Summary Notice to be published in *Investor's Business Daily* and to be transmitted over the *PR Newswire*. *See id.* ¶ 12.

56.     Lead Counsel also caused Epiq to establish a dedicated settlement website, www.ReataSecuritiesLitigation.com (the "Settlement Website"), to provide potential Settlement Class Members with information concerning the Settlement and access to downloadable copies of the Stipulation, Notice, and Claim Form, as well as the CAC and Preliminary Approval Order. *See id.* ¶¶ 16-17. Lead Counsel also made copies of the Notice and Claim Form available on its firm website, https://www.kmllp.com/cases-investigations/doyle-v-reata-pharmaceuticals.

57.     Additionally, Lead Counsel caused Epiq to establish a case-specific, toll-free telephone helpline to accommodate potential Settlement Class Members with questions about the Action and the Settlement and/or to allow Settlement Class Members to request copies of the Notice and Claim Form. *See id.* ¶¶ 13-14.

58.     As set forth above, the deadline for Settlement Class Members to file objections to the Settlement, the Plan of Allocation, and/or the Fee and Expense Application, or to request exclusion from the Settlement Class, is March 8, 2024. To date, no requests for exclusion and no objections to the Settlement, the Plan of Allocation, or the Fee and Expense Application have been received by the Claims Administrator, Lead Counsel, or filed with the Court. *See id.* ¶¶ 20, 22. Lead Counsel will file reply papers on March 22, 2024, that will address any requests for exclusion and any objections that may be received hereafter.

## V.     The Settlement Falls within a Reasonable Range of Recovery

59.     Lead Counsel submits that the Settlement is fair and reasonable in light of the amount of damages potentially recoverable in the Action.

60.     According to NERA, the median settlement between 2014 and 2023 in securities cases with investor losses between $1 billion and $4.999 billion recovered 1.3% of investor losses. *See* Ex. 8 at 25. The $45 million Settlement here constitutes *over three times* that amount, equating to 4% of the $1.138 billion in class-wide damages that Lead Plaintiff and Lead Counsel believe could have been recovered in the Action in the event of a trial victory that withstood subsequent appeals. Notably, the $1.138 billion damages estimate properly accounts for known litigation risks, discussed further below, including (i) Defendants' anticipated argument that the alleged August 2020 and August 2021 corrective disclosures did not cause any claimed losses or otherwise directly relate to the alleged fraud, and (ii) Lead Counsel's assessment, following its review of Reata's document productions and interviews with Officer Defendants Huff and Meyer, that falsity and/or scienter would likely be difficult to prove with respect to Defendants' pre-October 2018 misstatements and omissions.[5]

61.     The $45 million Settlement is also well above the median settlement value in securities class actions settled in both 2022 and 2023, reported by Cornerstone Research and NERA to be $13 million and $14 million, respectively. *See* Ex. 9 at 1; Ex. 8 at 20.

62.     The foregoing numbers, however, tell only part of the story. As summarized in the next section, there were very real risks that could have resulted in a much smaller recovery or no recovery at all if the case had proceeded through a decision on Defendants' motion to dismiss, formal discovery, motions for class certification and summary judgment, trial, and likely appeals. When viewed in light of the risks of continued litigation, the Settlement not only falls within a

---

[5] Even if liability could have been established with respect to *all* claims for the *entirety* of the Class Period, Lead Plaintiff's consulting damages expert estimates that maximum aggregate damages potentially recoverable under the Exchange Act would have been approximately $2.392 billion. The Settlement represents approximately 1.9% of this amount, which is still more than the median recovery of 1.3% obtained in securities class actions involving similar damages amounts. *See* Ex. 8 at 25.

reasonable range of recovery, it represents a truly excellent recovery for the Settlement Class.

## VI.    The Risks of Continued Litigation

63.    Based on publicly available information, information obtained through Lead Counsel's investigation, and the discovery conducted during the settlement negotiations and confirmatory process, Lead Counsel believes that it has adduced substantial evidence to support Settlement Class Members' claims. However, Lead Counsel also realizes that the Action presented substantial risks that could have precluded any recovery at all, let alone a recovery greater than the Settlement Amount. Lead Counsel carefully considered these risks during the months leading up to the Settlement and throughout the settlement negotiations with Defendants.

### A.    Risks on Defendants' Pending Motion to Dismiss

64.    At the time the Settlement was reached, Defendants' motion to dismiss remained pending. As discussed at Point III.C, *supra*, Defendants' motion argued, *inter alia*, that Defendants did not make any false or misleading statements, and even if they did, they did not do so with scienter. *See* ECF No. 59 at 23-50. Defendants also denied any duty to disclose the FDA's purported concerns, arguing that any such concerns (i) did not relate to the adequacy of a four-week washout period, and (ii) were, in any event, mere interim feedback expressed during ordinary back-and-forth between Reata and the FDA. *See id*. at 25-28. Defendants further argued that the CAC's allegations were not pleaded with sufficient particularity because the CAC allegedly did not specify, among other things, the dates on which the FDA conveyed its alleged concerns to Reata. *See id.* at 37-42.

65.    Although Lead Plaintiff and Lead Counsel believed in their prospects of success on the motion, success was far from certain. An adverse decision could have drastically shortened the Class Period or could have resulted in the Action's dismissal in part or in its entirety.

19

**B.      Risks to Proving Falsity and Scienter**

66.      Even if Lead Plaintiff defeated Defendants' motion to dismiss entirely, it still had to ultimately prove falsity and scienter at summary judgment and trial. As noted above, the Reata Defendants' documents, produced during the settlement negotiation process, as well as the information obtained during Lead Counsel's interviews with Officer Defendants Huff and Meyer, plausibly suggested an absence of falsity and/or scienter with respect to Defendants' pre-October 2018 statements and omissions. Moreover, Defendants have maintained, and would have continued to maintain, that: (i) the FDA did not express any concerns about the adequacy of the four-week washout period, not just during the period prior to October 2018, but at any point prior to the FDA Briefing Book's publication in December 2021; and (ii) relevant documents in Defendants' possession are allegedly consistent with that position.

67.      Furthermore, Lead Counsel knew that discovery from the FDA – the only other party to the alleged communications with Reata – was unlikely to be forthcoming. As a result, Lead Plaintiff would have had to rely almost entirely on documents and testimony from Reata's own witnesses to prove that Defendants' statements and omissions were materially false, and that Defendants acted with the requisite scienter.

68.      Accordingly, despite believing this Action to be meritorious, Lead Plaintiff and Lead Counsel were aware of the high hurdles they would have to surmount to successfully prove falsity and scienter at summary judgment and trial.

**C.      Risks to Proving Loss Causation and Damages**

69.      Even if Lead Plaintiff overcame the risks of establishing falsity and scienter, it would also have confronted considerable challenges in establishing loss causation and damages.

70.      Pursuant to *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), it is Lead

20

Plaintiff's burden to prove loss causation and damages. This would require Lead Plaintiff to proffer expert testimony as to: (a) the "true value" of Reata's stock had there been no alleged material misstatements or omissions; (b) the amount by which Reata's stock was inflated (or deflated) by the alleged material misstatements and omissions; and (c) the amount of artificial inflation removed by the purported corrective disclosures.

71.    Defendants, however, would have presented their own theories and conclusions as to the reasons for the decline in Reata's stock price. For example, Defendants would likely have argued that the decline in Reata's stock price on one or more of the corrective disclosure dates was caused by the disclosure of information unrelated to the alleged fraud that could have impacted its share price. Thus, any price decline flowing from the alleged fraud would need to be disaggregated from other confounding news. Defendants would also likely have argued that the alleged corrective disclosures in August 2020 and August 2021 were not related to the FDA's alleged concerns over the adequacy of CARDINAL's four-week washout period but were instead related to the FDA's unrelated concerns over data collected *prior to* the end of the four-week washout period. Moreover, Defendants almost certainly would have presented their own damages expert(s) to support their theories and conclusions. As a result, proving loss causation and damages would inevitably require a jury to decide a "battle of the experts" – an expensive and intrinsically unpredictable process.

72.    Indeed, expert testimony can often rest on many assumptions, any of which risks being rejected by a jury. A jury's reaction to such expert testimony is highly unpredictable and Lead Plaintiff recognizes that, in such a battle, there is the possibility that a jury could be swayed by Defendants' experts and could find that only a fraction of Settlement Class Members' damages truly resulted from the alleged fraud. Thus, the amount of damages that the Settlement Class would recover at trial, even if successful on liability issues, was uncertain. Similarly, there was no

assurance that Lead Plaintiff's key evidence and trial testimony relating to loss causation and damages would be admitted as evidence by the Court at trial. This could have seriously affected Lead Plaintiff's ability to successfully prosecute the Action.

73.    In sum, had any of Defendants' loss causation and damages arguments been accepted at summary judgment or trial, they could have dramatically limited – if not eliminated – any potential recovery by the Settlement Class.

**D.    Additional Risks of Continued Litigation, Trial, and Appeals**

74.    Any future recovery in the Action would require Lead Plaintiff to prevail at several later stages of the litigation, each of which presents significant risks in complex class actions such as this one. For example, Lead Plaintiff would have to move to certify the class, which, if granted, would likely result in Defendants filing a Rule 23(f) petition for interlocutory appellate review. Moreover, if Defendants were able to demonstrate that Wespath was atypical in any way, it could put the entire case in jeopardy.

75.    Lead Plaintiff would also have to complete substantial additional fact and expert discovery, which would entail, among other things, document production, review and analysis of documents produced by Defendants and third parties, taking and/or defending percipient and expert depositions, propounding and responding to interrogatories and requests for admission, and defending Lead Plaintiff's deposition. The costs of each of these tasks would assuredly be high, and the fruits of each endeavor would be highly uncertain. Furthermore, as discussed above, Lead Plaintiff would have to successfully prevail on Defendants' pending motion to dismiss and anticipated motion(s) for summary judgment, as well as at trial.

76.    Lead Counsel knew from experience that despite the most vigorous and competent efforts, success at trial in complex litigation is never assured. In recent years, Kirby McInerney

lost a two-week bench trial in the Southern District of New York following four years of hard-fought litigation even after plaintiff's claims arising under the Investment Company Act of 1940 had survived motions to dismiss and for summary judgment. *See Chill ex rel. Calamos Advisors LLC*, 417 F. Supp. 3d 208 (S.D.N.Y. 2019). Similarly, within the last couple of years, Glancy lost a six-week antitrust jury trial in the Northern District of California after five years of litigation, which included many overseas depositions and the expenditure of more than a million dollars in hard costs. *See In re Korean Ramen Indirect Antitrust Litig.*, No. 13 Civ. 04115 (N.D. Cal.).

77.     Moreover, even if Lead Plaintiff prevailed at trial, it would have to succeed on any appeals that would surely follow. This process could extend for years and might ultimately lead to a smaller recovery, or no recovery at all.[6]

78.     In sum, having evaluated the relative strengths and weaknesses of the Action in light of Defendants' arguments, and having considered the very real risks presented by the significant hurdles of class certification, summary judgment, trial, and any eventual appeals, it is the informed judgment of Lead Counsel, based upon all of the proceedings to date and its extensive experience litigating class actions under the federal securities laws (*see* Ex. 3-C), that the proposed Settlement is fair, reasonable, and adequate and in the best interests of the Settlement Class.

79.     Lead Counsel's conclusion that the Settlement is fair, reasonable, and adequate is also supported by Lead Plaintiff. *See* Ex. 2 ¶¶ 7, 13.

**VII.    The Proposed Plan of Allocation**

80.     Pursuant to the Preliminary Approval Order, all Settlement Class Members who

---

[6] *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir. 1997) (reversing $81 million jury verdict for plaintiffs); *In re BankAtlantic Bancorp, Inc. Sec. Litig.*, No. 07 Civ. 61542, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following trial verdict for plaintiffs); *In re Apple Computer Sec. Litig.*, No. 84 Civ. 20148, 1991 WL 238298 (N.D. Cal. Sept. 6, 1991) (overturning jury verdict for plaintiffs after extended trial).

23

wish to participate in the distribution of the Settlement proceeds must submit a valid Claim Form, including all required information, that is postmarked, emailed, or submitted online no later than April 24, 2024. *See* ECF No. 76 ¶¶ 10-12; Ex. 1-A ¶ 38. As provided in the Notice, the Net Settlement Fund, which is the Settlement Fund (*i.e.*, the $45,0000,000 Settlement Amount plus any and all interest earned thereon) less any: (a) taxes; (b) Notice and Administration Costs; (c) Litigation Expenses awarded by the Court; and (d) attorneys' fees awarded by the Court, will be distributed according to a Court-approved plan of allocation. *See* Ex. 1-A ¶¶ 2, 49-72.

81. The proposed Plan of Allocation, set forth in full in the Notice, was prepared by Lead Counsel with the assistance of Lead Plaintiff's consulting damages expert and was designed to achieve an equitable and rational distribution of the Net Settlement Fund. The Plan of Allocation provides for distribution of the Net Settlement Fund among Authorized Claimants[7] on a *pro rata* basis based on "Recognized Loss" formulas tied to liability and damages. *See* Ex. 1-A ¶¶ 49-72.

82. In developing the Plan of Allocation, Lead Plaintiff's damages expert considered the amount of artificial inflation present in Reata's common stock throughout the Settlement Class Period that was purportedly caused by the alleged fraud. This analysis entailed studying the price declines associated with Reata's allegedly corrective disclosures, adjusted to (i) eliminate the effects attributable to general market or industry conditions, and (ii) account for Lead Counsel's assessment of potential loss causation defenses, including the potential argument, discussed above, that the August 2020 and August 2021 corrective disclosures did not cause any claimed losses or otherwise relate directly to the fraud.

83. For Authorized Claimants who purchased Reata common stock pursuant and/or

---

[7] An "Authorized Claimant" is a Settlement Class Member who submits a Claim Form to the Claims Administrator that is approved by the Court for payment from the Net Settlement Fund. *See* Stipulation ¶ 1(e).

24

traceable to the 2019 or 2020 Offerings, the Plan of Allocation provides for an enhancement to their Recognized Loss Amounts with respect to those shares to account for the fact that a *prima facie* Section 11 claim does not require proof of scienter, reliance, or loss causation. *See id.* ¶ 53.

84.     The Plan of Allocation also accounts for Lead Counsel's conclusion, discussed above, that Exchange Act claims based on pre-October 23, 2018 statements and omissions involved significant difficulties of proof, by applying a downward adjustment to Authorized Claimants' Recognized Loss Amounts for shares purchased prior to that date. *See id.* ¶ 54.

85.     Under the Plan of Allocation, the sum of each Authorized Claimant's Recognized Loss Amounts for each share of Reata common stock purchased or otherwise acquired during the Settlement Class Period is known as the Authorized Claimant's "Recognized Claim." *See id.* ¶ 64. Each Authorized Claimant will receive a "Distribution Amount" under the Plan of Allocation, calculated by dividing his or her Recognized Claim by the total Recognized Claims of all Authorized Claimants, multiplied by the total amount in the Net Settlement Fund. *See id*. ¶ 70.[8]

86.     In sum, the Plan of Allocation ensures that Settlement Class Members' recoveries are based upon the relative losses they sustained in relation to their respective litigation risks. It also ensures that eligible Settlement Class Members will receive a *pro rata* distribution from the Net Settlement Fund calculated in the same manner. As a result, Lead Counsel believes that the Plan of Allocation provides a fair and reasonable method to equitably allocate the Net Settlement Fund. To date, there have been no objections to the Plan of Allocation. *See* Ex. 1 ¶ 22.

**VIII.  Lead Counsel's Application for an Award of Attorneys' Fees, Reimbursement of Litigation Expenses, and an Award for Lead Plaintiff's Costs and Expenses**

87.     Lead Counsel seeks an award of attorneys' fees of 30% of the Settlement Fund (*i.e.*,

---

[8] If any claimant's Distribution Amount calculates to less than $10.00, it will not be included in the calculation and no distribution will be made to such claimant. *See id.*

$13,500,000) to compensate Plaintiffs' Counsel for the services they have rendered on behalf of the Settlement Class. Lead Counsel also requests reimbursement of the Litigation Expenses incurred by Plaintiffs' Counsel in connection with their prosecution of the Action in the amount of $204,323.08. Finally, pursuant to 15 U.S.C. § 78u-4(a)(4), Lead Counsel requests an award for Lead Plaintiff of $10,000 for the costs it incurred in representing the Settlement Class. The legal authorities supporting these requests are set forth more fully in the concurrently filed Fee and Expense Application. The primary factual bases for the requested fee and reimbursement of Litigation Expenses are summarized below.

### A. Lead Counsel's Request for an Award of Attorneys' Fees

#### 1. Lead Counsel's Fee Request Is Reasonable under both the Percentage Method and the Lodestar Cross-Check Method

88. Kirby McInerney, Glancy, and Steckler have each submitted declarations in support of Lead Counsel's Fee and Expense Application. *See* Exs. 3-5. Based upon those declarations, I respectfully submit that Lead Counsel's requested fee award is fair, reasonable, and justified, whether calculated as a percentage of the fund or as a multiplier of counsel's lodestar.

##### a. Lead Counsel's Fee Request Is Reasonable under the Preferred Percentage-of-the-Fund Method

89. As set forth in the Fee and Expense Application, the percentage method is the preferred method for determining attorneys' fees because, unlike the lodestar method, it aligns the lawyers' interest with that of the Settlement Class, motivating lawyers to achieve the maximum recovery possible in the shortest amount of time required. *See* Fee & Expense Application at 5-6; Ex. 7 ¶¶ 10-11. It also minimizes any unnecessary drain on court resources. *See id*. Moreover, the percentage method most closely mimics the market for complex litigation, which is almost always conducted on a contingency, percentage fee basis. *See* Fee & Expense Application at 8-9; Ex. 7 ¶¶

11, 14. The percentage method is also specifically contemplated by the PSLRA. *See* 15 U.S.C. § 78u–4(a)(6)); *see also* Ex. 7 ¶ 12; Fee & Expense Application at 6.

90.    Here, Lead Counsel requests a fee of 30% of the Settlement Fund, which equates to $13,500,000. Courts within the Fifth Circuit have consistently found fee requests of 30% or more to be reasonable. *See* Ex. 7 ¶¶ 15-17; Fee & Expense Application at 7-8. In addition, courts in the Fifth Circuit routinely grant such awards, including in cases involving comparably sized or larger settlement funds. *See id.*

91.    Moreover, Lead Plaintiff, a sophisticated institutional investor, entered into a contingency fee agreement with Kirby McInerney that provided for attorneys' fees, subject to Court approval, of up to 33% of any recovery in the Action, plus expenses. This also supports the reasonableness of the 30% fee request. *See* Ex. 7 ¶ 14; Fee & Expense Application at 9. The request is also strongly supported and should be approved based on the facts of this case, including the superb result achieved, the skill required, the quality of the work performed, and the risk of pursuing claims on a contingency basis. *See* Points V & VI, *supra* and Point VIII.A.2, *infra*.

92.    Accordingly, Lead Counsel respectfully submits that the requested 30% fee award is fair and reasonable and well within the range of percentages awarded in complex class actions with comparable settlements in this Circuit. In addition, the requested fee award has been approved by Lead Plaintiff. *See* Ex. 2 ¶¶ 8-9.

> **b.    A Lodestar Cross-check Confirms the Reasonableness of the Requested Fee**

93.    As noted in the Fee and Expense Application, a full lodestar analysis is not required here. *See* Fee & Expense Application at 5-6. However, when utilizing the percentage method, courts sometimes perform a lodestar "cross-check" to confirm the reasonableness of the requested percentage and to ensure that it does not result in an extraordinary windfall. *See* Fee & Expense

Application at 10; Ex. 7 ¶ 21.

94.     Here, the requested 30% fee represents a 2.24 multiplier on the lodestar value of Plaintiffs' Counsel's time (which is discussed in further detail below at Point VIII.A.2.b, *infra*). This multiplier is well within the range of multipliers regularly awarded in securities class actions and other comparable litigation in the Fifth Circuit and elsewhere. *See* Fee & Expense Application at 12; Ex. 7 ¶ 25.

### 2.     The *Johnson* Factors Further Support the Reasonableness of the Requested Fee

95.     Lead Counsel submits that, for the reasons discussed below and in the Fee and Expense Application, the additional factors identified by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974), further demonstrate that the requested fee is reasonable and appropriate here. *See* Fee & Expense Application at 12-22.

### a.     The Skill and Qualifications of Plaintiffs' Counsel and the Quality of the Work Performed

96.     Lead Counsel, Kirby McInerney, has extensive experience in complex class action litigation, including securities litigation. Those credentials are set forth in Kirby McInerney's firm resume attached hereto. *See* Ex. 3-C. Likewise, Glancy and Court-appointed Local Liaison Counsel, Steckler, have extensive experience in complex class action litigation, including securities litigation, as set forth in their firm resumes attached hereto. *See* Exs. 4-C & 5-C.

97.     As discussed above, Plaintiffs' Counsel prosecuted this Action vigorously against Defendants and obtained a thorough understanding of the strengths and weaknesses of the Parties' claims and defenses. As a result of their extensive litigation and settlement efforts, Plaintiffs' Counsel achieved an excellent result for the Settlement Class, and they spent substantial time and resources doing so. *See* Point III, *supra*. Once a settlement in principle was reached, Plaintiffs'

Counsel also worked diligently to finalize and document the Settlement through negotiations with Defendants and through the drafting and filing of the Preliminary Approval Motion and Final Approval Motion. *See id.* Lead Counsel also oversaw the Claims Administrator and notice process. *See* Point IV, *supra.* Furthermore, Lead Counsel will be appearing at the Settlement Hearing and will continue to oversee the Settlement's administration.

98.     The quality of Plaintiffs' Counsel's work in attaining the Settlement is especially notable in light of the quality of the opposition. Defense counsel was equally well-informed regarding the case, and their representation of Defendants was no less rigorous than Plaintiffs' Counsel's representation of the Settlement Class. To defend the Action, Defendants hired the top defense law firms of Davis Polk & Wardwell LLP and Vinson & Elkins LLP to represent the Reata Defendants and Shearman & Sterling LLP to represent the Underwriter Defendants. These firms litigated the case aggressively on behalf of the Defendants they represented. In the face of this experienced and formidable opposition, Lead Counsel was nonetheless able to develop a case that was sufficiently strong to persuade Defendants to settle on terms favorable to the Settlement Class.

### b.     The Time and Labor Expended

99.     As set forth more fully above, the investigation, prosecution, and settlement of this Action required an extensive effort on the part of Plaintiffs' Counsel, given the complexity of the issues raised and the vigorous defenses mounted by Defendants. The many tasks undertaken by Plaintiffs' Counsel in this case are detailed above at Points III & IV, *supra.*

100.     Attached hereto are declarations from Plaintiffs' Counsel in support of Lead Counsel's request for an award of attorneys' fees and expenses. *See* Exs. 3-5. Included in those declarations are schedules that summarize (i) the time that each firm spent prosecuting and settling the Action, (ii) each firm's lodestar calculations, *i.e.*, their hours multiplied by their hourly rates,

29

and (iii) the Litigation Expenses incurred by each firm, broken down by category. *See* Exs. 3-A, 3-B, 4-A, 4-B, 5-A, & 5-B. The declarations were prepared from the daily time records regularly prepared and maintained by the respective firms, which are available at the request of the Court.

101.    As set forth in each declaration, each firm's lodestar figures are based upon the firms' current billing rates (subject to annual increases) and do not include charges for expense items. *See* Ex. 3 ¶¶ 3, 7; Ex. 4 ¶¶ 3, 7; Ex. 5 ¶¶ 3, 7; *see also Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283-86 (1989) (courts may use either current rates or past rates with interest when calculating the lodestar amount because either method provides "[a]n adjustment for delay in payment [which] is . . . an appropriate factor in the determination of what constitutes a reasonable attorney's fee"). For personnel who are no longer employed by the firms, the lodestar calculations are based on the billing rates for such personnel in their final year of employment. *See* Ex. 3 ¶ 3. Billing rates for first-level document review have been capped at the reduced rate of $400 per hour. *See* Ex. 3 ¶ 3; Ex. 4 ¶ 3. In addition, time expended on Lead Counsel's Fee and Expense Application has been excluded. *See* Ex. 3 ¶ 4; Ex. 4 ¶ 4; Ex. 5 ¶ 4. Each firm reviewed its time and expenses for accuracy, necessity, and reasonableness. *See id.*

102.    The hourly rates of Plaintiffs' Counsel range from $715 to $1,250 for partners, $700 to $1,200 for of counsels, $400 to $800 for associates, and $350 to $400 for staff attorneys. *See* Exs. 3-A, 4-A, & 5-A. The declarants from each firm comprising Plaintiffs' Counsel attest that the hourly rates for their attorneys and professional support staff[9] are in line with the rates of other lawyers and staff at law firms handling large, complex class action litigation and/or which have been accepted in other complex or class action litigation, subject to the subsequent annual

---

[9] Plaintiffs' Counsel's hourly rates for professional support staff range from $350 to $475 for analysts and $175 to $300 for paralegals. *See* Exs. 3-A, 4-A, & 5-A. Analyst and paralegal time is compensable as part of Lead Counsel's fee award, and courts have regularly approved hourly rates for analysts and paralegals that are comparable to, or higher than, the rates at issue here. *See* Fee & Expense Application at 11 n.11.

increases. *See* Ex. 3 ¶ 5; Ex. 4 ¶ 5; Ex. 5 ¶ 5. Exhibit 10, attached hereto, is a table of hourly rates for other plaintiffs' firms and defense firms compiled by Lead Counsel. This analysis shows that across all types of attorneys, Plaintiffs' Counsel's rates are consistent with the firms surveyed. *See* Ex. 10; *see also* Fee & Expense Application at 10-11.

103.    The following chart summarizes the aggregate hours, lodestar, and expenses of Plaintiffs' Counsel set forth in the attached declarations.

| Table 1: Plaintiffs' Counsel Summary of Hours, Lodestar, and Expenses | | | |
|---|---|---|---|
| **Firm Name** | **Hours** | **Lodestar** | **Expenses** |
| Kirby McInerney LLP | 6,921.3 | $5,689,792.50 | $184,317.79 |
| Glancy Prongay & Murray LLP | 397.9 | $259,040.00 | $19,337.60 |
| Steckler Wayne & Love PLLC | 145.0 | $70,105.00 | $667.69 |
| **Total:** | **7,464.2** | **$6,018,937.50** | **$204,323.08** |

104.    From the Action's inception, the total number of hours expended by Plaintiffs' Counsel is 7,464.2. The total lodestar is $6,018,937.50 consisting of $5,504,345.00 for attorney time and $514,592.50 for professional support staff time. The requested fee of $13,500,000 (or 30% of the Settlement Fund) results in a multiplier of approximately 2.24 to Plaintiffs' Counsel's total submitted lodestar, which, as discussed above, is well within the range of multipliers accepted by courts in this Circuit. Moreover, if final approval is granted, additional time will be expended by Plaintiffs' Counsel during the administration of the Settlement.

c.      **The Novelty and Difficulty of the Questions Presented**

105.    Courts within the Fifth Circuit have long acknowledged that securities class actions are "notoriously difficult and unpredictable." *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983); *see* Fee & Expense Application at 14-15.

106.    As detailed at Point VI, *supra*, this Action presented substantial risks to proving Defendants' liability and damages. These case-specific risks were in addition to the more typical

risks accompanying securities class action litigation generally, including the fact that this Action is governed by the stringent PSLRA requirements and case law interpreting federal securities laws and was undertaken by Plaintiffs' Counsel on an entirely contingent basis.

### d.      The Contingent Nature of the Fee

107.      From the outset, Lead Counsel understood that it was embarking on a complex, expensive, and lengthy litigation with no guarantee of compensation for the substantial investment of time and money the case would require. In undertaking that responsibility, Lead Counsel ensured that sufficient resources were dedicated to the prosecution of the Action, and that funds were available to compensate staff and to cover the considerable litigation costs that a case like this requires. With an average lag time of several years for securities class actions to conclude, the financial burden on contingent fee counsel is far greater than on a firm that is paid on an ongoing, hourly basis. Indeed, Plaintiffs' Counsel have represented the Settlement Class on a wholly contingent basis for over two years, not receiving any payment for their services or reimbursement for the expenses they have incurred in prosecuting this Action and negotiating the Settlement. Despite receiving no compensation, Plaintiffs' Counsel have expended 7,464.2 hours of time for a total lodestar of $6,018,937.50 and have incurred $204,323.08 in Litigation Expenses in order to prosecute the Action for the benefit of the Settlement Class. *See* Point VIII.A.2.b, *supra.*

108.      Plaintiffs' Counsel also bore the risk that no recovery would be achieved. As discussed above, from the outset, this case presented multiple risks and uncertainties that could have prevented any recovery whatsoever. Lead Counsel knows from experience that the commencement of a class action does not guarantee a recovery. To the contrary, it takes hard work and diligence by skilled counsel to develop the facts and theories that are needed to sustain a complaint or win at trial, or to induce sophisticated defendants to engage in serious settlement

negotiations at meaningful levels.

109.    For this reason, courts have repeatedly recognized that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 n.4 (2007) ("[P]rivate securities litigation [] is an indispensable tool with which defrauded investors can recover their losses – a matter crucial to the integrity of domestic capital markets."). As recognized by Congress through the passage of the PSLRA, vigorous private enforcement of the federal securities laws can only occur if private investors take an active role in protecting shareholders' interests. If this important public policy is to be carried out, the courts must award fees that adequately compensate plaintiffs' counsel for the contingency risks undertaken in prosecuting securities class actions.

### e.    The Amount Involved and the Result Obtained

110.    Courts in the Fifth Circuit have recognized that the result achieved is a significant factor to be considered in awarding fees. *See* Fee & Expense Application at 18.

111.    Here, the $45,000,000 Settlement is a very favorable result, particularly when considered in light of the substantial risks and obstacles to recovery if the Action was to continue through a decision on Defendants' pending motion to dismiss, class certification, summary judgment, trial, and through likely post-trial motions and appeals. *See* Points V & VI, *supra*.

112.    This recovery was the result of thorough and creative litigation and investigative efforts, complicated motion practice, and lengthy, adversarial settlement negotiations. As a result of this Settlement, Settlement Class Members will benefit and receive compensation for their losses and avoid the very substantial risk of no recovery in the absence of a settlement.

**B.      Lead Counsel's Request for Reimbursement of Litigation Expenses**

113.    Lead Counsel seeks payment from the Settlement Fund of $204,323.08 in out-of-pocket Litigation Expenses reasonably and necessarily incurred by Plaintiffs' Counsel in connection with prosecuting and settling the claims in this Action.

114.    Throughout the pendency of this Action, Lead Counsel has sought to ensure that sufficient resources were dedicated to prosecuting Lead Plaintiff's and Settlement Class Members' claims. Plaintiffs' Counsel advanced the Litigation Expenses required to pursue and complete such complex litigation with no guarantee of repayment.

115.    As set forth in Exhibits 3-B, 4-B, and 5-B, Plaintiffs' Counsel incurred a total of $204,323.08 in unreimbursed Litigation Expenses.

116.    The following schedule was prepared from Exhibits 3-B, 4-B, and 5-B:

| Table 2: Cumulative Expenses by Category | | |
|---|---|---|
| **Expense Category** | **Cumulative Expense** | **Percentage of Expenses** |
| Court Filing Fees | $702.00 | 0.34% |
| Document Management | $15,306.78 | 7.49% |
| Experts | $73,703.00 | 36.07% |
| Investigator | $31,117.00 | 15.23% |
| Mediation | $50,243.42 | 24.59% |
| Online Research (Westlaw, LEXIS, PACER) | $13,018.93 | 6.37% |
| Postage and Mailing | $123.86 | 0.06% |
| Printing and Photocopying | $180.62 | 0.09% |
| PSLRA Mandated Press Release | $110.00 | 0.05% |
| Service of Process | $2,079.19 | 1.02% |
| Travel, Meals, Lodging | $17,738.28 | 8.68% |
| **Total Expenses:** | **$204,323.08** | **100%** |

117.    Lead Counsel believes that these expenses were all reasonably necessary to the prosecution of this Action. Lead Counsel also believes that they are the type of expenses that (i) Plaintiffs' Counsel would normally incur in litigation, and (ii) would normally be reimbursed by

clients under fee arrangements where the client is responsible for paying expenses.

### C. The Reaction of Lead Plaintiff and the Settlement Class

118. As set forth in the declaration submitted by Lead Plaintiff, attached hereto, Lead Plaintiff has concluded that the requested fees and Litigation Expenses are fair and reasonable, based on the work performed by Plaintiffs' Counsel, the recovery obtained, and the risks of the Action. *See* Ex. 2 ¶¶ 8-10. Lead Counsel represented Lead Plaintiff throughout the litigation. Lead Plaintiff has been intimately involved in this case since its earliest stages, and its endorsement of the fee request and request for reimbursement of Litigation Expenses supports the reasonableness of those requests and should be given substantial weight by the Court.

119. The reaction of the Settlement Class to date also supports approval of the requested fee and expense awards. The Notice informed Settlement Class Members that Lead Counsel would apply for attorneys' fees of up to 33⅓% of the Settlement Fund, plus reimbursement of expenses up to $500,000. *See* Ex. 1-A ¶¶ 5, 73. As noted above, as of February 21, 2024, a total of 30,582 copies of the Notice Packet had been mailed to potential Settlement Class Members and nominees. *See* Ex. 1 ¶ 10. To date, no Settlement Class Member has objected to the amount of attorneys' fees or Litigation Expenses disclosed in the Notice. *See id.* ¶ 22.

120. Notably, Lead Counsel's Fee and Expense Application seeks less than the maximum fee set forth in the Notice. It also requests reimbursement of Litigation Expenses in an amount far less than the $500,000 set forth in the Notice. The deadline for Settlement Class Members to file objections to the Fee and Expense Application is March 8, 2024. *See* Ex. 1-A ¶ 80. As discussed above, Lead Counsel will address any future objections filed by Settlement Class Members in its reply papers due March 22, 2024.

**D.**    **Lead Counsel's Request for an Award of Reasonable Costs and Expenses for Lead Plaintiff**

121.    Lead Counsel respectfully requests a $10,000 award for Lead Plaintiff to be paid from the Settlement Fund. To date, no member of the Settlement Class has objected to the amount of the proposed award (*see* Ex. 1 ¶ 22), which was set forth in the Notice. *See* Ex. 1-A ¶¶ 5, 73.

122.    To the best of my knowledge, I believe that Lead Plaintiff's representatives: (a) regularly communicated with Lead Counsel regarding the posture and progress of the case; (b) compiled Wespath's trading data and completed a certification in connection with its motion to be appointed Lead Plaintiff; (c) reviewed pleadings and briefs filed in the Action; (d) consulted with Lead Counsel regarding the settlement negotiations and mediation, as well as the Parties' mediation submissions; (e) physically attended the mediation sessions with Mr. Melnick in New York, New York and Dallas, Texas; (f) reviewed certain documents produced during the settlement negotiation process; and (g) evaluated and approved the proposed Settlement. *See* Ex. 2 ¶¶ 4-5; ECF No. 20-2. In the opinion of Lead Counsel, Lead Plaintiff is deserving of the requested award having worked with Lead Counsel to obtain a terrific result for the Settlement Class.

**IX.    Conclusion**

123.    In view of the recovery to the Settlement Class and the substantial risks of this Action, Lead Counsel respectfully submits that the Court should: finally approve the Settlement as fair, reasonable, and adequate; approve the Plan of Allocation as fair, reasonable, and adequate; and affirm its certification of the Settlement Class for settlement purposes.

124.    Lead Counsel, on behalf of all Plaintiffs' Counsel, also respectfully submits that an award of attorneys' fee in the amount of 30% of the Settlement Fund ($13,500,000) and reimbursement of Litigation Expenses in the amount of $204,323.08 is fair and reasonable to both Plaintiffs' Counsel and the Settlement Class, and that the requested award of $10,000 for Lead

Plaintiff is well-deserved and reasonable.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: February 23, 2024          By:   _____
New York, New York                      Daniel Hume, Esq.

37